LATHAM & WATKINS LLP
  Marvin S. Putnam (SBN 212839)
    *marvin.putnam@lw.com*
  Amy C. Quartarolo (SBN 222144)
    *amy.quartarolo@lw.com*
  Adam S. Sieff (SBN 302030)
    *adam.sieff@lw.com*
  Harrison J. White (SBN 307790)
    *harrison.white@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

National Center for Lesbian Rights
  Shannon P. Minter (SBN 168907)
    *sminter@nclrights.org*
  Amy Whelan (SBN 2155675)
    *awhelan@nclrights.org*
870 Market Street, Suite 360
San Francisco, CA 94102
Telephone: +1.415.392.6257
Facsimile: +1.415.392.8442

GLBTQ Legal Advocates & Defenders
  Jennifer Levi (*pro hac vice forthcoming*)
    *jlevi@glad.org*
  Mary L. Bonauto (*pro hac vice forthcoming*)
    *mbonauto@glad.org*
30 Winter Street, Suite 800
Boston, MA 02108
Telephone: +1.617.426.1350
Facsimile: +1.617.426.3594

*Attorneys for Plaintiffs Aiden Stockman, Nicolas
Talbott, Tamasyn Reeves, Jaquice Tate, John
Does 1-2, Jane Doe, and Equality California*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIDEN STOCKMAN; NICOLAS TALBOTT; TAMASYN REEVES; JAQUICE TATE; JOHN DOES 1-2; JANE DOE; and EQUALITY CALIFORNIA,<br><br>              Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, et al.<br><br>              Defendants. | CASE NO. 5:17-CV-01799-JGB-KK<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br><u>Hearing</u><br>Date:      October 30, 2017<br>Time:      9:00 a.m.<br>Courtroom: 1 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 9:00 a.m. on October 30, 2017, or as soon thereafter as possible, in Courtroom 1 of the above-referenced court located at the George E. Brown, Jr. Federal Building and United States Courthouse, 3470 Twelfth Street, Riverside, CA 92501-3801, Plaintiffs Aiden Stockman, Nicolas Talbott, Tamasyn Reeves, Jaquice Tate, John Does 1-2, Jane Doe, and Equality California will, and hereby do, move this Court to grant a preliminary injunction prohibiting Defendants from implementing the ban on military service by transgender individuals, as expressly directed by President Donald J. Trump on August 25, 2017.

The Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations; all pleadings and papers filed in this action; and such additional papers, evidence, and argument as may be presented at or in connection with the hearing.

Dated:  October 2, 2017

Respectfully submitted,

LATHAM & WATKINS LLP
Marvin S. Putnam
Amy C. Quartarolo
Adam S. Sieff
Harrison J. White

By _____/s/ Amy C. Quartarolo_____
Amy C. Quartarolo

*Attorneys for Plaintiffs Aiden Stockman, Nicolas Talbott, Tamasyn Reeves, Jaquice Tate, John Does 1-2, Jane Doe, and Equality California*

# <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................... 2

    A.   The Open Service Policy ............................................................ 2

    B.   President Trump's Reversal of the Open Service Policy .................. 6

    C.   Plaintiffs .................................................................................. 7

III. ARGUMENT .................................................................................. 11

    A.   Plaintiffs Likely Will Succeed on the Merits ................................ 11

        1.   The Ban on Transgender Military Service Violates Equal Protection ................................................................. 11

            a.   A Ban on Transgender Military Service Warrants Strict Scrutiny Because It Discriminates Based on a Suspect Classification. ............................................................... 12

            b.   The Ban Also Warrants Heightened Scrutiny Because It Discriminates Based on Sex. ...................... 14

            c.   The Ban Cannot Satisfy Any Level of Review. .......................................................................... 15

        2.   The Ban Violates Plaintiffs' Right to Due Process. ............... 22

            a.   The Ban Violates Plaintiffs' Fundamental Right to Personal Autonomy. ......................................... 22

            b.   The Ban Impermissibly and Retroactively Punishes Conduct the Government Induced. ............... 25

        3.   The Ban Violates Plaintiffs' First Amendment Rights. ......................................................................... 27

    B.   Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm. ................................................................................... 30

    C.   An Injunction is in the Public Interest and the Balance of Hardships Tips Sharply in Plaintiffs' Favor. ................................ 32

IV.  CONCLUSION .............................................................................. 35

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Adkins v. City of New York*,

5

    143 F. Supp. 3d 134 (S.D.N.Y. 2015) ........................................................ 13, 14

6

*Alliance for the Wild Rockies v. Cotrell*,

7

    632 F.3d 1127 (9th Cir. 2011) ................................................................. 11

8

*Arizona Dream Act Coal. v. Brewer*,

9

    757 F.3d 1053 (9th Cir. 2014) ................................................... 17, 30, 31, 32

10

*Attorney General of New York v. Soto-Lopez*,

    476 U.S. 898 (1986) ........................................................................... 25

11

*Bd. of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,

12

    208 F. Supp. 3d 850 (S.D. Ohio 2016) ............................................. 13

13

*Bd. of Trs. Of Univ. of Ala. v. Garrett*,

14

    531 U.S. 356 (2001) ........................................................................... 12

15

*Bowen v. Gilliard*,

16

    483 U.S. 587 (1987) ........................................................................... 12

17

*Chalk v. U.S. Dist. Court Cent. Dist. Of Cal.*,

18

    840 F.2d 701 (9th Cir. 1988) ............................................................ 31

19

*City of Cleburne v. Cleburne Living Ctr.*,

20

    473 U.S. 432 (1985) ..................................................... 12, 16, 18, 25

21

*Cooney v. Dalton*,

    877 F. Supp. 508 (D. Haw. 1995) .................................................. 31

22

*Cornelius v. NAACP Legal Def. & Educ. Fund*,

23

    473 U.S. 788 (1985) ........................................................................... 28

24

*Cox v. Louisiana*,

25

    379 U.S. 559 (1965) ........................................................................... 26

26

*Crawford v. Cushman*,

27

    531 F.2d 1114 (2d Cir. 1976) ......................................................... 20

28

*Cupolo v. Bay Area Rapid Transit*,
   5 F. Supp. 2d 1078 (N.D. Cal. 1997) .................................................................. 31

*Diaz v. Brewer*,
   656 F.3d 1008 (9th Cir. 2011) ............................................................... 22, 32

*Duronslet v. Cty. of Los Angeles*,
   --- F. Supp. 3d ----, 2017 WL 2661619 (C.D. Cal. June 20, 2017) .................. 14

*Elrod v. Burns*,
   427 U.S. 347 (1976) ........................................................................ 30

*Evancho v. Pine-Richland Sch. Dist.*,
   237 F. Supp. 3d 267 (W.D. Pa. 2017) .............................................. 14

*Fabian v. Hosp. of Cent. Conn.*,
   172 F. Supp. 3d 509 (D. Conn. 2016) ............................................. 14

*Fisher v. University of Texas at Austin*,
   133 S. Ct. 2411 (2013) .................................................................. 15

*Fricke v. Lynch*,
   491 F. Supp. 381 (D.R.I. 1980) ..................................................... 28

*G.G. v. Gloucester Cty. Sch. Bd.*,
   853 F.3d 729 (4th Cir. 2017) .......................................................... 14

*Gay Law Students Ass'n v. Pac. Tel. & Tel. Co.*,
   24 Cal. 3d 458 (Cal. 1979) ............................................................. 28

*Gay Students Org. of Univ. of N.H. v. Bonner*,
   509 F.2d 652 (1st Cir. 1974) .......................................................... 27

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) ..................................................... 14

*Golinski v. OPM*,
   824 F. Supp. 2d 968 (N.D. Cal. 2012) ........................................... 13

*Griswold v. Connecticut*,
   381 U.S. 479 (1965) ...................................................................... 23

*Harper v. Virginia State Bd. of Elections*,
   383 U.S. 663 (1966) ...................................................................... 25

*Heller v. Doe by Doe,*
  509 U.S. 312 (1993) ....................................................................... 16

*Hernandez-Montiel v. INS,*
  225 F.3d 1084 (9th Cir. 2000) ............................................... 13, 24

*INS v. St. Cyr,*
  533 U.S. 289 (2001) ......................................................... 22, 25, 26

*Int'l Refugee Assistance Project v. Trump,*
  857 F.3d 554 (4th Cir. 2017) .................................................. 17, 18

*Landgraf v. USI Film Prods.,*
  511 U.S. 244 (1994) ......................................................... 25, 26, 27

*Lawrence v. Texas,*
  539 U.S. 558 (2003) ............................................................... 23, 24

*In re Levenson,*
  587 F.3d 925 (9th Cir. 2009) ......................................................... 22

*Log Cabin Republicans v. United States,*
  716 F. Supp. 2d 884 (C.D. Cal. 2010), *vacated on other grounds as
  moot,* 658 F.3d 1162 (9th Cir. 2011) ............................................ 27

*Lopez v. Candaele,*
  630 F.3d 775 (9th Cir. 2010) ......................................................... 28

*Lopez-Valenzuela v. Arpaio,*
  770 F.3d 772 (9th Cir. 2014) ................................................... 22, 23

*Lyng v. Int'l Union,*
  485 U.S. 360 (1988) ....................................................................... 22

*Macy v. Holder,*
  2012 WL 1435995 (EEOC Apr. 20, 2012) .................................... 15

*Majors v. Jeanes,*
  48 F. Supp. 3d 1310 (D. Ariz. 2014) ............................................ 31

*Marlett v. Harrington,*
  2015 WL 6123613 (E.D. Cal. Oct. 16, 2015) ............................... 14

*Melendres v. Arpaio,*
  695 F.3d 990 (9th Cir. 2012) ........................................................ 33

