CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

RYAN B. PARKER
ANDREW E. CARMICHAEL
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-4336
Email: ryan.parker@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIDEN STOCKMAN, et al., | No. 5:17-cv-1799-JGB-KK |
| Plaintiffs, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

Hearing
Date:        November 20, 2017
Time:        9:00 a.m.
Courtroom:  1

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 20, 2017 at 9:00 a.m., or as soon thereafter as possible in Courtroom 1 of the above-referenced court located at the George E. Brown, Jr. Federal Building and United States Courthouse, 3470 Twelfth Street, Riverside, CA 92501-3801, Defendants Donald J. Trump, et al., will, and hereby do, move this Court to dismiss Plaintiffs' Complaint for lack of jurisdiction and failure to state a claim.

The Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations; all pleadings and papers filed in this action; and such additional papers, evidence, and argument as may be presented at or in connection with the hearing.  Defendants' Memorandum of Points and Authorities also serves as Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction.

Dated: October 23, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Ryan Parker*
RYAN B. PARKER
ANDREW E. CARMICHAEL
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-4336
Email: ryan.parker@usdoj.gov

*Counsel for Defendants*

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................1

BACKGROUND .............................................................................................................................3

    I.   History of the Accessions Policy Regarding Transgender Individuals ..............................3

    II.  The President's Memorandum and Plaintiffs' Complaint ..................................................5

    III. the Interim Guidance and Plaintiffs' Request for Preliminary Injunction ........................7

STANDARD OF REVIEW FOR MOTION TO DISMISS .................................................................11

ARGUMENT....................................................................................................................................11

    I.   The Court Should Dismiss Plaintiffs' Complaint for Lack of Jurisdiction ......................11

        A.  The Court's Standing Inquiry Should Be Especially Rigorous...................................12

        B.  Plaintiffs Have Not Met Their Burden of Showing an Injury-in-Fact......................13

        C.  Plaintiffs' Claims Are Not Ripe for Adjudication.......................................................15

    II.  Plaintiffs' Motion for a Preliminary Injunction Should Be Denied .................................18

        A.  Plaintiffs Have Not Shown that They Are Likely to Suffer an Irreparable
            Harm Absent the Entry of a Preliminary Injunction..................................................19

        B.  Plaintiffs Are Unlikely To Succeed on the Merits.......................................................20

            1.   Plaintiffs Have Not Challenged Defendants' Operative Policy for
                Enlisted Transgender Service Members, and any such Challenge Would
                Fail to State an Equal Protection Claim....................................................................21

            2.   Plaintiffs' Challenge to the Accession Policy is Unlikely to Succeed ..................22

            3.   In any Event, an Equal Protection Challenge to Defendants'
                 Longstanding Accession Policy Would Not Succeed.........................................24

                 a.   The Military's Longstanding Accessions Policy is Subject to a Highly
                    Deferential Form of Review.............................................................................24

                 b.   Plaintiffs are Unlikely to Succeed on Their Challenge to the Military's
                    Longstanding Accessions Policy.....................................................................28

            4.   Plaintiffs Are Unlikely To Succeed on Their Due Process Claim ......................31

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - i
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**

5.    Plaintiffs Are Unlikely to Succeed on Their First Amendment Claim................34

C.    The Balance of Equities and the Public Interest Weigh Strongly Against the Entry of a Preliminary Injunction ........................................................................36

D.    The Injunctive Relief Plaintiffs Seek Is Inappropriate .............................................37

CONCLUSION ........................................................................................................................39

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - ii
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs—four members of the military, three civilians, and an advocacy organization—ask this Court to prejudge the constitutionality of a future Government policy regarding military service by transgender individuals and issue the extraordinary relief of a worldwide preliminary injunction. That challenge is premature several times over. To start, the President issued a memorandum on August 25, 2017, setting forth his policy directive to the Secretary of Defense and the Secretary of Homeland Security and ordering a further study of policies concerning military service by transgender individuals. The President's memorandum states that no policy changes to the status quo will be effective until at least March 2018. The President further directed the Secretary of Defense to determine how to address transgender individuals currently serving in the military and that *no action* be taken against such individuals until *after a policy review is completed.*

Although the Presidential Memorandum had no immediate effect on individual service members, Plaintiffs filed this action on September 5, 2017. ECF No. 1. On September 14, 2017, the Secretary of Defense issued Interim Guidance reaffirming that for now, no current service member will be involuntarily separated, discharged, or denied reenlistment solely on the basis of a gender dysphoria diagnosis or transgender status, and service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition. On October 2, 2017, Plaintiffs moved for a preliminary injunction but failed to address the Secretary of Defense's Interim Guidance. Thus, neither the Complaint nor Plaintiffs' motion address, let alone challenge, the policy that is in effect today.

Nor do any of the Plaintiffs face a current or imminent threat of injury while the policy is being studied. Plaintiffs allegedly fear being involuntarily separated from the military and the loss of associated benefits, and the disruption of transition-related medical care. But none of those alleged injuries are occurring, or will occur, under the Interim Guidance. And beyond that, it is unclear whether the currently serving Plaintiffs will be affected by

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 1
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

the future policy regarding service by transgender individuals once it is finalized and implemented. Likewise Plaintiffs who have not applied for and been denied accession into the military, which can be denied for any number of reasons unrelated to transgender status, nor sought a medical waiver after being denied accession based on a history of gender dysphoria or gender transition, have not been injured by the challenged policies, much less irreparably so. Without such injury, Plaintiffs lack standing and their claims are not ripe. The Court should dismiss this case for lack of jurisdiction.

Were the Court to address Plaintiffs' preliminary injunction motion, it should deny them the drastic relief they seek. To prevail on this motion, Plaintiffs must show that they will suffer irreparable harm absent an injunction, they are likely to succeed on the merits, the balance of equities tips in their favor, and an injunction is in the public interest. They have not made any of those showings.

To start, for the same reasons this Court lacks jurisdiction, Plaintiffs cannot show that they will suffer irreparable harm absent a preliminary injunction. The speculative harms they believe may occur in the future, once the policy is formulated and implemented, cannot be redressed at this stage.

Nor can Plaintiffs show that they are likely to succeed on the merits. Even if they could somehow establish jurisdiction at this stage, the policy currently in place—which maintains the status quo for transgender persons in the military—has not been challenged and, in any event, is plainly lawful. And to the extent Plaintiffs assail the President's directive to study the questions at issue and develop a new policy in accordance with his memorandum, they likewise have no meritorious claim. Plaintiffs cannot show a likelihood of success on their equal protection, due process, or First Amendment claims given that the Defense Department has not completed its review or adopted a final policy.

Even if Plaintiffs could challenge the military's longstanding accession policy, that challenge would fail because the policy withstands the highly deferential review required here. Federal courts owe the utmost deference to the political branches in the field of national defense and military affairs, because the Constitution commits military decisions

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 2
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

exclusively to those branches and because courts "have less competence" to second-guess military decision-making. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Decisions concerning the composition of a military force and the requisite conditions attendant to military service are at the core of these constitutionally committed powers.

Finally, the balance of equities and the public interest weigh against injunctive relief. While Plaintiffs are suffering no injury during the interim period while the policy is being examined—and may never be injured by the policy finally adopted—the Government is convening a panel of experts to study the policy, analyze the data, and provide recommendations. The public interest obviously would be harmed if an injunction precluded the President and Secretary of Defense from receiving expert advice on important issues of military personnel policy and acting in light of the results of that study. And even if Plaintiffs somehow hurdle every problem with their challenge, there is no basis for the worldwide injunction against the military they request.

## BACKGROUND

### I. History of the Accessions Policy Regarding Transgender Individuals

The U.S. military has long required individuals to satisfy rigorous standards in order to serve. The military presumptively excludes individuals who suffer from particular physical and mental conditions, although individualized waivers may be available. DOD Instruction 6130.03 at 7 (Apr. 28, 2010) (DODI 6130.03). These exclusions are necessary to ensure, *inter alia*, that service members are "capable of performing duties," free of conditions that "may require excessive time lost from duty for necessary treatment or hospitalization," and "adaptable to the military environment without the necessity of geographical area limitations." *Id.* at 2.

For decades, these conditions have included "transsexualism." *Id.* at 48; *see also, e.g.*, DOD Directive 6130.3 at ¶ 2–34(b) (Mar. 31, 1986) ("[t]ranssexualism and other gender identity disorders"); Army Regulation 40–501 at ¶ 6–32(b) (May 17, 1963) ("behavior disorders[] as evidenced by … transvestism"). This condition, like others, is subject to a waiver process. Under DODI 6130.03, the military shall "[a]uthorize the waiver of the

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 3
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

standards [for entry] in individual cases for applicable reasons and ensure uniform waiver determinations," and service-specific implementing rules set forth the process for each branch, *see, e.g.*, Army Reg. 40-501, Standards of Medical Fitness at ¶ 1-6(b).