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
  192 F.3d 1283 (9th Cir. 1999) ................................................................. 28

*Monterey Mech. Co. v. Wilson*,
  125 F.3d 702 (9th Cir. 1997) ................................................................... 30

*N. Cheyenne Tribe v. Norton*,
  503 F.3d 836 (9th Cir. 2007) ................................................................... 32

*Nieto v. Flatau*,
  715 F. Supp. 2d 650 (E.D.N.C. 2010) ..................................................... 28

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................ 32

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1104 (N.D. Cal. 2015) .............................................. 13, 24

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) ................................................................. 22, 23, 25

*Olive v. Harrington*,
  2016 WL 4899177 (E.D. Cal. Sept. 14, 2016) ....................................... 14

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ................................................................................ 23

*Plyler v Doe*,
  457 U.S. 202 (1982) ................................................................................ 13

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) ................................................................................ 14

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ................................................................................ 23

*Rochin v. California*,
  342 U.S. 165 (1952) ................................................................................ 25

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ................................................................. 33

*Romer v. Evans*,
  517 U.S. 620 (1996) ......................................................................... 12, 15

*Rosa v. Park W. Bank & Trust Co.*,
214 F.3d 213 (1st Cir. 2000) ................................................................... 14

*Sammartano v. First Judicial Dist. Court*,
303 F.3d 959 (9th Cir. 2002) ................................................................... 33

*Schroer v. Billington*,
577 F. Supp. 2d 293 (D.D.C. 2008) ......................................................... 15

*Schwenk v. Hartford*,
204 F.3d 1187 (9th Cir. 2000) ................................................................. 14

*Singh v. Carter*,
168 F. Supp. 3d 216 (D.D.C. 2016) ......................................................... 35

*Skinner v. Oklahoma ex rel. Williamson*,
316 U.S. 535 (1942) ................................................................................. 23

*Small v. Avanti Health Sys., LLC*,
661 F.3d 1180 (9th Cir. 2011) ................................................................. 30

*Smith v. City of Salem*,
378 F.3d 566 (6th Cir. 2004) ................................................................... 14

*Thomas v. Gonzales*,
409 F.3d 1177 (9th Cir. 2005) ................................................................. 13

*Troxel v. Granville*,
530 U.S. 57 (2000) ................................................................................... 23

*UAAIW Local 645, AFL-CIO v. Gen. Motors Assembly Div.*,
1982 WL 2028 (C.D. Cal. Oct. 29, 1982) ............................................... 32

*United States v. Virginia*,
518 U.S. 515 (1996) ................................................................................. 15

*United States v. Windsor*,
133 S. Ct. 2675 (2013) ...................................................................... 11, 16

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........................................................................... 15, 17

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
252 F.3d 316 (4th Cir. 2001) ................................................................... 17

*Watkins v. U.S. Army,*
  875 F.2d 699 (9th Cir. 1989) ............................................................... 26

*Weaver v. Nebo Sch. Dist.,*
  29 F. Supp. 2d 1279 (D. Utah 1998) ............................................ 27, 28

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
  858 F.3d 1034 (7th Cir. 2017) ....................................................... 13, 14

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................... 11, 35

*Witt v. Dep't of Air Force,*
  527 F.3d 806 (9th Cir. 2008) ............................................................... 24

**Other Authorities**

U.S. CONST. amend. I ........................................................................... 27

U.S. CONST. amend. V ...................................................................*passim*

## MEMORANDUM OF POINTS & AUTHORITIES

## I.   INTRODUCTION

Following a lengthy review process, the United States Department of Defense ("DOD") in June 2016 reversed its prior policy barring transgender people from military service and adopted a new policy permitting transgender people to enlist and serve openly ("Open Service Policy").  In response, transgender service members—including Plaintiffs in this case—identified themselves as transgender to their chain of command, and many took steps to obtain transition-related medical care.  In addition, other transgender individuals—including Plaintiffs— took steps to enlist.

On July 26, 2017, Defendant President Donald J. Trump abruptly announced via Twitter that "the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military."  On August 25, 2017, Defendant President Trump formalized that reversal of policy, directing his co-Defendants to reinstate the ban "on military service by transgender individuals that was in place prior to June 2016" (the "August 25 Memorandum").

Through this Motion, Plaintiffs seek preliminary relief prohibiting Defendants from implementing the ban on military service by transgender individuals as an infringement of Plaintiffs' rights under the United States Constitution.  The ban inflicts irreparable injuries upon Plaintiffs and Plaintiff Equality California's members.  The ban denies Plaintiffs and their members the equal protection of the laws, their right to liberty and privacy, and their right to freedom of expression in violation of the United States Constitution.  As set forth below, Plaintiffs are likely to succeed on the merits of these claims.  Plaintiffs also easily satisfy the other preliminary injunction factors.  As the Ninth Circuit has held, the unlawful deprivation of liberty constitutes irreparable harm.  Moreover, particularly where transgender people have been serving loyally and with distinction since the ban's reversal, the balance of hardships and public interest

favor an injunction.  For these reasons, the Court should grant this Motion and enjoin the implementation of the ban.

## II.  FACTUAL BACKGROUND

### A.  The Open Service Policy

Transgender individuals have served in the military for decades.  In 2014, transgender persons accounted for an estimated 8,800 active-duty service members, and more than 134,000 veterans and retirees.  (*See* Declaration of Adam Sieff ("Sieff Decl."), Ex. A at 1, 4.)  Despite their numbers, transgender individuals traditionally served in silence.  Starting some time before 1981, DOD enforced a policy that barred transgender people from serving openly.  (*See* Declaration of Dr. George R. Brown ("Brown Decl."), ¶¶ 39-58.)

The military began a formal review of that previous discriminatory practice in July 2015.  In recognition that then-existing policy was "an outdated, confusing, inconsistent approach that's contrary to our value of service and individual merit"—especially in the wake of the successful repeal of "Don't Ask Don't Tell," which affected gay and lesbian service members (*see* Declaration of Eric Fanning ("Fanning Decl."), ¶ 11; Declaration of Michael Mullen ("Mullen Decl."), ¶¶ 9-15)—then-Secretary of Defense Ashton Carter ordered Brad Carson, his acting Undersecretary of Defense for Personnel and Readiness, to convene a working group (the "Working Group") to study the "readiness implications" of open service by transgender individuals.  (Sieff Decl., Ex. B at 1; *see also* Declaration of Brad Carson ("Carson Decl."), ¶¶ 8-10, Ex. A; Declaration of Deborah James ("James Decl."), ¶¶ 9-12; Declaration of Ray Mabus ("Mabus Decl."), ¶¶ 8.)  The Working Group included leadership from across the Armed Forces, with representation from a senior officer from each branch of service, as well as the Joint Chiefs of Staff, Surgeons General, and the Service Branch Secretaries.  (Carson Decl., ¶ 9.)

Over the course of the next year, the Working Group performed a comprehensive review of the issues and policies related to service by transgender

people.  (Carson Decl., ¶ 10; James Decl., ¶¶ 11-12; Fanning Decl., ¶¶ 17-22; Mabus Decl., ¶¶ 10-12.)  They interviewed globally-deployed transgender service members; consulted with commanders; and met with medical, readiness, and personnel experts, as well as health insurance companies, and civilian employers.  (*E.g.* Carson Decl., ¶ 10; *see also* Sieff Decl., Ex. C.)  The Working Group also solicited an independent report from the RAND National Defense Research Institute ("RAND"), a research institution that regularly provides research and analysis to the Armed Services. (Carson Decl., ¶ 11.)  RAND conducted an exhaustive review of existing research, analyzed DOD data and policies related to readiness, as well those of foreign militaries, and also examined medical information and cost structures—including all available actuarial data to conclude how many transgender service members are likely to seek gender transition-related medical treatment.  (*See* Carson Decl., ¶ 15, Ex B at 2-3.)

RAND subsequently issued a report reflecting the conclusions reached following its exhaustive study (the "RAND Report"). The RAND Report stated that there would be no negative impact on military readiness or deployability from allowing transgender service members to serve openly, and that related medical costs would comprise an "exceedingly small" share of DOD health expenditures. (Carson Decl., Ex. B at xi-xii, 31, 70.)  With respect to medical costs, RAND concluded that "even in the most extreme scenario," providing medical care for transgender individuals would increase the military's annual healthcare budget by 0.13 percent—$8.4 million out of $6.2 billion.  (Carson Decl., Ex B at 36.) Military leadership considered this financial impact to be "budget dust" and "hardly even a rounding error."  (Mabus Decl., ¶ 41.)

With respect to deployability, the RAND Report reflected the Working Group's assessment and confirmed that the short-periods of non-deployability that *some* transgender service members *might* experience as a result of gender transition-related treatments would at most impact 0.0015 percent of all available

deployable labor years across the military (Carson Decl., ¶ 18)—a miniscule figure comparable to the non-deployability associated with medical conditions the military does not consider a basis for discharge, like pregnancy and appendicitis. (Carson Decl., ¶ 22; Declaration of Margaret Wilmoth ("Wilmoth Decl."), ¶ 19.) Moreover, citing the successful repeal of "Don't Ask, Don't Tell," as well as the experience of other countries that permit military service by transgender people, the RAND Report confirmed the Working Group's determination that open service by transgender individuals would not undermine unit cohesion, operational effectiveness, or readiness.  (Carson Decl., ¶ 19-20, Ex. B at 44; Wilmoth Decl., ¶ 23; James Decl., ¶ 16.)