In July 2015, former Secretary of Defense Ashton Carter ordered the creation of a working group "to study … the policy and readiness implications of welcoming transgender persons to serve openly" and instructed the group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness." Statement by Former Secretary of Defense Ash Carter, Release No. NR-272-15.[1] The Defense Department also commissioned the RAND Corporation to study the matter, which in turn issued a report concluding that the proposed policy change would impose burdens on the military, but that such costs were "negligible" or "marginal." RAND Report 33, 46, 69, 70.[2]

On June 30, 2016, former Secretary Carter issued a directive setting forth a new policy on service by transgender individuals. Defense Department Directive-Type Memorandum ("DTM") 16-005.[3] The directive allowed transgender individuals currently in the military to begin serving openly and authorized the Departments of Defense and Homeland Security to fund sex-reassignment surgeries. *Id.* It also ordered the revision of the military's accession policy by July 1, 2017. *Id.* That revision would provide that a history of "gender dysphoria," "medical treatment associated with gender transition," or "sex reassignment or genital reconstruction surgery" were all presumptively "disqualifying." *Id.* Under the proposed revision, however, the applicant could overcome that presumption by proving that: (i) in the case of gender dysphoria, he had "been stable without clinically significant distress or

---

[1] Statement by Former Secretary of Defense Ash Carter, Release No. NR-272-15, is available online at: https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/statement-by-secretary-of-defense-ash-carter-on-dod-transgender-policy/ (last visited Oct. 23, 2017).

[2] The RAND Report is available online at: https://www.rand.org/pubs/research_reports/RR1530.html (last visited Oct. 23, 2017).

[3] Defense Department Directive-Type Memorandum 16-005 is available online at: https://www.defense.gov/Portals/1/features/2016/0616_policy/DTM-16-005.pdf (last visited Oct. 23, 2017).

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 4
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

impairment in social, occupational, or other important areas of functioning for 18 months"; (ii) in the case of a medical gender transition, he had completed all medical treatment and had "been stable in the preferred gender for 18 months"; and (iii) in the case of surgery, he had waited 18 months since the operation and "no functional limitations or complications persist, nor is any additional surgery required." *Id.*

On June 30, 2017, Secretary of Defense James Mattis extended the deadline for revising the accession policy by six months, until January 1, 2018. Department of Defense, Release No. NR-250-17 (June 30, 2017).[4] Nearly a month later, on July 26, 2017, the President stated on Twitter that "the United States Government will not accept or allow transgender service members to serve in any capacity in the U.S. military," citing the "medical costs and disruption that transgender in the military would entail." ECF No. 1 at ¶ 36.

## II.    The President's Memorandum and Plaintiffs' Complaint

On August 25, the President issued a memorandum to the Secretaries of Defense and Homeland Security regarding military service by transgender individuals. Presidential Memorandum, 82 FR 41319. The Presidential Memorandum explains that, until June 2016, longstanding policy and practice "generally prohibited openly transgender individuals from accession into the United States military and authorized the discharge of such individuals." *Id.* § 1. In his role as Commander in Chief, the President found that former Secretary Carter had failed to identify a sufficient basis to conclude that ending these longstanding policies "would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." *Id.* Accordingly, he determined, "further study is needed to ensure that implementation of last year's policy change would not have those negative effects." *Id.*

The President directed the military to maintain its longstanding policies and practices regarding transgender service that were in place before June 2016. Those policies would remain until there existed a sufficient basis to conclude that ending them would not cause

---

[4] The Department of Defense Release is available online at: https://www.defense.gov/News/News-Releases/News-Release-View/Article/1236145/statement-by-chief-pentagon-spokesperson-dana-w-white-on-transgender-accessions/ (last visited Oct. 23, 2017).

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 5
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

the harms identified by the President. The President also stated that the Secretary of Defense, in consultation with the Secretary of Homeland Security, should advise him at any time if a policy change is warranted. *Id.* § 1(b).

The President then directed the Secretaries of Defense and Homeland Security to maintain the current policy regarding accession of transgender individuals into the military beyond January 1, 2018—when the revision announced in June 2016 was set to take effect—until such time as the Secretary of Defense, in consultation with the Secretary of Homeland Security, provides a recommendation to the contrary that the President finds convincing. *Id.* § 2(a). The President also directed the Departments of Defense and Homeland Security to halt the use of resources to fund sex-reassignment surgical procedures for military personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his sex. *Id.* § 2(b).

Other than the provision regarding accessions, the Memorandum's provisions take effect on March 23, 2018. This delayed implementation date was adopted so that the two Cabinet Secretaries can study the issues addressed in the Memorandum and submit an implementation plan to the President by February 21, 2018. *Id.* § 3.

The Memorandum also addresses currently serving transgender individuals. It provides that "[a]s part of the implementation plan, the Secretary of Defense, in consultation with the Secretary of Homeland Security, shall determine how to address transgender individuals currently serving in the United States military." *Id.* And, "[u]ntil the Secretary has made that determination, no action may be taken against such individuals under the policy set forth in Section 1(b) of this memorandum." *Id.*

On August 29, 2017, Secretary Mattis issued a statement explaining that the Department of Defense had received the Presidential Memorandum and would develop a study and implementation plan. Statement of Secretary Jim Mattis, Release No: NR-312-17.[5]

---

[5] The August 29, 2017 Statement of Secretary Jim Mattis, Release No: NR-312-17, is available online at: https://www.defense.gov/News/News-Releases/News-Release-View/Article/1294351/ (last visited on Oct. 23, 2017).

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 6
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

Secretary Mattis promised to "establish a panel of experts serving within the Departments of Defense and Homeland Security to provide advice and recommendations on the implementation of the president's direction." *Id.* According to Secretary Mattis, the "[p]anel members will bring mature experience, most notably in combat and deployed operations, and seasoned judgment to this task," and "will assemble and thoroughly analyze all pertinent data, quantifiable and non-quantifiable." *Id.* Secretary Mattis also stated that he expected to issue interim guidance on the issue of service by transgender individuals "to ensure the continued combat readiness of the force until our final policy on this subject is issued." *Id.*

Although the Presidential Memorandum had no immediate effect on individual service members, Plaintiffs filed this action on September 5, 2017.  ECF No. 1.  Plaintiffs alleged that the President's Memorandum violated their equal protection, due process, and First Amendment rights under the Constitution.  *Id.*

### III.    The Interim Guidance and Plaintiffs' Request for Preliminary Injunction

On September 14, 2017, Secretary Mattis issued Interim Guidance regarding military service by transgender individuals.[6]  The Interim Guidance states, "first and foremost," that the military[7] "will continue to treat every Service member with dignity and respect." Interim Guidance, supra n.6.  It then confirms that the military's longstanding accessions policy, "which generally prohibit[s] the accession of transgender individuals into the Military Services, remain[s] in effect because current or history of gender dysphoria or gender transition does not meet medical standards." *Id.*   It emphasizes, however, that this "general[]" prohibition remains "subject to the normal waiver process." *Id.*

The Interim Guidance also addresses potential harms alleged by the Plaintiffs who are current service members.  On the issue of involuntary discharges, it states that "no action may be taken to involuntarily separate or discharge an otherwise qualified Service member

[6] Secretary Mattis's September 14, 2017 Memorandum and the accompanying Interim Guidance are available at: https://www.defense.gov/Portals/1/Documents/PDFs/Military-Service-By-Transgender-Individuals-Interim-Guidance.pdf (last visited October 23, 2017).
[7] By agreement with the Acting Secretary of Homeland Security, the Interim Guidance also applies to the U.S. Coast Guard.  Mattis Memorandum, September 14, 2017, supra n.6.

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 7
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

solely on the basis of a gender dysphoria diagnosis or transgender status." *Id.* The Interim Guidance also addresses reenlistment into military service, providing that "[a]n otherwise qualified transgender Service member whose term of service expires while this Interim Guidance remains in effect, may, at the Service member's request, be reenlisted in service under existing procedures." *Id.* Finally, it directs that "Service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition." *Id.*

Rather than amend their Complaint to address the operative policy, Plaintiffs filed a motion for preliminary injunction. *See* ECF No. 15. However, Plaintiffs' motion does not even mention the Interim Guidance much less explain why the guidance does not address their claims of irreparable harm. Their current complaint and motion for a preliminary injunction therefore fail to address the current state of the Government's policy regarding military service by transgender individuals. Instead Plaintiffs' motion relies almost entirely on speculation that the currently serving Plaintiffs will be discharged from the military and are suffering stigmatic injures untethered to any actual adverse effects and speculation that the civilian Plaintiffs will be denied accession solely based on their transgender status and will be unable to obtain a medical waiver under the operative Department of Defense instruction. Such speculative injuries cannot serve as the basis for standing much less an irreparable injury. This is true for each of the seven individual Plaintiffs as well as the organizational Plaintiff suing on their behalf. Under current policy, not one of the individual Plaintiffs has been discharged from the military, denied re-enlistment, refused health care by the military, or denied accession to the military.