Based on its independent assessment and the findings of the RAND Report, the Working Group concluded that there was *no basis* for a prohibition on open military service by transgender individuals.  (Fanning Decl., ¶¶ 25-27, 29; Carson Decl., ¶ 26; Mabus Decl., ¶ 19; James Decl., ¶ 22.)  Instead, the Working Group concluded that the ban's "primary impact was to cause harms" to the transgender men and women serving in the military, as well as to their units.  (Mabus Decl., ¶ 19.)  Based on the Working Group's comprehensive review and evaluation, Defense Secretary Carter determined that "open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity." (Mabus Decl., Ex. C at 2.)

On June 30, 2016, the Secretary issued the Open Service Policy, rescinding the historical policy of discriminating against transgender people.  (*Id.*)

The Open Service Policy provided:

1. that "no otherwise qualified Service member may be involuntarily separated discharged or denied reenlistment or continuation of service, solely on the basis of their gender identity" and that medical conditions affecting transgender service members are treated "in a manner consistent with a Service member whose ability to serve is

similarly affected for reasons unrelated to gender identity or gender transition." (Mabus Decl.. Ex. C at Attachment § 1(a)-(b));

2. that "transgender Service members may transition gender while serving" pursuant to contemporaneously-issued guidance that stated that "[a]ny medical care and treatment provided to an individual Service member in the process of gender transition [is] provided in the same manner as other medical care and treatment," applying consistent standards for deployability (*Id.* at Attachment § 3(a); Sieff Decl., Ex. D at § 1.2(d)-(e)); and

3. that individuals seeking to join the military would not be prohibited from doing so solely because they are transgender (*see* Mabus Decl., Ex. C at § 1(a)).

The enlistment (also referred to as "accession") policy and guidelines included as part of the Open Service Policy were specific and thorough, setting forth rigorous requirements to "ensure that those entering service are free of medical conditions or physical defects that may require excessive time lost from duty." (*Id.* at § 2(a).) Specifically, under the Open Service Policy:

- those with "[a] history of gender dysphoria" must have a medical provider's certification that "the [prospective enlistee] ha[d] been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for [at least] 18 months." (*Id.* at § 2(a)(1) (emphasis in original).);

- those with a history of any medical treatment "associated with gender transition" must have "completed all medical treatment" associated with the transition; must have been "stable" in the transition for 18 months; and must have been stable on any hormones for 18 months. (*Id.* at § 2(a)(2).); and

- for those with "[a] history of sex reassignment or genital reconstruction surgery," at least 18 months must have passed since the surgery, no further surgery must be required, and "no functional limitations or complications may persist." (*Id.* at § 2(a)(3).).

In the months following the issuance of the Open Service Policy, each branch of the Armed Forces conducted mandatory trainings to ensure that all military personnel, from commanding officers, to recruitment officers, to medical personnel, to the most junior soldiers, were familiar with the Open Service Policy and prepared to implement the new inclusive procedures permitting enlistment of openly transgender people. (Brown Decl., ¶ 68; Declaration of Jaquice Tate ("Tate

Decl."), ¶ 20; Decl. of John Doe 2 ("John Doe 2 Decl."), ¶ 23.)   The policy permitting transgender persons to enlist was to begin "[n]o[] later than July 1, 2017." (Mabus Decl., Ex. C at § 2(a).)

On June 30, 2017—the day before new enlistments were scheduled to commence—Defendant Sec. James Mattis, the current Secretary of Defense, announced that it was "necessary to defer the start of accessions for six months," *i.e.,* until January 1, 2018. (Sieff Decl., Ex. E.)

### B.   President Trump's Reversal of the Open Service Policy

On July 26, 2017, Defendant President Trump abruptly announced a reversal of the Open Service Policy via a series of three tweets:

> After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow . . . Transgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming . . . victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail. Thank you

(Sieff Decl., Ex. F.)

Just weeks later, President Trump issued the August 25 Memorandum formally reversing the Open Service Policy, and stating:

> In my judgment, the previous Administration failed to identify a sufficient basis to conclude that terminating the [military's] longstanding policy and practice [forbidding service by transgender service members] would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources, and there remain meaningful concerns that further study is needed to ensure that continued implementation of last year's policy changes would not have those negative effects.

(Sieff Decl., Ex. G at § 1(a).)

The August 25 Memorandum has three components.  *First*, it imposes a blanket and indefinite extension of the ban on enlistment by openly transgender persons, beyond the January 1, 2018 date previously announced by Secretary Mattis. *Second*, it "halt[s] all use of DOD or DHS resources to fund sex

reassignment surgical procedures for military personnel" except in limited instances. *Third*, it bans the retention of transgender service members and requires their separation from the military by directing that, as of March 23, 2018, military policy shall "return" to the pre-June 2016 rules that excluded transgender people from enlisting or serving openly.   It directs the Secretaries of Defense and Homeland Security to develop a plan by February 21, 2018 to implement the ban, including with respect to "transgender individuals currently serving in the United States military." (Sieff Decl., Ex. G.)

### C.   Plaintiffs

Plaintiffs include active service members in the United States military who are transgender, transgender individuals who wish to enlist in the military, and Equality California, the nation's largest statewide LGBTQ civil rights organization, whose members include transgender persons who serve in the Armed Forces and transgender persons who wish to enlist.

<u>Plaintiff Sergeant Jaquice Tate, United States Army</u>.   Sergeant Tate has served in the United States Army for nearly ten years, including a deployment to Ramadi, Iraq, where he defended his compound and his comrades-in-arms.  (Tate Decl., ¶¶ 4, 6, 8.)   For his service, Sergeant Tate was awarded an Army Commendation Medal, two Colonel Coins of Excellence, and numerous Certificates of Appreciation and Army Achievement Medals. (*Id.*, ¶ 11.)  Sergeant Tate currently leads a team of Military Police at West Point, New York.  (*Id.*, ¶ 9.) Relying on the Open Service Policy, Sergeant Tate came out as transgender to his chain of command.  (*Id.*, ¶ 19.)

Sergeant Tate's command has approved him for Drill Sergeant School, an honor that has been placed in jeopardy by the ban.  (*Id.*, ¶¶ 10, 30.)   Under the supervision of DOD medical personnel, Sergeant Tate is undergoing hormone replacement therapy ("<u>HRT</u>") as part of his gender transition; the ban threatens to disrupt his medical treatment.  (*Id.*, ¶ 21.)  The ban has forced Sergeant Tate and

his wife to reconsider their goals and plans.  (*Id.*, ¶¶ 25-27.)  They planned to have children, but the financial uncertainty as a result of the ban has caused them to place their plans on hold.  (*Id.*, ¶ 28.)

Plaintiff Staff Sergeant Jane Doe, United States Air Force.  Staff Sergeant Jane Doe enlisted in the Air Force in 2010, served two deployments to the Middle East, and is currently stationed abroad at a strategically important Air Force base. (Declaration of Jane Doe ("Jane Doe Decl."), ¶¶ 2-7.)  She currently serves as a Risk Management Framework Program Manager and will soon be sent to work with an intelligence-gathering unit at a strategic base in Asia.  (*Id.*, ¶¶ 1, 7.)  For her service, Staff Sergeant Jane Doe has been awarded an Air Force Commendation Medal, two Air Force Achievement Medals, and a rare "below the zone" early promotion.  (*Id.*, ¶¶ 4-6.)  Relying on the Open Service Policy, Staff Sergeant Jane Doe informed her command that she is transgender.  (*Id.*, ¶ 13.)

Staff Sergeant Jane Doe has been notified that she is in line for promotion to Technical Sergeant, but the ban threatens that promotion.  (*Id.*, ¶¶ 7, 18.)  As a result of the ban, Staff Sergeant Jane Doe must now prepare for a financial future in which she is involuntarily separated from the military, including loss of income, health insurance and her expected retirement benefits.  (*Id.*, ¶ 17-18.)

Plaintiff Staff Sergeant John Doe 1, United States Air Force.  Staff Sergeant Doe has served in the Air Force since 2012.  (Declaration of John Doe 1 ("John Doe 1 Decl."), ¶ 5).  He graduated first in his class from Airman Leadership School.  (*Id.*, ¶ 8.)  Before that, he received a "below the zone" promotion to Senior Airman and a "must promote" to Staff Sergeant, one of the strongest endorsements for promotion.  (*Id.*, ¶¶ 6-7.)  Staff Sergeant Doe is a subject matter expert in certain technological skills vital to the military intelligence community. (*Id.*, ¶ 9.)  For his performance, he was awarded Academic Achievement and Distinguished Graduate honors.  (*Id.*, ¶ 8.)  Relying on the Open Service Policy, Staff Sergeant Doe told his command that he is transgender.  (*Id.*, ¶ 17.)

Staff Sergeant Doe expected a promotion to Technical Sergeant with an accompanying pay increase, but as a result of the ban, he instead must plan for involuntary separation from the military. (*Id.*, ¶ 10, 20.) He now must make decisions assuming that he will lose his income and health insurance, as well as any hope for retirement benefits. (*Id.*, ¶¶ 20-21.) He also is undergoing HRT, but is concerned that the ban will disrupt his medical treatment. (*Id.*, ¶¶ 17, 21.)

<u>Plaintiff Specialist John Doe 2, United States Army</u>. Specialist John Doe 2 enlisted in the Army in 2015. (John Doe 2 Decl., ¶¶ 6-7.) His technical expertise pertains to the operations, diagnostics, and maintenance of the multichannel communications systems necessary for real-time strategic and tactical decisions. (*Id.*, ¶ 5.) His position requires Secret-level Security Clearance. (*Id.*) In his two years of service, Specialist Doe has received two Colonel Coins of Excellence. (*Id.*, ¶ 6.) Relying on the Open Service Policy, Specialist Doe told his command that he is transgender. (*Id.*, ¶ 20.) Specialist Doe had planned to become a Criminal Investigations Division ("<u>CID</u>") officer upon meeting the age requirement next year, but instead must plan for involuntary separation from the military. (*Id.*, ¶¶ 7, 30.) The ban is jeopardizing his financial future, retirement planning, health insurance, and educational goals for both Specialist Doe and his wife. (*Id.*, ¶¶ 31, 34-37.)