Plaintiff Aiden Stockman is a transgender civilian who currently resides in California. ECF No. 1 ¶ 10. In June 2014, Mr. Stockman began hormone replacement therapy. *Id.* Mr. Stockman has made plans to complete a double-mastectomy and hopes to enlist in the Air Force thereafter. *Id.* Mr. Stockman does not claim to have attempted to enlist in the Air Force or sought a medical waiver, in accordance with the procedures of DoDI 6130.03, and

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 8
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

the Air Force has no record of him doing so. *See id.;* Declaration of Phillip A. Layman ("Layman Decl.").[8]

Plaintiff Nicholas Talbott is a transgender civilian who currently resides in Ohio and wishes to join the Air Force National Guard. ECF No. 1 ¶ 11. Mr. Talbot alleges that he met with a recruiter in December 2016 and filled out paperwork confirming his interest in acceding into the military. *Id.* He further alleges that the recruiter asked Mr. Talbot to obtain a letter from his doctor confirming that being transgender did not have any adverse effects on his life or ability to perform military-related duties. *Id.* He also alleges that the recruiter told him the next steps would be to meet with the regional Military Entrance Processing Station for a physical exam and to take the Armed Services Vocational Aptitude Battery test. *Id.* He does not allege that he completed these additional steps, submitted an application for accession and was denied, or sought a medical waiver under the procedures detailed in DoDI 6130.03.

Plaintiff Tamasyn Reeves is a transgender civilian who currently resides in California. ECF No. 1 ¶ 12. At the age of 23, Ms. Reeves began hormone replacement therapy. *Id.* Ms. Reeves alleges that she tried to join the Navy in 2010 and was told that she was not eligible to enlist. *Id.* She further alleges that she decided to enlist as soon as the final procedures for accession of transgender individuals were solidified. *Id.* She does not allege that she submitted an application for accession and was denied or sought a medical waiver under the procedures detailed in DoDI 6130.03.

Plaintiff Sergeant (SGT) Jaquice Tate serves in the U.S. Army and revealed his transgender status to military personnel in 2016. ECF No. 1 ¶ 13. SGT Tate alleges that he fears that he will be discharged and will lose the retirement benefits associated with active duty service. *Id.* But Defendants have submitted a declaration from SGT Tate's company commander noting that, under the Interim Guidance, he will not be discharged from the

---

[8] In this memorandum and related documents, the Government uses Plaintiffs' choice of pronouns for purposes of consistency and for the convenience of the Court.

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 9
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

military based on his transgender status. *See* Declaration of Captain (CPT) John Kareta (Kareta Decl.) ¶ 3.

Plaintiff John Doe 1 serves in the U.S. Air Force and revealed his transgender status in April 2017. ECF No. 1 ¶ 15. John Doe 1 alleges that he fears that he will be discharged from the Air Force and that he will be precluded from obtaining promotions and further advancing his career in the Air Force. But under the Interim Guidance, service members cannot be separated on the basis of transgender status, and transgender service members, like John Doe 1, are subject to the same standards as any other service member of the same gender. Interim Guidance, *supra* n.6.

Plaintiff John Doe 2 serves in the U.S. Army and revealed his transgender status sometime after June 2016. ECF No. 1 ¶ 16. John Doe 2 alleges that he fears that he will be discharged from the Army and will lose benefits associated with active duty service. *Id.* But Defendants have submitted a declaration from the Acting Assistant Secretary of the Army (Manpower and Reserve Affairs) explaining that, under the Interim Guidance, John Doe 2 will not be discharged from the military based on his transgender status. *See* Declaration of Raymond Horoho (Horoho Decl.) ¶ 3.

Plaintiff Jane Doe serves in the U.S. Air Force and revealed her transgender status sometime after June 2016. ECF No. 1 ¶ 17. Jane Doe alleges that she fears that she will be discharged from the Air Force, will lose benefits associated with active duty service and her ability to obtain promotions will be compromised. *Id.* But under the Interim Guidance, service members cannot be separated on the basis of transgender status, and transgender service members, like Jane Doe, are subject to the same standards as any other service member of the same gender. Interim Guidance, *supra* n.6.

Plaintiff Equality California sues on behalf of its members which "include transgender individuals in active military service, transgender military veterans, and transgender individuals who have taken steps to serve[.]" ECF No. 1 ¶ 18. Equality California does not assert any injuries in its own right.

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 10
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

**STANDARD OF REVIEW FOR MOTION TO DISMISS**

When a defendant brings a Rule 12(b)(1) motion, the plaintiff has the burden of establishing subject matter jurisdiction. *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007) ("Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence."). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction," *id.*, and "the court assumes the factual allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor," *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047, 1052 (C.D. Cal. 2014). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. In resolving a factual attack, district courts "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness of the plaintiff's allegations." *Id.*

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of claims alleged in the complaint. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal is proper "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**ARGUMENT**

**I.    The Court Should Dismiss Plaintiffs' Complaint for Lack of Jurisdiction**

Plaintiffs' claims should be dismissed for two reasons. First, Plaintiffs neither have suffered an injury that could establish standing nor face an imminent threat of future injury. Second, and in the alternative, their claims are unripe, as the issues presented are not fit for judicial decision, no actual discharge or denial of accession has occurred, and Plaintiffs will

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 11
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

not suffer a hardship if the Court withholds consideration until after the challenged policies are implemented and are found to affect Plaintiffs.

## A. The Court's Standing Inquiry Should Be Especially Rigorous

Article III of the Constitution confines federal courts to adjudicating only "actual cases and controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984) *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). Accordingly, federal courts have "neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them," and must resolve only "real and substantive controvers[ies] admitting of specific relief through a decree of a conclusive character." *Preister v. Newkirk*, 422 U.S. 395, 401 (1975).

One aspect of this case-or-controversy limitation is the requirement of standing. To establish standing, Plaintiffs (1) must have suffered an injury-in-fact, *i.e.*, a judicially cognizable injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" (2) the injury must be "fairly … trace[able] to the challenged action of the defendant;" and (3) "it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations in original).

To satisfy the first requirement, Plaintiffs must establish they have suffered a "distinct and palpable injury," *Warth v. Seldin*, 422 U.S. 490, 500–01 (1975); a "generally available grievance about government" is insufficient. *Lujan*, 504 U.S. at 573–74. By limiting the judicial power to instances where specific individuals have suffered concrete injuries, standing requirements "serve[] to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). A court's standing inquiry thus should be "especially rigorous when reaching the merits of the dispute" would compel it "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* Here, Plaintiffs have brought a constitutional challenge to the President's policy directive to conduct further study before the military changes its longstanding policies regarding service by transgender

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 12
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

individuals. The Court thus should conduct an "especially rigorous" inquiry into the existence of standing. *Id.*

## B.    Plaintiffs Have Not Met Their Burden of Showing an Injury-in-Fact

Each of the Plaintiffs bears the burden of establishing that they have standing in their own right to pursue their claims. *Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir. 1993) ("To have standing to bring this lawsuit in federal court, each plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant."). None of the Plaintiffs have standing and at the very least, they have brought this action prematurely.

Plaintiffs allege three categories of injuries. First, they allege that they have been harmed by a stigma resulting from allegedly unconstitutional discrimination. *See* ECF No. 15 at 30-31. But that sort of stigmatic injury "accords a basis for standing only to those persons who are personally denied equal treatment." *Allen,* 468 U.S. at 755. Because Plaintiffs have not shown that they themselves have been subject to discriminatory treatment, they cannot rely upon a claim of stigmatic injury. Instead, "stigmatic injury… requires identification of some concrete interest with respect to which respondents are personally subject to discriminatory treatment," and "[t]hat interest must independently satisfy the causation requirement of standing doctrine." *Id.* at 757 n.22. No such interest exists here.

Second, Plaintiffs allege that they are being injured because the currently serving Plaintiffs may be discharged from the military in the future and lose the medical and retirement benefits associated with service in the military based on their transgender status. ECF No. 15 at 31-32. But Defendants have shown that no Plaintiff has been discharged from the military and that the Interim Guidance bars individuals from being discharged solely on the basis of transgender status or a diagnosis of gender dysphoria. Plaintiffs' speculation that they may be discharged in the future is insufficiently concrete and imminent to establish standing. *See, e.g., Amnesty Int'l USA*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.").

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 13
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

Similarly speculation that Plaintiffs will lose their health care coverage after March 2018 is insufficient to establish standing, particularly in light of the Interim Guidance which states "Service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition." Plaintiffs appear to base this allegation on the Interim Guidance's direction that "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex." However, none of the service member Plaintiffs claim that they have been denied any medical treatment or that they even plan to seek sex reassignment treatment through the military now or in the future.