<u>Plaintiff Aiden Stockman</u>. Aiden Stockman is 20 years old. (Declaration of Aiden Stockman ("<u>Stockman Decl.</u>"), ¶ 1.) He aspires to serve his country in the military, and has worked toward that goal since the eighth grade. (*Id.*, ¶ 8.) He took the Armed Services Vocational Aptitude Battery ("<u>ASVAB</u>") test so that he could join the military. (*Id.*, ¶ 10.) He intends to enlist so that he may begin a career focused on service, with a steady income, opportunities for advancement, and healthcare. (*Id.*, ¶ 15-16.) However, solely because he is transgender, the ban is forcing Plaintiff Stockman to delay the start of his military career and also to look for other work. (*Id.*)

Plaintiff Nicolas Talbott. Nicolas Talbott is 23 years old. (Declaration of Nicolas Tablott ("Talbott Decl."), ¶ 1.) He wants to serve his country in the military, most likely as an airman in the Air Force National Guard. (*Id.*, ¶ 1.) Plaintiff Talbott decided to pursue a career in the military after learning about the Reserve Officers' Training Corps ("ROTC") during college. (*Id.*, ¶ 3.) When the Open Service Policy was announced, he began reaching out to military recruiters, eventually connecting with a recruiter for the Air Force National Guard. (*Id.*, ¶ 10-11.) Since that time, he has been studying practice ASVAB exams and training regularly for the physical exams necessary to qualify for military service. (*Id.*, ¶¶ 13, 19.) He has counted on joining the military, seeking the opportunity to serve his country, and the training, steady income and health insurance that military service provides. (*Id.*, ¶¶ 3, 16-17.) Simply because he is transgender, and despite his continued preparation, the ban is denying Plaintiff Talbott that opportunity.

Plaintiff Tamasyn Reeves. Tamasyn Reeves is 29. (Declaration of Tamasyn Reeves ("Reeves Decl."), ¶ 1.) She comes from a military family and has wanted to serve in the military since hearing her grandfather's stories of service on the U.S.S. Kiersarge when she was a child. (*Id.*, ¶ 2-3.) She attempted to enlist in the Navy, but was rejected because of her LGBTQ identity. (*Id.*, ¶ 5.) Upon learning of the Open Service Policy, she made plans to enlist as soon as she graduated college; enlistment remains her goal today. (*Id.*, ¶ 9, 12.) Rather than earning a military salary, housing allowance and health insurance as planned, the ban is forcing her to consider other jobs upon graduation. (*Id.*, ¶ 13.)

Plaintiff Equality California. Plaintiff Equality California is an organization dedicated to combatting discrimination and injustice on the basis of sexual orientation and gender identity, and to protecting the fundamental rights of those within the LGBTQ community. (Declaration of Rick Zbur ("Zbur Decl."), ¶ 2.) Its members include currently serving transgender service members (both those who have come out to their command in reliance on the Open Service Policy and

some who are actively serving but have not come out for fear of retribution and separation), as well as transgender people who have taken steps to enlist.  (*Id.*, ¶ 4.)

Each of the Plaintiffs is facing and experiencing the stigma, hostility, and animosity toward transgender individuals that inevitably follows from the ban. (Tate Decl., ¶ 29; Jane Doe Decl., ¶¶ 22-24; John Doe 1 Decl., ¶¶ 23-24; John Doe 2 Decl., ¶ 38; Stockman Decl., ¶ 18; Talbott Decl., ¶ 18; Reeves Decl., ¶15-16; Zbur Decl., ¶ 7.)   Each of the Plaintiffs asks this Court to preliminarily enjoin Defendants' implementation of the ban.

## III.   ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cotrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).  Plaintiffs easily satisfy all four factors.

### A.   Plaintiffs Likely Will Succeed on the Merits.

Banning transgender persons from serving in the military violates the U.S. Constitution's guarantees of equal protection, due process, and freedom of expression.  Plaintiffs are likely to succeed on the merits of each claim.

#### 1.   *The Ban on Transgender Military Service Violates Equal Protection.*

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."  *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013).

The ban violates that prohibition.  On its face, the August 25 Memorandum directs the Secretaries of Defense and Homeland Security to reinstate a ban that "prohibited  openly transgender individuals from accession into the United State military and authorized the discharge of such individuals," thereby excluding an entire class of persons from military service based on a characteristic with no bearing on their ability to serve.   Such invidious discrimination warrants heightened review, both as a classification based on transgender status—a suspect classification—and as a classification based on sex.  While the ban is subject to heightened scrutiny, it fails under any level of review.  President Trump's abrupt decision to override the military's evidence-based policy defies rational explanation.  The justifications cited in defense of the ban are either demonstrably false or "ma[k]e no sense in light of how the [military] treat[s] other groups similarly situated in relevant respects." *Bd. of Trs. Of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n. 4 (2001).  As such, the ban is "inexplicable by anything but animus toward the class it affects." *Romer v. Evans*, 517 U.S. 620, 623 (1996).

a.    <u>A Ban on Transgender Military Service Warrants Strict Scrutiny Because It Discriminates Based on a Suspect Classification.</u>

By singling out individuals for exclusion from military service based on a person's transgender status, the ban rests on a suspect classification warranting strict scrutiny.  The Supreme Court has recognized that a classification warrants strict scrutiny when: (i)  it has been used to oppress a historically disfavored group, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (ii) it "bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); (iii) it targets a "discrete group" that exhibits "obvious, immutable, or distinguishing characteristics," *Bowen*, 483 U.S. at 602;  and (iv) the group targeted is politically "vulnerable," *id.* at 629.  "The presence of *any* of the factors is a signal that the particular classification is 'more likely than others to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

reflect deepseated prejudice rather than legislative rationality in pursuit of some legitimate objective,' thus requiring heightened scrutiny." *Golinski v. OPM*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012) (emphasis added), quoting *Plyler v Doe*, 457 U.S. 202, 216 n.4 (1982).

Discrimination based on a person's transgender status meets every one of these criteria. First, transgender people have long "face[d] discrimination, harassment, and violence because of their gender identity." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 n.8 (N.D. Cal. 2015) (finding that transgender people "have experienced even greater levels of societal discrimination and marginalization" than gay and lesbian people); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (same). Second, "no data or argument suggest[s] that a transgender person, simply by virtue of their status, is any less productive than any other member of society." *Adkins*, F. Supp. 3d 139; *see also Norsworthy*, 87 F. Supp. 3d at 1119 n.8 (holding that being transgender is "irrelevant to [a person's] ability to contribute to society"). Third, transgender people have "immutable [and] distinguishing characteristics that define them as a discrete group." *Bd. of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *Norsworthy*, 87 F. Supp. 3d at 1119 n.8 (transgender identity is "immutable"); *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005) (en banc) (being transgender is "so fundamental" that a person should not be required to hide or suppress it in order to avoid discrimination); *see also* Brown Decl., ¶ 23.

And finally, "as a tiny minority of the population, whose members are stigmatized," transgender people have limited recourse through the political process to correct the kind of injury—a ban on military service—that brands them with a stamp of inferiority and interferes with their rights of equal citizenship. *Id.*;

*see also Adkins*, 143 F. Supp. 3d at 140 ("[T]ransgender people lack the political strength to protect themselves."); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (same); *G.G. v. Gloucester Cty. Sch. Bd.*, 853 F.3d 729, 730 (4th Cir. 2017) (Davis, J., concurring) (transgender people are "a vulnerable group that has traditionally been unrecognized, unrepresented, and unprotected"). In sum, discrimination based on transgender status has all the indicia of a suspect classification and, thus, warrants the highest level of review.

b.      The Ban Also Warrants Heightened Scrutiny Because It Discriminates Based on Sex.

Discrimination against transgender persons also warrants heightened scrutiny because, as the Ninth Circuit and other circuits have held, it is sex discrimination.[1] *See Schwenk v. Hartford*, 204 F.3d 1187, 1200-03 (9th Cir. 2000) (recognizing that discrimination against a transgender person is based on gender stereotypes) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). As the DOD has recognized, "discrimination based on gender identity is a form of sex discrimination." (Mabus Decl., Ex. D at 4); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *see Whitaker*, 858 F.3d at 1047-51; *Smith v. City of Salem*, 378 F.3d 566, 572-75 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000).

Discriminating against individuals because they have undergone, or wish to undergo, a gender transition is "*literally* discrimination 'because of … sex." *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016);

---

[1]      Numerous district courts in this Circuit have applied heightened review to discrimination against transgender people, either as a sex-based characteristic or as a status that independently warrants heightened scrutiny. *See Olive v. Harrington*, 2016 WL 4899177, at *5 (E.D. Cal. Sept. 14, 2016); *Marlett v. Harrington*, 2015 WL 6123613, at *4 (E.D. Cal. Oct. 16, 2015); *Duronslet v. Cty. of Los Angeles*, --- F. Supp. 3d ----, 2017 WL 2661619, at *6 (C.D. Cal. June 20, 2017) (concluding without deciding that "our current understanding of transgenderism" supports "the application of heightened scrutiny").