Third, Plaintiffs allege that they have been injured by the accessions policy. ECF No. 15 at 31. But not one of them has been denied accession into the military, which could be denied for numerous reasons wholly unrelated to an applicant's transgender status. *See, e.g.,* DODI 6130.03 (listing various other medical conditions that are "grounds for rejection for military service" absent a waiver). Nor has any Plaintiff alleged that they have been denied a medical waiver under the procedures detailed in DODI 6130.03. Such allegations of speculative future harms are insufficient to establish standing. Moreover, Plaintiffs Stockman and Reeves have both indicated that they have recently taken medical steps to transition or plan to in the near future, ECF No. 1 ¶¶ 10, 12 and therefore would not be eligible for accession even under former Secretary Carter's policy were the Court to reinstate it. *See* DTM 16-005 (requiring a prospective service member have completed all medical treatment and have been stable in the preferred gender for 18 months). Finally, individuals who are transgender or who have been diagnosed with gender dysphoria can still apply for a medical waiver under the procedures detailed in DODI 6130.03, yet Plaintiffs Stockman, Talbott, and Reeves have not alleged that they have even sought such a waiver.

The lack of an injury-in-fact also defeats the organizational Plaintiff's claims to associational standing. To establish associational standing, each plaintiff organization must

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 14
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). Because the Interim Guidance maintains the status quo, the organizational Plaintiff has not identified even a single member who has suffered an injury-in-fact. Equality California has failed to show that its claims do not require the participation of individual members in the lawsuit. It consequently has not established associational standing and should be dismissed from the case.

### C. Plaintiffs' Claims Are Not Ripe for Adjudication

Plaintiffs' claims are also unripe. The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The prudential ripeness requirement is designed to prevent courts from "entangling themselves in abstract disagreements over administrative policies" until "an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998). To decide whether a claim is prudentially ripe, a court must evaluate (1) "the fitness of the issues for judicial decision" and (2) "the hardship[s] to the parties of withholding court consideration." *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967). Both considerations show that Plaintiffs' challenge is premature.

First, the issues presented by Plaintiffs' challenge are not fit for judicial decision. "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009). In applying this standard, "[c]ourts have regularly declined on prudential grounds to review challenges to recently promulgated laws or regulations in favor of awaiting an actual application of the new rule." *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 837 (9th Cir. 2012). Here, the policy Plaintiffs assail is still being studied and implemented, and judicial review at this stage would entangle the Court in an abstract

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 15
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

disagreement over a rule that has not yet been finalized or had any concrete effect on Plaintiffs. In addition, no Plaintiff has been discharged, refused health care, or denied accession to the military, so there is no actual decision affecting a litigant, which should be the focus of judicial review. Finally, concerns regarding whether issues are fit for judicial decision apply with special force where, as here, Plaintiffs ask this Court to interfere in a policy making process regarding an area that is constitutionally committed to the discretion of the political branches.

Under these settled principles, the Court should defer to the policymaking process presently underway concerning service by transgender persons. Plaintiffs cannot establish, nor should this Court attempt to predict, the effect that future policies will have on overall military needs when the military is exploring these issues. While Plaintiffs seek to rely at this stage on the views of former military leaders regarding the policy on service by transgender individuals, ECF No. 15 at 19-22, these citations only underscore that different views exist as to a policy debate now underway—not that a possible future policy would be unlawful.

Second, due to the protections afforded by the Interim Guidance, Plaintiffs are not being harmed and will not suffer hardships if the Court withholds consideration. As for Plaintiffs' allegations that they will be harmed in the future, it is unclear both how the policy regarding military service by transgender individuals will be developed and implemented and whether that policy will even have any effect on Plaintiffs. Plaintiffs' speculation about future events is insufficient to show that they will be harmed if this Court withholds its consideration. After all, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

Further, the Ninth Circuit has traditionally required military service members to exhaust intraservice corrective measures before a district court may review a military decision, except where exhaustion would be futile. *Meinhold v. US Dep't of Def.*, 34 F.3d 1469, 1473-74 (9th Cir. 1994) ("[S]trict application of exhaustion requirements in military discharge cases helps maintain the balance between military authority and federal court intervention[.]"); *see*

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 16
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

*also Watkins v. US Army,* 875 F.2d 699, 705 (9th Cir. 1989) (en banc), *cert. denied,* 498 U.S. 957 (1990). Here, it is quite clear that not only have Plaintiffs not exhausted their military remedies, in most cases they do not even know what those remedies will be or what adverse personnel action, if any, they could be subject to in the future.

For example, all of the currently serving Plaintiffs claim to fear a future discharge. As explained *supra*, the Interim Guidance currently prohibits discharge based solely on a diagnosis of gender dysphoria or on a service members' transgender status; but even if the Court were to accept Plaintiffs' assumption that they will one day be involuntarily separated from the military, such separations whether administrative or medical, are heavily regulated by detailed instructions both at the Defense Department and service level. *See, e.g.,* Department of Defense Instruction 1332.14 (providing detailed procedures for the current types of enlisted administrative separations);[9] Department of Defense Manual 1332.18 Vol. 1–3 (providing detailed procedures for current medical separations).[10] And each type of military discharge has individually tailored procedures. For example, separation by administrative board provides a service member the opportunity for a formal hearing before the board with the opportunity to present evidence and cross-examine witnesses. *See, e.g.,* Army Reg. 635-200 ¶ 3-7.[11] Because the final policy is still being studied, it is premature to know which specific regulatory process might apply.

For Plaintiffs seeking to access into the military the Department of Defense continues to apply DODI 6130.03, but those procedures have not been utilized by Plaintiffs. Plaintiffs Stockman, Talbott, and Reeves have not even passed the initial hurdle by showing that they have applied for accession into the military and been denied solely based on their transgender

[9]Available at http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/133214p.pdf last visited Oct. 23, 2017.

[10] Available at http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/133218m_vol1.pdf; http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/133218m_vol2.pdfhttp://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/133218vol3.pdf last visited at Oct. 23, 2017.

[11]Available at http://www.apd.army.mil/epubs/DR_pubs/DR_a/pdf/web/AR635-200_Web_FINAL_18JAN2017.pdf last visited at Oct. 23, 2017.

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 17
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

status. Then, if such an action were to occur, Plaintiffs may utilize the procedures of DODI 6130.03 to seek a medical waiver for "current or history of gender dysphoria or gender transition[.]" Interim Guidance, supra n.6. Only after Plaintiffs follow these procedures, similarly applied to any other civilian seeking to join the military, will they have exhausted their intraservice remedies.

The principles of constitutional avoidance further counsel for exhaustion of administrative remedies. *See Meinhold,* 34 F.3d at 1474 (holding that it is error to rule on an avoidable constitutional claim); *Ar v. Hawaii*, 314 F.3d 1091, 1098-99 (9th Cir. 2002) (Wallace, J. concurring). Here, the service member Plaintiffs may never face an adverse personnel action and so deciding whether or not a speculative action based on their gender dysphoria or transgender status would be in compliance with the constitution could be wholly unnecessary. Likewise, Plaintiffs who wish to join the military in the future may be denied accession on grounds completely unrelated to gender dysphoria or transgender status or they may have their medical waiver granted. The Court should therefore require Plaintiffs to exhaust those remedies and decline to issue an advisory opinion on possible constitutional theories, and dismiss Plaintiffs' claims until they become ripe.

## II.   Plaintiffs' Motion for a Preliminary Injunction Should Be Denied

Because Plaintiffs lack standing and their claims are not ripe, the Court should not consider their preliminary injunction motion but instead dismiss the complaint. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."). But if the Court decides to reach Plaintiffs' motion, it should deny them the relief they seek.

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 18
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). A plaintiff cannot prevail without some showing on each of these four factors. *See id.* at 23–24, 31–32 (holding that "proper consideration of" balance of equities and public interest "alone requires denial of the requested injunctive relief" and thus finding no need to address likelihood of success). And that showing must be especially strong to obtain an injunction from an Article III court that runs to internal operations of the military. Here, Plaintiffs have not met that burden.

### A. Plaintiffs Have Not Shown that They Are Likely to Suffer an Irreparable Harm Absent the Entry of a Preliminary Injunction

The Court's review of this preliminary injunction motion should begin and end with a consideration of whether Plaintiffs are likely to suffer irreparable injury. To show that a preliminary injunction is warranted, Plaintiffs must demonstrate "that irreparable injury is *likely* in the absence of an injunction," regardless of the likelihood of success on the merits of their claims. *Id.* at 22; *see id.* ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction.").

The standard for an irreparable injury is a demanding one: "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to qualify as irreparable, and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). In the military context that standard is even higher. *See Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985) (indicating that a moving party seeking injunctive relief against the armed services must make a stronger showing of irreparable harm than is ordinarily required).