*Schroer v. Billington*, 577 F. Supp. 2d 293, 302 (D.D.C. 2008) (emphasis added). Discrimination against men or women because they have transitioned from the sex assigned to them at birth is inherently sex-based for at least two reasons.  First, the different treatment requires consideration of a sex-related characteristic of the individual.  Second, such discrimination because a person changes their sex is sex-based just as discrimination because someone changed their religion is religion-based.  *Schroer*, 577 F. Supp. 2d at 306-07; *see also Macy v. Holder*, 2012 WL 1435995, at *11 (EEOC Apr. 20, 2012).

c.    <u>The Ban Cannot Satisfy Any Level of Review.</u>

The asserted justifications for the ban cannot survive any level of equal protection review.  Because discrimination based on transgender status is a suspect classification, the ban may be upheld only if it is "narrowly tailored to further compelling governmental interests."  *Fisher v. University of Texas at Austin*, 133 S. Ct. 2411, 2419 (2013).   At a minimum, under Ninth Circuit precedent recognizing that anti-transgender discrimination also discriminates based on sex, the ban must be "substantially related" to an "exceedingly persuasive" justification.  *United States v. Virginia*, 518 U.S. 515, 533 (1996).

Far from meeting these stringent tests, the ban fails even the most basic level of review.   The haste with which the government enacted the ban—suddenly, without deliberation or significant involvement from military leadership, and in total disregard for the military's own extensive examination of relevant evidence—itself shows the ban was enacted for an improper purpose.  *See, e.g.*, *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977) (holding that the circumstances in which a policy is enacted, including anomalies in the process, may show that it was enacted for an improper purpose); Sieff Decl., Ex. M (military leaders were "blindsided" by the announced ban).

"It is not within our constitutional tradition to enact laws of this sort." *Romer*, 517 U.S. at 633.  Even under rational basis review, justifications must have

MOTION FOR PRELIMINARY INJUNCTION

a "footing in the realities of the subject addressed," *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993), and the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational," *Cleburne*, 473 U.S. at 446.  As explained below, the ban fails even these most basic tests of equal protection.

The August 25 Memorandum cites three justifications for reversing the policy permitting open service, asserting that permitting transgender people to serve would: (1) "hinder military effectiveness"; (2) "disrupt unit cohesion"; and (3) "tax military resources."  (Sieff Decl., Ex. G at § 1(a).)  As set forth below, none of these purported rationales for excluding all transgender people from military service has any basis.  Especially in light of the circumstances surrounding the announcement of the ban, this complete disconnect between the effect of the ban and its asserted rationales inescapably leads to the conclusion that the ban lacks any footing in reality and advances no legitimate interest.  *Cf.  Windsor*, 133 S. Ct. at 2694 (holding that a law excluding same-sex spouses from federal benefits was designed to "impose inequality" rather than to advance a legitimate governmental interest).

> i)  *The Circumstances, Context, and Irregularity of the Ban's Adoption Show That It Was Enacted for an Improper Purpose.*

The extraordinary context of this case shows that the ban was enacted for an improper discriminatory purpose.  Before adopting a policy permitting open military service by transgender people, the DOD undertook a lengthy, careful, and exhaustive process that comprehensively examined—and rejected as lacking any evidentiary basis—each of the justifications cited by Defendants.  Such a dramatic reversal of military policy would ordinarily require some formal deliberation or process of review.  In addition, the military has consistently eliminated prior barriers to equal military service by other previously disfavored groups, including African American people, women, and

lesbian, gay, and bisexual people.  The resulting diversity has strengthened the military.  (*See*, *e.g.*, Mabus Decl., ¶ 46.)  As noted by Former Navy Secretary Ray Mabus, there is not "another instance in United States military history of such a stark and unfounded reversal of policy, or of any example in our nation's history in which a minority group once permitted to serve has been excluded from the military after its members had been allowed to serve openly and honestly." (*Id.*, ¶ 47; *see also* James Decl., ¶ 45.)

This unprecedented irregularity eviscerates any claim that this reversal of policy was adopted for legitimate reasons.  *See Int'l Refugee Assistance Project ("IRAP") v. Trump*, 857 F.3d 554, 596 (4th Cir. 2017) (en banc) (proffered national security interest "is belied by evidence in the record that President Trump issued the First Executive Order without consulting the relevant national security agencies"); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 336 (4th Cir. 2001) (discriminatory purpose shown by "the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures" (internal quotation marks omitted)); *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1066 (9th Cir. 2014) (granting preliminary injunction under rational basis review where the policy simply "appears intended to express animus").

The illegitimacy of this abrupt change in the status quo and reinstatement of a categorical ban, after more than a year of success with permitting transgender troops to serve openly, is underscored by the political context in which it occurred, which also strongly suggests that it was enacted for an improper purpose. *Arlington Heights*, 429 U.S. at 266-68.   The sudden reinstatement of a categorical ban is only one of many hostile steps taken by this administration, even in its short tenure, to erode core protections and deny equality to transgender people.  From the earliest days of this administration, federal agencies began to take immediate action to identify and reverse legal

guarantees of equality for transgender people.  For example, one of its earliest actions was to withdraw guidance intended to ensure the equal treatment of transgender students in schools.  (*See* Sieff Decl., Ex. R.)  Soon thereafter, the Department of Justice abandoned its challenge to a North Carolina law targeting transgender people as well as its appeal of a nationwide injunction that, to this day, prohibits the federal government from responding to discrimination claims relating to health care by transgender people.  Around the same time, the Department of Health and Human Services announced that it was excluding transgender elders from its annual survey of older adults and the service they need.  (*Id.* (citing additional examples).)

The timing and immediate political context of the ban also show that it was enacted for an improper purpose.  There was no urgency as a matter of policy to announce a ban on transgender service on July 26, 2017.  Rather, that date correlated with efforts by some members of Congress to strip transgender service members of essential health care, based on open animosity toward transgender people.  (Sieff Decl., Exs. K, L.)  President Trump made his abrupt announcement on Twitter shortly after being contacted by those legislators and after meeting with a national anti-transgender advocacy organization about the ban.  President Trump issued his precipitous announcement two weeks later.  (*See* Sieff Decl., Ex. S.)  This backdrop reinforces the conclusion that the ban reflects a desire to cater to "negative attitudes," "fear," and "irrational prejudice."  *Cleburne*, 473 U.S. at 448, 450; *cf. IRAP*, 857 F.3d at 592 (rejecting asserted justification based on national security where political context demonstrated that it was a pretext for discrimination).

    ii) *Banning Transgender People from Military Service is Not Rationally Related to Military Effectiveness.*

This evidence that the ban reflects "mere negative attitudes, or fear," *Cleburne*, 473 U.S. at 448, is confirmed by the absence of any rational connection

between it and its stated purposes.  The ban does not rationally, much less substantially, further the government's interest in military effectiveness.  Like thousands of other transgender service members, Plaintiffs are serving their country with distinction.  Their transgender status has no negative impact on operational effectiveness or readiness.  During their time serving openly, Plaintiffs have continued to be selected for promotions in rank as well as awards and commendations for their exemplary service.  (Tate Decl., ¶¶ 9-10; Jane Doe Decl., ¶ 7; John Doe 2 Decl., ¶ 5-6.)  Plaintiffs' service records confirm the conclusions reached by the Working Group and the DOD that "service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, *is consistent with military readiness*." (Mabus Decl., Ex. C (emphasis added); *see* Carson Decl., ¶¶ 17-20; *see also* Brown Decl., Ex. C at 61 (explaining how open service by transgender individuals in other countries has in fact "improved readiness").)  The military uses strict protocols to assess the fitness and deployability of its servicepersons (Mabus Decl., Ex. C at Attachment § 1), that apply to transgender individuals in military service and ensure their service, like those of others, advances military readiness.

The fact that transgender people may seek medical care for transition does not change this analysis.  Military readiness is not undermined by the fact that many transgender people undergo gender transition and that some may have a medical need for transition-related surgeries.  Under the accessions policy for transgender service members, men and women who are transgender must generally have completed all transition-related surgery 18 months before initial enlistment.  (Sieff Decl., Ex. E.)  Some (but not all) transgender service members who have already enlisted may require medically necessary surgeries, but any impact on availability for deployment is "negligible and significantly

1  smaller than the lack of availability due to [other] medical conditions." (Brown
2  Decl., Ex. C (RAND Report) at 46.)

3       The evidence reviewed by the Working Group, which formed the basis of
4  the DOD policy, showed that the impact of transition-related care on deployable
5  transgender service members "is negligible," amounting to a minuscule fraction of
6  non-deployable labor hours.  (*Id.*)  The RAND Report concluded that based even
7  on the most aggressive estimates of utilization, "we expect the annual gender
8  transition-related health care to be an extremely small part of overall health care
9  provided to the [active] population."  (*Id.* at 31.)  As the Working Group found,
10 there is no reason to treat this minuscule impact any differently from the far more
11 significant impact of other common medical conditions that require short-term
12 gaps in deployability, such as "pregnancy, orthopedic injuries, obstructive sleep
13 apnea, appendicitis, gall bladder disease, infectious disease, and myriad other
14 conditions." (Carson Decl., ¶ 22; *see* Wilmoth Decl., ¶¶ 14-20.)

15      Over 40 years ago, the Second Circuit struck down military regulations that
16 barred pregnant women from service, finding that their exclusion was not
17 rationally related to the asserted justifications of readiness and mobility.  *See*, *e.g*.,
18 *Crawford v. Cushman*, 531 F.2d 1114, 1121-25 (2d Cir. 1976).  So too here, there
19 simply is no rational relationship between the ban and Defendants' claimed interest
20 in military readiness.