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 19
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

Plaintiffs have not shown a likelihood of irreparable harm in this case. First, for much the same reasons they lack standing, Plaintiffs cannot show that they are likely to be injured if the Court does not enter an injunction. *See supra* Part I. Second, even if Plaintiffs could establish that they are likely to be injured, they cannot show that their injuries would be beyond remediation. Separation from the military, for example, would not constitute an irreparable harm because it is within the Court's equitable powers to remedy such an injury. *See, e.g.*, *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (finding no irreparable harm where, if she succeeded on the merits of her claim, service member could be "compensated in damages and back pay."); *Hartikka*, 754 F.2d at 1518 (lost income, lost retirement and relocation pay, and damage to a military service member's reputation resulting from the stigma of a less-than-honorable discharge did not constitute irreparable harm). And Plaintiffs cannot overcome their lack of an actual, irreparable harm by relying entirely on their allegations of constitutional violations. *See, e.g.*, *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484–85 (1st Cir. 2009) ("[I]t cannot be said that violations of plaintiffs' rights to due process and equal protection automatically result in irreparable harm.") (emphasis omitted). As Plaintiffs have failed to show that they are likely to suffer an irreparable harm if the Court does not intervene, the Court should deny Plaintiffs' motion for a preliminary injunction.

## B.    Plaintiffs Are Unlikely To Succeed on the Merits[12]

Plaintiffs also cannot establish that they are likely to succeed on the merits. To begin, Plaintiffs' failure to clear the standing and ripeness thresholds forecloses any conclusion that they are likely to prevail on the merits of this lawsuit. *See supra* Part I; *see also, e.g.*, *Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction. It says nothing about the 'likelihood of success on the merits,' other than making such success more *unlikely* due to potential impediments to even

---

[12] For the same reasons that Plaintiffs cannot establish a likelihood of success on the merits, they also fail to state a claim as a matter of law. Accordingly, Plaintiffs' Amended Complaint is also subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 20
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

reaching the merits."). But even if Plaintiffs could somehow establish jurisdiction at this stage, their challenge would founder for several reasons. First, the policy currently in place—which maintains the status quo for transgender persons currently serving in the military during an interim period while the need for possible changes is studied—has not been challenged in this case and, in any event, is plainly lawful. Second, to the extent Plaintiffs seek to attack the ongoing policy-making process, their claims similarly lack merit. The President and Secretary Mattis' decision that the complex issues presented by the policy on military service by transgender individuals warrant additional study before changes are made to longstanding policies passes muster under any standard. Third, even if the Court could somehow review the military's current maintenance of its longstanding accessions policy, the policy would withstand constitutional challenge. Likewise, until the future policy concerning transgender service is resolved and implemented, Plaintiffs cannot show they are likely to succeed on their due process or First Amendment claims.

### 1. Plaintiffs Have Not Challenged Defendants' Operative Policy for Enlisted Transgender Service Members, and any such Challenge Would Fail to State an Equal Protection Claim

Plaintiffs fail even to mention the policy on service by transgender individuals that is currently in effect. For that reason alone, they cannot show a likelihood of success on the merits. While Plaintiffs say much about the potential impact of the President's August 25 Memorandum, ECF No. 15 at 6-7, 12, 16, 30-32, 34, they never address the operative Interim Guidance issued on September 14, which bars any disparate treatment of currently serving transgender individuals. Under the operative policy:

> [N]o action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status. Transgender Service members are subject to the same standards as any other Service member of the same gender; they may be separated or discharged under existing bases and processes, but not on the basis of gender dysphoria diagnosis or transgender status.

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 21
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

Interim Guidance, *supra* n.6.  The operative policy further provides that transgender service members "who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition." *Id.*  And it makes clear that "[a]n otherwise qualified transgender Service member whose term of service expires while this Interim Guidance remains in effect, may, at the Service member's request, be re-enlisted in service under existing procedures." *Id.*[13]

Under this operative policy, Plaintiffs' claims fail on their face.  Plaintiffs ask this Court to enter a preliminary injunction "prohibiting Defendants from implementing the ban on military service by transgender individuals[.]" ECF No. 15 at 1.  But the Interim Guidance *already* explicitly states that "no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis."  The Equal Protection component does not apply under these circumstances.  "A denial of equal protection entails, at a minimum, a classification that treats individuals unequally." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 707 (9th Cir. 1997).  Here, the current operative policy does not impermissibly classify service members based on transgender status, but rather *prohibits* disparate treatment of existing service members based on transgender status. A law that forbids disparate treatment cannot violate Equal Protection.

### 2.  Plaintiffs' Challenge to the Accession Policy is Unlikely to Succeed

To the extent Plaintiffs seek to challenge Defendants' current policy for the accession of transgender persons into the military, they also cannot establish a likelihood of success on the merits and have failed to state a valid claim challenging that policy for several reasons.

First, neither the President's Memorandum nor the operative Interim Guidance establishes a new restriction that has been imposed on Plaintiffs with respect to accession to military service.  Even before the President took action, the policy on accession by

---

[13] The policy also states that "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, *except to the extent necessary to protect the health of the individual who has already begun a course of treatment to reassign his or her sex.*" *Id.* (emphasis added).  There are thus no restrictions on sex-reassignment surgery at present.  In addition, this provision confirms that medically necessary procedures will be accommodated in the future.

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 22
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

transgender individuals announced in June 2016 had not gone into effect. Originally scheduled to be implemented on July 1, 2017, Secretary Mattis had deferred implementation of a revised accession policy until January 1, 2018, before the President issued his memorandum. *See* Presidential Memorandum § 1(a). The President's Memorandum "extends the deadline to alter the currently effective accession policy beyond January 1, 2018, while [the relevant Departments] continue to study the issue." *Id.* The "currently effective" accession policy is set forth in DODI 6130.03, and was most recently modified in September 2011. *See* DODI 6130.03. The Interim Guidance thus maintains the status quo by continuing the longstanding procedures set forth in DODI 6130.03 to permit further review by a panel of experts before any change in policy occurs. Thus, with respect to accession, Plaintiffs cannot claim that the President imposed a new requirement; instead, he declined to relax longstanding policy without further study. The President has preserved the status quo "until such time as a sufficient basis exists upon which to conclude" that ending the accessions policy would not result in harm to the military. Presidential Memorandum § 1(b). The President has the authority to insist on further study before a significant change to military personnel policy, and Plaintiffs cannot show otherwise, let alone obtain an injunction to halt such a study. And certainly no Plaintiff can credibly sustain a claim for emergency relief as to a policy whose current version has been in place without modification for over six years.

Second, Plaintiffs cannot show a likelihood of success on the merits of any challenge to the accession policy because it has not injured them. Plaintiffs Tate, John Doe 1, John Doe 2, and Jane Doe 1 who are currently serving in the military, are not subject to the accessions policy, but to the policy set forth in the Interim Guidance under which they may reenlist and obtain promotions. Plaintiffs Stockman, Talbott, and Reeves do not allege that their applications have been denied due to their transgender status. And because the Interim Guidance expressly confirms that the accession policy, which "generally" bars the accession of transgender individuals into the military, is "subject to the normal waiver process," Interim Guidance, supra n.6, those Plaintiffs could be injured only if they sought and were denied

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 23
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

individualized waivers.  Given that there is no way of knowing whether the military would deny their waiver requests until they are actually sought, Plaintiffs Stockman, Talbott, and Reeves cannot claim to have been injured by the accessions policy.

Finally, even if the accession policy did apply to Plaintiffs, the President has concluded only that the analysis undertaken thus far does not provide "a sufficient basis to conclude that terminating the Departments' longstanding policy and practice would not hinder military readiness and lethality, disrupt union cohesion, or tax military resources" and that "further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects."  Presidential Memorandum § 1(a).  It is plainly reasonable for the Defense Department to study conditions that could have an adverse effect on the military, and Plaintiffs cannot state a valid claim, let alone support preliminary injunctive relief, on the ground that it is unlawful to do so.

In these circumstances, the Court need not—and should not—address the constitutionality of accession policy at this stage.  "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944).  This avoidance principle is particularly applicable here, where Plaintiffs' claims seek to delve into the judgment of military authorities. *See infra* Part II.B.3.

### 3. In any Event, an Equal Protection Challenge to Defendants' Longstanding Accession Policy Would Not Succeed

Although there is no basis for this Court to address the issue, Plaintiffs' equal protection challenge to the accession policy regarding transgender individuals is unlikely to succeed.

#### a. The military's longstanding accessions policy is subject to a highly deferential form of review

**i.** Courts have accorded substantial deference to Congress and the President on the development and regulation of military personnel policy.  That is not only because the Constitution itself commits military decisions to "the political branches directly

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 24 *Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE** **Civil Division, Federal Programs Branch** **20 Massachusetts Ave., NW** **Washington, DC 20530** **Tel: (202) 305-8902**

responsible—as the Judicial Branch is not—to the electoral process," but because "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at 10. Accordingly, there is "perhaps … no other area" where the Supreme Court has shown the political branches "greater deference." *Rostker v. Goldberg*, 453 U.S. 57, 64–65 (1981).