21           iii)   *Banning Transgender People from Military Service is*
22                  *Not Rationally Related to Promoting Unit Cohesion.*

23      The evidence reviewed by the Working Group similarly revealed "no
24 evidence or basis for concern that permitting openly transgender people to serve in
25 the military would disrupt unit cohesion." (Carson Decl., ¶ 19.)  To the contrary,
26 the available evidence, including the experience of foreign militaries who permit
27 openly transgender personnel to serve, showed that the opposite is true.  (*See id.*,
28 ¶ 20; Fanning Decl., ¶ 26; James Decl., ¶¶ 12-13, 17; Mabus Decl., ¶ 17.)  Similar

1  concerns were raised about policy changes permitting open service by gay and
2  lesbian personnel and allowing women to serve in ground combat positions; in
3  neither case were these concerns borne out by subsequent experience.  (*See* Carson
4  Decl., ¶ 19; Mabus Decl., ¶ 42; Mullen Decl. ¶¶ 12-14.)

5      Contrary to promoting unit cohesion, the reversal of policy in the face of
6  transgender people serving honorably and with distinction, sows fear and mistrust
7  among all the troops, transgender and non-transgender alike.   "This sudden
8  reversal also undermines the morale and readiness of other groups who must now
9  deal with the stress and uncertainty created by this dangerous precedent, which
10  represents a stark departure from the foundational principle that military policy
11  will be based on military, not political, considerations."  (Mabus Decl., ¶ 50.)  It
12  has triggered a "culture of fear" that "is anathema to the stability and certainty"
13  essential to a strong military.  (*Id.*, ¶ 51.)

14              iv)   *Cost Does Not Justify Banning Transgender People from*
15                    *Military Service.*

16      The ban also cites the supposedly burdensome costs of transition-related
17  healthcare despite DOD's conclusion, based on the Working Group's rigorous
18  review, that the cost of such care is *de minimis*—mere "budget dust," as Secretary
19  of the Navy Ray Mabus explained.  (Mabus Decl., ¶ 41.)  Considering the utterly
20  inconsequential cost of transition-related medical care the ban purports to
21  eliminate, it is impossible to see a cost-based justification as anything other than
22  pretext for invidious discrimination, especially when the Military Health Service
23  regularly provides the same care, including hormone therapy and similar surgeries,
24  to non-transgender service members.[2]  (Carson Decl., ¶ 14; Wilmoth Decl., ¶¶ 14-

25
26  [2]      Far from economizing government resources, in the short-term, the ban
   actually *does the opposite*: even using the government's most extreme estimate of
27  the medical costs associated with service by transgender individuals, any negligible
   cost-savings introduced by the ban is negated *at least tenfold* by new recruitment
28  and retraining costs that the ban imposes.  (Brown Decl., Ex. B at 35-37, 70; Sieff
   Decl., Ex. T ; *see also* Carson Decl., ¶ 32; Fanning Decl., ¶ 60; Mabus Decl., ¶ 45.)

20.)   "[A] government policy [which] incidentally saves the government an insignificant amount of money does not provide a rational basis for that policy if the policy is . . . founded upon a prohibited or arbitrary ground."   *In re Levenson*, 587 F.3d 925, 933 (9th Cir. 2009); *see also Lyng v. Int'l Union*, 485 U.S. 360, 376-77 (1988) ("[S]omething more than an invocation of the public fisc is necessary to demonstrate the rationality of selecting [one group], rather than some other group, to suffer the burden of cost-cutting legislation."); *Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011) (preservation of government resources cannot provide a rational basis to bar some arbitrarily chosen group from a government program).

## 2.      *The Ban Violates Plaintiffs' Right to Due Process.*

The ban violates Plaintiffs' right to due process in two ways.  First, the Due Process Clause protects the fundamental right to personal autonomy.  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2597-98 (2015).  The fundamental right to autonomy includes the right of every person, including those who are transgender, to live in accord with their gender identity.  Defendants have violated that right by barring transgender people from military service despite the absence of any rational basis for doing so, much less the more demanding justification required here.  *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (heightened scrutiny applies when the government interferes with a fundamental right).   The Due Process Clause also prohibits the government from arbitrarily punishing conduct that the government itself previously sanctioned and induced.  *See INS v. St. Cyr*, 533 U.S. 289, 323 (2001).   The ban violates that requirement by penalizing Plaintiffs and other transgender persons for engaging in the very conduct—identifying themselves as transgender—that the government itself encouraged.

### a.      The Ban Violates Plaintiffs' Fundamental Right to Personal Autonomy.

"The Due Process Clause provides heightened protection against government interference with certain fundamental rights and liberty interests,

1  forbidding the government to infringe certain fundamental liberty interests *at all*,

2  . . . unless the infringement is narrowly tailored to serve a compelling state

3  interest." *Lopez-Valenzuela v. Arpaio*, 770 F.3d at 780 (citations and internal

4  marks omitted) (emphasis original).  Banning transgender persons from military

5  service warrants, and fails, this heightened review.  Far from being narrowly

6  tailored, the ban sweeps broadly, categorically excluding all transgender persons

7  from military service.  And, as explained above, the ban fails to serve even a

8  legitimate state interest, much less the compelling interest required here.

9         The right to live in accord with one's gender identity is an inherent aspect of

10  the right to personal autonomy enjoyed by all persons. "Liberty presumes an

11  autonomy of self[.]"  *Lawrence v. Texas*, 539 U.S. 558, 562 (2003).   The

12  Constitution secures to all persons the fundamental liberty "to define and express

13  their identity."  *Obergefell*, 135 S. Ct. at 2593.  As the Supreme Court has

14  repeatedly explained, the liberty protected by the Due Process Clause includes the

15  right of the individual, rather than the state, to make "certain personal choices

16  central to individual dignity and autonomy, including intimate choices that define

17  personal identity and beliefs."  *Id*. at 2597.  The right to autonomy includes

18  important personal decisions that define the meaning of a person's life—such as

19  the freedom to choose whether and whom to marry, whether to use birth control,

20  whether to have a child, how to raise one's child, and whether to engage in

21  consensual adult intimacy outside of marriage.  *Id*.; *Griswold v. Connecticut*, 381

22  U.S. 479 (1965); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942);

23  *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992); *Troxel v.*

24  *Granville*, 530 U.S. 57, 65-66 (2000); *Lawrence*, 539 U.S. at 578; *see also Roberts*

25  *v. U.S. Jaycees*, 468 U.S. 609, 619 (1984) (explaining that the Constitution protects

26  these decisions from "unwarranted state interference" in order to "safeguard[] the

27  ability independently to define ones identity that is central to any concept of

28  liberty").

Under these well-established principles, the fundamental right to autonomy must include a person's right to be transgender, just as it includes a person's right to be lesbian, gay, bisexual, or heterosexual.  Like a person's sexual orientation or other central aspects of personhood, gender identity is "a basic component of a person's core identity." *Hernandez-Montiel*, 225 F.3d at 1094 (internal citations and quotation marks omitted); *Norsworthy*, 87 F. Supp. 3d at 1119 n.8 (transgender identity is "immutable"); *see also* Brown Decl., ¶¶ 21-23.  Just as gender is an important aspect of identity for non-transgender people—one that feels inseparable from who they are—it is equally important for transgender people.  Here, Plaintiffs attest to knowing their gender as a core aspect of identity even before they had a word for it.  (*See* John Doe 1 Decl., ¶¶ 13-15 ("For as long as I can remember, I have felt that inside, I am male."); *see also* Tate Decl., ¶ 15; Stockman Decl., ¶ 3; Talbott Decl., ¶ 4; Reeves Decl., ¶ 4; Jane Doe Decl., ¶ 10; John Doe 2 Decl., ¶ 15.)  The ban intrudes upon the right of transgender men and women who already serve in accordance with military standards or who wish to do so, and who simply seek to live as who they are, consistent with this core aspect of their identity.

That intrusion is subject to heightened review.  Even within the context of military service, government actions that burden a serviceperson's fundamental right to personal autonomy are subject to heightened scrutiny.  *Witt v. Dep't of Air Force*, 527 F.3d 806, 819 (9th Cir. 2008) (holding that heightened scrutiny applies "when the government attempts to intrude upon . . . the rights [of personal autonomy] identified in *Lawrence*").

Moreover, the ban is subject to heightened scrutiny not only because it burdens a fundamental right, but because it does so *selectively*.  For the great majority of those serving in the Armed Forces, the ban does not restrict their right to identify as who they are or to live in accord with their gender identity.  Only for the minority of those serving whose gender identity is not aligned with their assigned sex—transgender people—does the ban deny this right.  When a law

selectively denies a protected liberty, heightened equal protection scrutiny also applies. *See, e.g., Obergefell*, 135 S. Ct. at 2603 (explaining "the synergy between the two protections"); *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 902 (1986); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 672 (1966). As discussed above, *see supra* § III.A.1.c, the ban cannot survive any level of review, much less the exacting review required here. The ban is thus unconstitutional, and Plaintiffs are likely to succeed on the merits of this claim.

b. <u>The Ban Impermissibly and Retroactively Punishes Conduct the Government Induced.</u>

The "canons of decency and fair play" that animate the Due Process Clause, *Rochin v. California*, 342 U.S. 165, 173 (1952), "constrain the extent to which government can upset settled expectations," *Cleburne*, 473 U.S. at 471 n.22. Expectations concerning the lawfulness of one's actions, especially, must "not be lightly disrupted," as "considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

"The Due Process Clause . . . protects the[se] interests in fair notice and repose" against the enforcement of "retroactive" public policies. *Id.* at 266. A policy has an "impermissible retroactive effect," and courts prohibit its application, when it *inter alia* "attaches a new disability, in respect to transactions or considerations already past." *St. Cyr*, 533 U.S. at 321, 321 n.46 (quotation omitted) (such an effect is "sufficient" to find impermissible retroactivity).