None of this is to say that the Constitution may be disregarded when military affairs are at stake, *see id.* at 78, but "the tests and limitations to be applied may differ because of the military context," *id.* at 67. For instance, judicial "review of regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations destined for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). In the military context, the government may ban political speeches and the distribution of leaflets, *Greer v. Spock*, 424 U.S. 828 (1976), or even impose prior restraints on circulating petitions, *Brown v. Glines,* 444 U.S. 348, 355 (1980). And even during an era when the Court applied a more rigorous standard for free-exercise claims, it still allowed the Air Force to prohibit a Jewish officer from wearing a yarmulke while working as a clinical psychologist in an Air Force base hospital. *Weinberger*, 475 U.S. 503.

The same principle applies to "'[t]he complex, subtle, and professional decisions as to the composition … of a military force.'" *Rostker*, 453 U.S. at 65 (citation omitted). These "'are essentially professional military judgments, subject always to the civilian control of the Legislative and Executive Branches,'" and thus are particularly ill-suited to judicial second-guessing. *Id.* at 65–66 (emphasis omitted). That is in part because choices about the composition of the armed forces "are based on judgments concerning military operations and needs, and the deference unquestionably due the latter judgments is necessarily required in assessing the former as well." *Id.* at 68 (internal citation omitted).

Courts consequently have upheld exclusionary policies in the military while at the same time invalidating similar policies in the civilian sphere. *Compare, e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976), *Reed v. Reed*, 404 U.S. 71 (1971); and *Massachusetts v. HHS*, 682 F.3d 1, 9–10 (1st Cir. 2012), *with Rostker*, 453 U.S. 57, *Schlesinger v. Ballard*, 419 U.S. 498 (1975); and *Cook*

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 25
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

*v. Gates*, 528 F.3d 42, 62 (1st Cir. 2008).  Of course, there are limits: no amount of deference could save the military's decision to exclude a race or religion from being considered under the strict scrutiny standard.  *See Rostker* 453 U.S. at 78.  But outside those extreme examples, the military's policies are entitled to a "healthy deference" their civilian counterparts do not enjoy.  *Id.* at 66.

**ii.** While the Supreme Court has yet to provide a precise explanation of how this deference interacts with traditional tiers of scrutiny, *see id.* at 69–70, at least three features of the highly deferential review applied to military decisions are significant.  First, courts defer to the judgments of the political branches even in the face of contrary evidence.  In *Weinberger*, for instance, the plaintiff provided "expert testimony that religious exceptions" to the Air Force's dress code "will increase morale by making the Air Force a more humane place," and noted "that the Air Force's assertion" that such exceptions "would threaten discipline" was "mere *ipse dixit*, with no support from actual experience or a scientific study in the record." 475 U.S. at 509.  The Court dismissed the "views of expert[s]" as "quite beside the point," because "military officials … are under no constitutional mandate to abandon their considered professional judgment." *Id.*  Similarly, in *Rostker*, the Supreme Court rejected the lower court's conclusion that the available evidence showed that "'military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it.'"  453 U.S. at 63 (citation omitted).  As the Court explained, judges could not substitute their "own evaluation of evidence for a reasonable evaluation" by the political branches.  *Id.* at 68.

Second, the political branches enjoy a significant latitude to choose "among alternatives" in developing military policy, including among alternatives supported by different government officials and military experts.  *Id.* at 72.  In *Rostker*, for example, President Carter recommended that Congress "permit the registration and conscription of women as well as men," *id.* at 60, and secured "testimony of members of the Executive Branch and the military in support of that decision," *id.* at 79.  That side of the debate stressed that women inducted into the army could "be used to fill noncombat positions, freeing men

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 26
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

to go to the front." *Id.* at 81.  The Supreme Court rejected the lower court's reliance on this testimony, explaining that the policy question of participation of women in the selective service was appropriately left to Congress and the military rather than the courts.  *See id.*

Third, arguable inconsistencies that result from line-drawing have not rendered military policies invalid.  The Court in *Weinberger*, for instance, acknowledged that the Air Force both had an "exception … for headgear worn during indoor religious ceremonies" and allowed commanders "in their discretion" to allow "visible religious headgear … in designated living quarters and nonvisible items generally." 475 U.S. at 509.  But the fact that "Air Force has drawn the line essentially between religious apparel that is visible and that which is not" did not trouble the Court, for the regulations challenged in that case "reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity." *Id.*

**iii.** Plaintiffs ignore all of this, treating their premature challenge as if it were a run-of-the-mill civilian case.  They first insist that the military's accessions policy is subject to a conventional strict-scrutiny analysis, but fail to identify a single court that has applied this exacting standard to laws bearing on transgender individuals in any context.  ECF No 15 at 12.  This Court should not be the first to do so with respect to a military judgment.  Indeed, applying strict scrutiny here would mean that transgender status receives far greater protection than core First Amendment freedoms, *see Weinberger*, 475 U.S. 503; *Brown*, 444 U.S. 348; *Greer*, 424 U.S. 828, sexual orientation, *see Witt v. Dep't of Air Force*, 527 F.3d 806, 818 (9th Cir. 2008), and even gender itself, *see Rostker*, 453 U.S. 57.

In the alternative, Plaintiffs insist that the military's policy warrants intermediate scrutiny because it is a sex-based classification or sex stereotyping.  ECF No. 15 at 14-15.  But the Ninth Circuit has never applied intermediate scrutiny to an equal protection claim of transgender discrimination, and, to our knowledge, no court has ever applied heightened scrutiny to a claim of transgender discrimination in the military.  *See, e.g., Doe v. Alexander*, 510 F. Supp. at 902, 905 (D. Minn. 1981) (declining to review medical fitness determination policy for service member who had undergone sex change procedure under heightened

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 27
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

review).  The Ninth Circuit cases Plaintiffs cite in support of their argument for intermediate scrutiny did not involve constitutional equal protection claims and are distinguishable from the facts of this case.  *See Witt*, 527 F.3d at 821 (applying a heightened level of scrutiny to a substantive due process claim challenging the military's Don't Ask, Don't Tell policy and upholding the dismissal of the plaintiffs' equal protection claim under rational basis review); *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) (holding that the Gender Motivated Violence Act prohibits discrimination on the basis of sex and gender).  And insofar as *Witt* suggests that an ordinary form of heightened scrutiny may be applied to a military personnel policy, that approach is inconsistent with Supreme Court authority granting substantial deference in this context.  *See, e.g.*, *Witt v. Dep't of Air Force*, 548 F.3d 1264, 1272 (9th Cir. 2008) (O'Scannlain, J, dissenting from denial of rehearing en banc) ("*Witt* is in considerable tension with this traditional deference [to the military], which obtains even when it comes to constitutional rights."); *id.* at 1276 (Kleinfeld, J, dissenting from denial of rehearing en banc) ("few liberties prevail against" the "especially high level of deference we are required to extend to Congress and the President regarding military affairs").

In any event, every case Plaintiffs cite concerning distinctions on the basis of transgender status addresses the civilian context—typically, employment—and thus are distinguishable.  *See generally* ECF No. 32 at 14-15.  There is consequently no need for this Court to weigh in on how to apply equal protection doctrine to transgender individuals when it comes to civilian affairs.  *Compare, e.g.*, *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), *petition for cert. filed*, -- U.S.L.W. ---- (U.S. Aug. 25, 2017) (No. 17-301), *with Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007).

### b.  Plaintiffs are unlikely to succeed on their challenge to the military's longstanding accessions policy

In light of the considerable deference due to military personnel decisions, Plaintiffs cannot show that they are likely to succeed on their challenge to the decades-long accessions policy.  As the President explained, there were significant concerns that abandoning this policy could "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 28
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

resources." Presidential Memorandum § 1(a). Plaintiffs claim that each of these reasons "inexplicable by anything but animus" ECF No. 15 at 12, but their argument does not withstand closer examination.

First, the military's longstanding accessions policy rests on the reasonable concern that at least some transgender individuals suffer from medical conditions that could impede the performance of their duties. *See* DODI 6130.03. The new accessions policy announced in 2016 acknowledged the legitimacy of this concern by providing that a history of gender dysphoria, medical treatment associated with gender transition, and sex reassignment surgery were disqualifying unless an applicant could prove that he had avoided complications for an 18 month period. DTM 16-005. Whether those medical conditions and treatments are sufficiently correlated with transgender status or gender dysphoria as to warrant a broader disqualification is one of the questions that the Defense Department's expert panel will study, and in the interim it was not irrational for the President to maintain the status quo pending that panel's review. For example, the current edition of the World Health Organization's *International Classification of Diseases* likewise classifies "transsexualism" as a "disorder[] of adult personality and behavior," International Classification of Diseases F64.0 (2016) (ICD), and there is no reason to think that this judgment or the judgments of the previous administrations that maintained the military's longstanding accessions policy were somehow driven by animus.