The rule applies with particular strength when, as here, the government attempts to impose adverse consequences on the basis of past events that the government *itself induced*. *See id.* at 323 (undocumented immigrants who pled guilty to certain criminal offenses in "almost certain[] reli[ance]" upon government representation that it would exercise discretion to waive their deportation could not be subject to deportation by later-enacted statute which eliminated such waivers);

1  *see also Cox v. Louisiana*, 379 U.S. 559, 569-570 (1965) (overturning conviction

2  where a party reasonably relied on the government's own representations about the

3  lawfulness of the conduct); *cf. Watkins v. U.S. Army*, 875 F.2d 699, 708 (9th Cir.

4  1989) (holding that government was equitably estopped from discharging a gay

5  man from military service after it "acted affirmatively" to "admit[]," "retain[]," and

6  "promot[e]" him, and then encouraged the disclosure that it used to discharge him).

7         Scores of current transgender service members, including Plaintiffs,

8  identified themselves as transgender to their command in reliance upon the Open

9  Service Policy, (*e.g.*, Fanning Decl., ¶ 53; James Decl., ¶ 35; Carson Decl., ¶ 33),

10 which expressly stated that it "is vital that you are open and honest with your

11 leadership when discussing the gender transition process," and offered advice on

12 the "many ways to respectfully disclose your gender identity to your colleagues."

13 (Sieff Decl., Ex. Q at 20; *see also* John Doe 1 Decl., ¶¶ 15-16, 19 ("I came out as

14 transgender only because the military had said that I would be allowed to continue

15 serving my country."); Tate Decl., ¶¶ 17-18; Jane Doe Decl., ¶ 12).  Now, in the

16 wake of the ban, Plaintiffs and others similarly situated face forced separation after

17 March 2018 as a result of that reliance.  They will lose their jobs, their healthcare,

18 and the dignity of equal service.  (*See* John Doe 1 Decl., ¶¶ 22-23; Jane Doe Decl.,

19 ¶¶ 15-22; Tate Decl., ¶¶ 21-29; John Doe 2 Decl., ¶¶ 30-39.)

20        Punishing Plaintiffs for their reliance on the military's promise of inclusion

21 offends the "considerations of fairness" that the Due Process Clause protects.

22 *Landgraf*, 511 U.S. at 265.  The ban's effects—including loss of employment and

23 healthcare and the stigma of being discharged for their transgender status—are no

24 less offensive than the manifest "unfairness" found impermissible in *St. Cyr*, in

25 which the Supreme Court held that undocumented immigrants who pled guilty,

26 "[r]elying on the settled practice" that they would be eligible for deportation

27 waivers, could not be deported after the Attorney General's discretion to issue

28 those waivers was eliminated.  533 U.S. at 323.  The injustice in this case is even

more pronounced, because transgender service members came out not just in reliance on a promise that they would be eligible for a discretionary benefit (i.e. the possibility of no penalty), but in reliance on the express promise that doing so would not invite *any penalty at all*. (*See* Sieff Decl., Exs. D, Q)

This anti-retroactivity component of the due process guarantee is "deeply rooted" in our constitutional tradition, and is intended to protect against precisely this sort of "vindictive" policymaking. *Landgraf*, 511 U.S. at 266-67 ("political pressures pose[] a risk" that retroactive public policies will be used "as a means of retribution against unpopular groups . . ."). The ban violates due process on this account, as well; Plaintiffs are likely to succeed on their due process claim.

### 3. *The Ban Violates Plaintiffs' First Amendment Rights.*

Plaintiffs also are likely to succeed on their First Amendment claim because the ban impermissibly restricts speech based on its content by barring transgender people who are open about who they are from serving in the military. As a result, they cannot demonstrate by their example that transgender people are fit to serve or advocate for their own equal treatment. Speech by which a person communicates a personal characteristic such as the person's race, religion, national origin, sexual orientation, or gender is protected by the First Amendment. *See* U.S. CONST. amend. I; *Log Cabin Republicans v. United States*, 716 F. Supp. 2d 884, 924 (C.D. Cal. 2010) (holding that expressions of gay or lesbian identity suppressed by military's "Don't Ask, Don't Tell" policy were protected by the First Amendment), *vacated on other grounds as moot*, 658 F.3d 1162 (9th Cir. 2011); *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1284-85 (D. Utah 1998) (coming out as gay or lesbian to an employer is protected expression); *Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652, 659 (1st Cir. 1974) (First Amendment protects gay students' public identification as such at social events).

Courts have long recognized that being able to "come out"—*i.e.*, to communicate one's identity to others—is essential for individuals in minority

groups that have experienced a history of legal and social discrimination to gain social acceptance, and to advocate for their own legal and political equality. *Gay Law Students Ass'n v. Pac. Tel. & Tel. Co.*, 24 Cal. 3d 458, 489 (Cal. 1979) (coming out to employer a form of political freedom); *cf. Fricke v. Lynch*, 491 F. Supp. 381, 385 (D.R.I. 1980) (gay student's open attendance at prom protected by First Amendment). A government policy that penalizes individuals for engaging in such expression—like the ban here—thus threatens core First Amendment values and restricts the most highly protected kind of First Amendment speech.

Policies of this kind, including in the military context, may be upheld only if the restriction is narrowly tailored to serve a compelling state interest. *See, e.g., Weaver*, 29 F. Supp. 2d at 1286. Even in the military context, a service member's speech may not be regulated on the basis of its content. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985); *Nieto v. Flatau*, 715 F. Supp. 2d 650, 655 (E.D.N.C. 2010) ("[R]egulations that selectively grant safe passage to speech of which officials approve while curbing speech of which they disapprove are impermissible, even in the military.") (citation omitted).

A threat of involuntary separation or denial of the ability to enlist "would chill or silence a person of ordinary firmness," from continuing to express his or her transgender identity. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (citation omitted); (*see* John Doe 1 Decl., ¶19). Plaintiffs face a "realistic danger of sustaining a direct injury as a result of the [ban's] operation or enforcement." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). The ban already has caused some service members to conceal their transgender identities. (*See* Zbur Decl., ¶ 4 (certain transgender service members have "opted not to come out for fear of retribution and separation); *see also* John Doe 1 Decl., ¶19.)

These restrictions on protected speech cause serious harms that implicate core First Amendment values. Under the Open Service Policy, Plaintiffs are able to let their peers and command know that they are transgender. That open

communication has been critical to breaking down social barriers and false stereotypes. It has enabled military leaders and troops to become familiar with transgender people and to see that they are just as capable of meeting the same military standards and serving honorably as others. (*See* Tate Decl., ¶¶ 19-20, 30; Jane Doe Decl., ¶¶ 13-14; John Doe 1 Decl., ¶¶ 17, 24; John Doe 2 Decl., ¶¶ 20, 27; *see also* Fanning Decl., ¶¶ 53-55.) The ban restricts this communication, forcing transgender service members to conceal their transgender identity and preventing them from communicating these positive messages by their example of open service. Just as harmfully, it also prevents transgender individuals who are in the military from discussing their experiences or needs and from advocating for their own equal treatment. In addition, by preventing transgender service members from openly identifying themselves as such while they are serving, it prevents the public from learning that transgender people are just as committed to serving our country and just as capable of doing so as others—thereby depriving transgender persons of one of the most powerful political tools for seeking legal and social equality as equal members of our society.

The ban cannot survive any level of First Amendment review, much less the heightened review required here. There is no legitimate governmental interest, let alone a compelling or even a substantial one, in prohibiting transgender individuals from disclosing their gender identity or their transgender status. To the contrary, the ban undermines military effectiveness by forcing transgender service members to hide a core aspect of their identity from their peers, thereby undermining the bonds of trust and solidarity that are essential to building unit cohesion. (*See* Mullen Decl., ¶ 12 ("Just as gay and lesbian soldiers should not have to lie about who they are to serve, nor should transgender soldiers."); *see also* Mabus Decl., ¶ 42 ("Units become closer when individual service members are respected for who they are."); Tate Decl., ¶ 19; Jane Doe Decl., ¶ 14; John Doe 1 Decl., ¶ 24; John Doe 2 Decl., ¶¶ 18, 20-21, 24.)

1      In sum, because there is no legitimate government interest to support the

2   ban, *see supra* § III.A.1.c, Plaintiffs are likely to succeed on the merits of their

3   First Amendment claim.

4   **B.      Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm.**

5      Absent preliminary relief, Plaintiffs will suffer ongoing and irreparable harm

6   as a result of the ban.  Irreparable harm has "traditionally [been] defined as harm

7   for which there is no adequate legal remedy, such as an award of damages." *Ariz.*

8   *Dream Act Coal.*, 757 F.3d at 1068 (holding loss of opportunity to pursue a

9   plaintiff's chosen profession constituted irreparable harm); *see also Small v. Avanti*

10  *Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011) (a plaintiff "need not prove

11  that irreparable harm is certain or even nearly certain," but must demonstrate only

12  a "likelihood" of irreparable harm).  That standard is easily satisfied in this case.

13     Here, Plaintiffs seek redress for serious constitutional violations.   The

14  asserted violations of Plaintiffs' constitutional rights "unquestionably constitutes

15  irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding the loss of

16  constitutional freedoms constitutes irreparable harm); *see also Monterey Mech. Co.*

17  *v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (holding that an equal protection

18  violation constitutes irreparable harm).

19     *First*, the ban brands Plaintiffs unfit to serve merely because they are

20  transgender.  Those Plaintiffs currently in the military have served honorably and

21  with distinction for many years.  The August 25 Memorandum formalizing the ban

22  harms them by stating that, despite their record of positive service, military policy

23  should be based on a presumption that transgender service members will "hinder

24  military effectiveness and lethality" and "disrupt unit cohesion."  (Sieff Decl., Ex.