Second, the accessions policy rests on the reasonable conclusion that these conditions may limit the ability of transgender individuals to deploy as well as impose additional costs on the armed forces. For decades, military professionals indicated that one basis for the policy was that complications associated with hormone therapy and sex-change procedures could impair soldiers from serving around the globe. *See, e.g.*, *DeGroat v. Townsend*, 495 F. Supp. 2d 845, 850–52 (S.D. Ohio 2007) (discussing testimony of military doctor); *Doe*, 510 F. Supp. at 905 (discussing affidavit of Brigadier General). Plaintiffs dispute this conclusion, relying on the RAND Report and the declarations of former military officials. ECF No. 15 at 19-22. But the RAND Report acknowledges that medical complications would limit

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 29
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

deployment capabilities, RAND Report 39–42; it simply concludes that this burden would be "negligible," *id.* at 46. But there is room for the military to think otherwise and in any event, cases such as *Weinberger* and *Rostker* teach that it is not this Court's role to resolve a battle of the experts in reviewing military policy.

Similarly, no one disputes that abandoning the longstanding accessions policy would impose costs on the military. Instead, Plaintiffs isolate one of those costs—transition-related care to active-duty service member—and dismiss it as "budget dust." ECF No. 15 at 21. But that ignores other costs associated with their desired policy change, and in any event the military's freedom to choose "among alternatives," *Rostker*, 453 U.S. at 72, includes the ability to decide how best to spend its money. At a minimum, the military is entitled to make the reasonable judgment that spending the millions of dollars necessary to accommodate transgender individuals on other endeavors would more effectively accomplish its "primary business"—*i.e.*, "to fight or be ready to fight wars should the occasion arise." *Id.* at 70 (citation omitted); *see* RAND Report 70 (estimating some costs).

Third, the President could reasonably conclude that the accessions policy furthers "unit cohesion." Presidential Memorandum § 1(a). Plaintiffs dismiss this rationale as well, invoking their own declarations as well as the experience of foreign militaries. ECF No. 15 at 20-21. But the RAND study on which Plaintiffs heavily rely noted that "[a] key concern in allowing transgender personnel to serve openly is how this may affect unit cohesion—a critical input for unit readiness," RAND Report 44, and specifically noted that it did "not have direct survey evidence or other data to directly assess the impact on the U.S. military." *Id.* RAND also acknowledged that its assessment of experience in foreign militaries was based on "fairly low numbers of openly serving transgender personnel." *Id.* at 45. Additionally, although the RAND study found that transgender service members were less deployable when seeking treatment, it did not appear to consider whether an impact in deployability in itself would affect unit cohesion. *See id.* at 40, 44–45. Given the limited information presently available, which the RAND study itself acknowledges, it is certainly reasonable for the President to have concluded that maintaining the accessions policy could

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 30
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

rationally further unit cohesion, and that the matter warranted further study. And in any event it is not the role of the judiciary to second-guess a Commander in Chief's judgment in this regard. After all, "the Supreme Court has indicated" that "military decisions and assessments of morale, discipline, and unit cohesion … are well beyond the competence of judges." *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (Kavanaugh, J., concurring).

Ultimately, Plaintiffs' theory reduces to the accusation that any justification for the accessions policy is a pretext for animus toward transgender individuals. But in the civilian context, the political branches are ordinarily free to engage in "line-drawing," even where, unlike here, "some persons who have an almost equally strong claim to favored treatment" are "placed on different sides of the line." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315–16 (1993). That freedom is even more important when it comes to deciding who may serve in the Armed Forces. For instance, a variety of physical and mental conditions presumptively bar entry into the military, including asthma, DODI 6130.03 at § 11(d); history of severe migraines, *id.* § 27(c); discrepancies in leg-length resulting in a limp, *id.* § 19(a)(2); or any curvature of the spine that would prevent one from wearing a uniform properly, *id.* § 17(c)(2). Reasonable people could disagree over whether these individuals should be able to serve. But that does not mean that the President or military leadership harbors animus towards these individuals.

### 4.     Plaintiffs Are Unlikely To Succeed on Their Due Process Claim

Nor are Plaintiffs likely to prevail on their due process claims, in either its substantive or procedural form. Plaintiffs' two substantive due process claims fail for essentially the same reasons. First, as shown above, Defendants have not deprived Plaintiffs of a liberty or property interest. Defendants have not interfered with Plaintiffs' "ability to continue serving in the military as openly transgender persons," ECF No. 1 ¶ 61, or their "liberty to live consistently with their gender identity," *id.* at ¶69. Plaintiffs attempt to analogize this case to the circumstances presented in *Witt v. Department of the Air Force*, but unlike the plaintiff in *Witt*, Plaintiffs have not been discharged from the military. 527 F.3d at 110. For that

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 31
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

reason alone, the Court should dismiss Plaintiffs' substantive due process claims, Counts Two and Three, for failure to state a claim upon which relief can be granted.

Moreover, Plaintiffs have failed to plausibly allege the violation a fundamental right or interest.  A fundamental constitutional right protected by the Due Process Clause is one that is "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).  The Supreme Court has mandated extreme caution in elevating individual liberty interests to the status of fundamental constitutional rights, because recognizing such rights, "to a great extent, places the matter outside the arena of public debate and legislative action" and risks transforming the Due Process Clause "into the policy preferences of the Members of the Court." *Id.*  In determining whether a claimed right is fundamental, courts first require "a careful description of the asserted fundamental liberty interest." *Id.* at 721. "[V]ague generalities . . . will not suffice." *Chavez v. Martinez*, 538 U.S. 760, 776 (2003).

Neither of the rights or interests that Plaintiffs assert here is fundamental.  Despite Plaintiffs' allegations in Count Two, individuals do not have a property right in continued service in the military. *See Christoffersen v. Wash. State Air Nat'l Guard,* 855 F.2d 1437, 1443 (9th Cir. 1988).  Plaintiffs cannot circumvent this limitation by recasting the right at issue as a reliance interest.  And Plaintiffs' suggestion that the military is somehow estopped under the Due Process Clause from changing its policies, ECF No. 15 at 25-27, is equally misplaced. *See, e.g., United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy."), cited in *New Hampshire v. Maine,* 532 U.S. 742, 755 (2001); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (estoppel cannot be justified against the government where it would "interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation.").  Notably, Plaintiffs do not cite any case in which a court has held that a federal agency is estopped from changing its generally applicable policies.  Indeed, it is axiomatic that the government may alter its policies for any number of reasons, in accordance with the applicable procedures. *See generally*

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 32
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1210 (2015).   Here, the President issued a directive setting forth his policy decision to further study the issue of military service by transgender individuals, before the military departs from longstanding policies and practices. The decision to issue this directive falls squarely within his discretion as Commander in Chief.

In Count Three, Plaintiffs assert "the right to self-identification and self-determination as transgender individuals."  ECF No. 1 ¶ 67.  But this description fails to narrowly and accurately define the interest that Plaintiffs actually seek to vindicate, which is an alleged right of some service members to have the military disregard their transgender status, notwithstanding the Government's determination that this information bears on longstanding medical standards.  Neither the Supreme Court nor the Ninth Circuit has recognized the type of interest that Plaintiff asserts here as a fundamental constitutional right. Indeed, as detailed supra, when the development and regulation of military personnel is at issue, there is "perhaps . . . no other area" where the Supreme Court has shown the political branches "greater deference."  *Rostker*, 453 U.S. at 64-65.

Moreover, the President has provided reasons for maintaining the status quo while the military studies the policy on service by transgender individuals that pass constitutional muster under any standard, especially in light of the significant deference courts accord to military judgments regarding the composition of the fighting force.  Plaintiffs have therefore failed to show a likelihood of success on their substantive due process claim.[14]

To the extent Plaintiffs are raising procedural due process claims, they fail for essentially the same reasons.  It is entirely speculative that they will ever be deprived of a liberty or property interest and it is unknown what process would be employed to effectuate that hypothetical deprivation.  "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424

---

[14] Should the Court conclude that *Witt's* application of heightened scrutiny for a substantive due process challenge to a military personnel policy would require further examination, that is all the more reason the Court should defer to the ongoing process now underway and review any impact future policy may have on plaintiffs after the military has completed its review.

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 33
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

U.S. 319, 332 (1976). Accordingly, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). As Plaintiffs cannot show that they have been deprived of a protected right or interest, they have failed to state a plausible procedural due process claim.