25  G.)  In a setting in which fellow soldiers necessarily rely on each other—at times

26  for their lives—such disparaging statements by the Commander-in-Chief

27  undermine the trust and confidence that others place in them.  (*See* Tate Decl., ¶

28  23; Jane Doe Decl., ¶ 23; John Doe 1 Decl., ¶ 24; John Doe 2 Decl., ¶ 33.)

The ban's casting of transgender service members as presumptively deficient (hindering "military effectiveness") and dangerous (hindering "lethality" and disrupting "unit cohesion) deprives Plaintiffs of their equal dignity and status as capable and highly qualified current and prospective service members.  *See, e.g.*, *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) ("Injuries to individual dignity and deprivations of civil rights constitute irreparable injury."); *Majors v. Jeanes*, 48 F. Supp. 3d 1310, 1315 (D. Ariz. 2014) (finding irreparable harm on the basis of denial of dignity and status); *see also Chalk v. U.S. Dist. Court Cent. Dist. Of Cal.*, 840 F.2d 701, 709-10 (9th Cir. 1988) (school's reassignment of teacher diagnosed with AIDS caused irreparable harm, because "[s]uch non-monetary deprivation is a substantial injury"); *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995) (irreparable harm from "brand[ing]" plaintiff as a drug user); *see also* Mullen Decl., ¶¶ 12-15.  In effect, the ban relegates transgender service members and potential service members to an inferior class, stigmatizing them in ways that will cause harm in virtually every aspect of their lives, including their ability to obtain civilian employment and to be seen and interact with others as equal members of our society.

*Second*, the ban significantly compromises or altogether eliminates Plaintiffs' career prospects within the military, and imposes serious personal and financial hardships on Plaintiffs.  (Tate Decl., ¶¶ 24-28; Jane Doe Decl., ¶¶ 17-22; John Doe 1 Decl., ¶¶ 20-23; John Doe 2 Decl., ¶¶ 31-38.)  As the Ninth Circuit has held, "diminished. . . opportunity to pursue [one's] chosen profession. . . constitutes irreparable harm." *Ariz. Dream Act Coal.*, 757 F.3d at 1068; *see also Chalk*, 840 F.2d at 709-10.  Moreover, those Plaintiffs who had dreamed of serving in the military and, in fact, had taken concrete steps to do so, face irreparable harm as the ban expressly prohibits them from enlisting.  (Stockman Decl., ¶¶ 15-17; Talbott Decl., ¶¶ 17, 19; Reeves Decl., ¶ 13.)  Where, as here, plaintiffs are at the very beginning of their adult working lives and in a "fragile socioeconomic

1  position," the irreparable nature of their injury is heightened.  *Ariz. Dream Act*
2  *Coal*, 757 F.3d at 1068.

3      *Third*, the ban compromises the health care coverage provided to Plaintiffs
4  and their families.  Those currently serving Plaintiffs face the loss of health care
5  for themselves and their families when the ban takes effect in March 2018,
6  rendering them ineligible for continued service.  For any Plaintiffs who may
7  remain beyond that date, the August 25 Memorandum expressly limits the health
8  care services they will be provided for gender transition-related health care.  This
9  loss of health care constitutes irreparable injury.  *See Diaz*, 656 F.3d at 1010
10  (affirming finding that plaintiffs would likely suffer irreparable harm if health
11  coverage was ceased); *UAAIW Local 645, AFL-CIO v. Gen. Motors Assembly Div.*,
12  1982 WL 2028, at *2 (C.D. Cal. Oct. 29, 1982) (finding that the harm resulting
13  from the termination of health benefits will be irremediable).

14      For Plaintiffs, service in the military has been a calling and, for many, their
15  life's work.  They have constructed their lives and those of their families around
16  military service.  Absent an order preliminarily enjoining its implementation, the
17  ban will continue to cause Plaintiffs irreparable harm.

18  **C.**    **An Injunction is in the Public Interest and the Balance of**
19            **Hardships Tips Sharply in Plaintiffs' Favor.** [3]

20      "[B]oth the public interest and the balance of the equities favor a preliminary
21  injunction" where the government acts to deprive a plaintiff of his or her
22  constitutional rights.  *Ariz. Dream Act Coal.*, 757 F.3d at 1069.

23

24

25          [3]    In determining whether a preliminary injunction is appropriate, courts
26  ordinarily "balance the competing claims of injury and must consider the effect on
each party of the granting or withholding of the requested relief." *N. Cheyenne*
27  *Tribe v. Norton*, 503 F.3d 836, 843-44 (9th Cir. 2007).  Where, as here, the
government is the opposing party, the balance of the hardships and the public
28  interest are considered together. *See Nken v. Holder*, 556 U.S. 418, 435-36 (2009).

Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), *quoting Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (reversing denial of preliminary injunction).  Where, as here, the injunction sought merely seeks to end an unlawful practice, there can be no dispute that the balance of hardships tips sharply in Plaintiffs' favor.  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (the government "cannot suffer harm from an injunction that merely ends an unlawful practice").

In addition, as the Working Group already determined based on an exhaustive review of the available evidence and relevant military policies, banning transgender people from military service will degrade military readiness and capabilities in contravention of the public interest.  (*See* James Decl., ¶¶ 40-41 ("[B]anning current transgender service members from enlisting or serving in the military will result in the loss of qualified recruits and trained personnel, reducing readiness and operational effectiveness."); Fanning Decl., ¶ 61 ("[C]ommanders must now deal with the prospect that key personnel may not be able to continue their service, thus impeding military readiness."); Mabus Decl., ¶ 45 ("[B]anning transgender service members will produce vacancies in the Services, creating an immediate negative impact on readiness."); Carson Decl., ¶ 31 ("Many military units include transgender service members who are highly trained and skilled and who perform outstanding work.  Separating these service members will deprive our military and our country of their skills and talents.").  The ban "erodes service members' trust in their command structure [that is] essential to the unit cohesion and rapid response required to address unexpected crises or challenges."  (James Decl., ¶ 43; *see also* Fanning Decl., ¶ 62 ("The President's reversal of policy is deeply harmful to morale because it impairs service members' trust in their command structure . . ."); Carson Decl., ¶ 33; Mabus Decl., ¶ 47-52.)

The public interest is served by the continued service of highly capable transgender service members, not by separating them at substantial expense. Indeed, training of transgender service members "has required a significant investment of taxpayer dollars, an investment whose return depends on their continued service." (Fanning Decl., ¶ 60.)  And, in the event transgender service members are separated, the loss of the investment in training them will be compounded by the fact that the Armed Forces would be forced to incur additional expenses recruiting and training their replacements.  (*See* Carson Decl., ¶ 32; Fanning Decl., ¶ 60; Mabus Decl., ¶ 45.)

Further, the serious and escalating harms to Plaintiffs if preliminary relief is not granted are far more severe than any hardship to the government.   If implementation of the ban is not enjoined, those currently serving Plaintiffs will be separated from the military in March 2018, losing their jobs, their benefits, and their military community.  Similarly, every day that goes by, those seeking to enlist lose the opportunity to gain stable employment, accrue benefits, and benefit from the unique training and leadership opportunities that military service provides. (Stockman Decl., ¶¶ 15-17; Talbott Decl., ¶¶ 17, 19; Reeves Decl., ¶ 13.)   The longer that the ban remains in place, and as the March 23, 2018 implementation date for those currently serving looms closer, Plaintiffs' injuries deepen in ways that cannot be remedied by a final judgment in their favor.

In contrast, an injunction imposes *no* hardship on Defendants.   The necessary policies and instructions regarding enlistment by transgender people already have been prepared and the necessary trainings have taken place.  (Tate Decl., ¶ 20; John Doe 2 Decl., ¶ 23; Brown Decl., ¶ 68.)  And, transgender people already are serving openly and honorably.  (Tate Decl., ¶ 19; Jane Doe Decl., ¶ 14; John Doe 1 Decl., ¶¶ 24-25; John Doe 2 Decl., ¶¶ 20-21, 24; Fanning Decl., ¶ 53.)

The unsubstantiated "concerns" set forth in the August 25 Memorandum are a far cry from those in other cases addressing issues of military readiness or

national security.  *Compare Winter*, 555 U.S. at 26 (holding that the balance of equities and of the overall public interest weighed "strongly in favor of the Navy" where the proposed injunction would "forc[e] the Navy to deploy an inadequately trained antisubmarine force" and "jeopardize[] the safety of the fleet"), *with Singh v. Carter*, 168 F. Supp. 3d 216, 219 (D.D.C. 2016) (distinguishing *Winter* on the ground that injunctive relief "would not have an impact on the national defense or the Army's ability to protect our nation's security").

Because Plaintiffs are suffering serious and escalating harms, including violations of their constitutional rights, and there is no plausible claim that enjoining the ban will have any negative impact on military readiness or effectiveness, a preliminary injunction is warranted.

## IV.    CONCLUSION

Each of the *Winter* factors warrants issuance of a preliminary injunction. The ban on transgender military service inflicts harms that escape repair; and there is no reason, equitable or otherwise, to justify its nakedly unconstitutional deprivations of fundamental rights and liberties.  Plaintiffs respectfully request a preliminary injunction prohibiting its enforcement.

Dated:  October 2, 2017                     Respectfully submitted,

LATHAM & WATKINS LLP
Marvin S. Putnam
Amy C. Quartarolo
Adam S. Sieff
Harrison J. White


By _____/s/ Amy C. Quartarolo_____
Amy C. Quartarolo

*Attorneys for Plaintiffs Aiden Stockman, Nicolas Talbott, Tamasyn Reeves, Jaquice Tate, John Does 1-2, Jane Doe, and Equality California*