### 5. Plaintiffs Are Unlikely to Succeed on Their First Amendment Claim

Plaintiffs' First Amendment claim is similarly unlikely to succeed. Plaintiffs contend that the Government's policy is an unconstitutional restriction on speech based on its content. But Defendants' policy is not a content-based regulation of speech at all. As a threshold matter, the policy does not "prohibit[] transgender individuals … from disclosing their gender identity or their transgender status." ECF No. 15 at 29. To the contrary, for current service members, the operative policy *prohibits* any disparate treatment based on expression of one's transgender status. Interim Guidance, supra n.6.

Nor does the military's longstanding policy on accession of transgender individuals constitute a content-based speech regulation. Plaintiffs strain to rely on case law addressing the "Don't Ask, Don't Tell" Act, ECF No. 15 at 27, but that statute expressly required a "servicemember's discharge if he or she 'has stated that he or she is a homosexual or bisexual, *or words to that effect.*'" *Log Cabin Republicans v. United States*, 716 F. Supp. 2d 884, 926 (C.D. Cal. 2010) (emphasis in original), *vacated on other grounds by* 658 F.3d 1162 (9th Cir. 2011). The accession policy, by contrast, turns on whether a person's current or history of gender dysphoria or gender transition meets *medical* standards, not because of the message one's gender identity conveys. Of course, an applicant must disclose any relevant condition to the military through words, but that alone cannot subject military medical standards to First Amendment scrutiny, for then every denial of accession would trigger a constitutional case. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("'[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 34
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

of language, either spoken, written, or printed.'" (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).  In any event, the accession policy does not "prohibit[] transgender individuals from disclosing their gender identity or transgender status[,]" ECF No. 15 at 29, but permits persons who have a disqualifying medical diagnosis or condition to seek a waiver from any applicable health requirement when appropriate and serve in the military.

Even assuming *arguendo* that the First Amendment were implicated here, Plaintiffs cannot show a likely success on the merits under the deferential standard of review that applies to regulation of speech in the military context.  *See Weinberger*, 475 U.S. at 507.  Plaintiffs attempt incorrectly to invoke the heightened First Amendment standard from the civilian context, ECF No. 15 at 28, but a regulation of speech in the military survives review if it "restrict[s] speech no more than is reasonably necessary to protect the substantial government interest." *Brown*, 444 U.S. at 355.[15]  Defendants' current policy on service by transgender persons meets this highly deferential standard.  The operative Interim Guidance maintains the status quo for enlisted transgender service members, and expressly protects them from being discharged or denied medical care based on their transgender status.  There is no restriction on service by transgender persons currently serving in the military or on any of their expression or associations.  And insofar as the military's longstanding accessions policy, which "generally" bars accession for transgender individuals, "subject to the normal waiver process," Interim Guidance, supra n.6, is found to implicate the First Amendment,

---

[15] None of the cases cited by Plaintiffs stand for their purported proposition that regulation of speech "in the military context, may be upheld only if the restriction is narrowly tailored to serve a compelling state interest." ECF No. 15 at 28. *Weaver v. Nebo School District* addressed the First Amendment claims of a public school teacher. 29 F. Supp. 2d 1279 (D. Utah 1998). And *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* addressed whether legal defense and political advocacy organizations were properly excluded from participation in a charity drive aimed at federal employees. 473 U.S. 788 (1985). And, while the Court in *Nieto v. Flatau* acknowledged that regulations restricting speech on military property may not discriminate based only on viewpoint (*e.g.,* by suppressing only one side of a particular debate), the court made clear that "military regulations are entitled to far greater deference than those designed for civilian society" and "[r]estrictions on speech that would run afoul of the First Amendment may, nevertheless, pass constitutional muster if promulgated by the military." 715 F. Supp. 2d 650, 655 (E.D. N.C. 2010).

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 35
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

that policy easily survives the highly deferential form of review applicable here. *See supra* Part II.B.3.

### C. The Balance of Equities and the Public Interest Weigh Strongly Against Entry of a Preliminary Injunction

Plaintiffs likewise cannot show the balance of equities tips in their favor. In weighing the equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). Plaintiffs are not being harmed by the Interim Guidance, which is the operative rule, and it is unclear whether they will ultimately be harmed by the final policy once it has been studied, developed and implemented. Plaintiffs therefore have not—and cannot—show that they will be harmed if the Court denies their motion for extraordinary preliminary relief. The military, on the other hand, is in the process of gathering a panel of experts who will "bring mature experience, most notably in combat and deployed operations, and seasoned judgment" to the task of providing advice and recommendations on the development and implementation of the policy on military service by transgender individuals. Statement of Secretary Jim Mattis, Release No: NR-312-17. Granting Plaintiffs their requested relief would directly interfere with the panel's work and the military's ability to thoroughly study a complex and important issue regarding the composition of the armed forces. The balance of equities thus tips strongly against issuing a preliminary injunction in this case.

Nor can Plaintiffs show that a preliminary injunction here would be in the public interest. The public has a strong interest in national defense, *see Winter*, 555 U.S. at 7, and here both the President and Secretary of Defense have directed that the policy on military service by transgender individuals be subject to further study. The public interest, therefore, weighs strongly against judicial interference with the military's study of its policy on transgender military service.

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 36
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

## D.    The Injunctive Relief Plaintiffs Seek Is Inappropriate

Finally, even if Plaintiffs had standing and had made the showing required for extraordinary preliminary relief, the worldwide injunction they seek would still be inappropriate.    Plaintiffs' request for a sweeping order enjoining Defendants from "implementing the ban on military service by transgender individuals" ECF No. 15 at 1, suffers from at least three major flaws.

First, Plaintiffs' desired injunction would simply require Defendants to comply with the Interim Guidance that the Secretary of Defense has already put in place.    The Interim Guidance directs that "no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status."    Interim Guidance, supra n.6.    It also provides that "Service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition."    *Id.*    In addition to being unnecessary, the "obey the law" injunction Plaintiffs seek is particularly inappropriate in a suit against the government, where it could subject the government defendants to contempt proceedings for every alleged legal failing, supplanting the civil remedies Congress has provided.    *Cobell v. Norton*, 392 F.3d 461, 475 (D.C. Cir. 2004).

Second, Plaintiffs seek an injunction that would in theory apply to service members worldwide.    Both constitutional and equitable principles, however, require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries.    Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought."    *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).    "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established."    *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996).    "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration."    *Id.*    And equitable principles independently require that

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 37
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties").

These constitutional and equitable limits apply with special force to injunctions concerning military policies. For example, in *Meinhold v. United States Department of Defense*, 808 F. Supp. 1455 (C.D. Cal. 1993), a district court enjoined the Defense Department, with limited exceptions, "from discharging or denying enlistment to any person based on sexual orientation" in a constitutional challenge brought by a single serviceman. *Id.* at 1458. The Supreme Court stayed the injunction to the extent it conferred relief on anyone other than the plaintiff, *U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993), and the Ninth Circuit vacated the injunction except to the extent it applied to him as well, *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994).

The entry of the worldwide injunction sought by Plaintiffs would be similarly indefensible. To the extent that Plaintiffs have cognizable injuries, those injuries would be fully addressed through an injunction concerning their ability either to accede into or continue serving in the military or to access medical treatment. To the extent that other service members or applicants believe they are injured by any of the policies at issue, they are free to bring their own challenges—and a few have done so. *See, e.g.*, *Doe v. Trump*, No. 1:17-cv-01597 (D.D.C., Filed Aug. 9, 2017). In all events, any injunction here should be limited to Plaintiffs and not extend to other members or applicants not before this Court.

Third, the military personnel decisions that Plaintiffs speculate they will one day face—separation, denial of reenlistment, denial of promotion, and denial of medical treatment,—are ordinarily reviewed by a district court in the APA context. *See, e.g., Stewart v. Stackley*, No. CV 14-0479 (ABJ), 2017 WL 1653147, at *16 (D.D.C. May 1, 2017). That review, of course, occurs *after* the military decision has been made and is subject to the APA's arbitrary and capricious standard. A plaintiff also has the opportunity to raise a constitutional

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 38
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

challenge through intra-military procedures such as the military corrections boards. *See Chappell v. Wallace,* 462 U.S. 296, 303 (1983) ("[Appellant's] claims based on [the] Constitution, executive orders and Army regulations could readily have been made within the framework of this intramilitary procedure"). Here, however, Plaintiffs ask for the extraordinary remedy of a preliminary injunction to prevent certain adverse personnel actions that have not been taken against them and may never occur. If those actions ever do occur, the ordinary administrative framework will provide a more orderly avenue of relief than the premature intrusion into military affairs they currently seek. *See also supra* p. 17-18.

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' motion to dismiss for lack of jurisdiction and for failure to state a claim upon with relief can be granted. The Court should also deny Plaintiffs' motion for a preliminary injunction.

Dated: October 23, 2017

Respectfully submitted,
CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Ryan Parker*
RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-4336
Email: ryan.parker@usdoj.gov

*Counsel for Defendants*

DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION - 39
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**