UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 17-1799 JGB (KKx)** | Date | December 22, 2017 |
|---|---|---|---|
| Title | ***Aiden Stockman et al. v. Donald J. Trump et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) DENYING Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (Dkt. No. 36); and (2) GRANTING Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 15)**

Two motions are before the Court.  First, Plaintiffs Aiden Stockman, Nicolas Talbott, Tamasyn Reeves, Jaquice Tate, John Doe 1, John Doe 2, Jane Doe, and Equality California (collectively, "Plaintiffs") have filed a Motion for Preliminary Injunction.  ("MPI," Dkt. No. 15.)  Second, Defendants Donald J. Trump ("President Trump"), in his official capacity as President of the United States; James N. Mattis, in his official capacity as Secretary of Defense; Joseph F. Dunford, Jr., in his official capacity as Chairman of the Joint Chiefs of Staff; Richard V. Spencer, in his official capacity as Secretary of the Navy; Ryan D. McCarthy, in his official capacity as Acting Secretary of the Army; Heather A. Wilson, in her official capacity as Secretary of the Air Force; and Elaine C. Duke, in her official capacity as Acting Secretary of Homeland Security (collectively, "Defendants,") have filed a Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  ("MTD," Dkt. No. 36.)

The Court held a hearing on these matters on December 11, 2017.  After considering the issues raised in oral argument, the papers filed supporting and opposing these motions, and the amici briefs, the Court DENIES Defendants' Motion to Dismiss.  Additionally, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction.

# I.   BACKGROUND

## A.  Procedural History

On September 5, 2017, Plaintiffs filed a complaint against Defendants, asserting four causes of action: (1) Fifth Amendment equal protection; (2) Fifth Amendment due process; (3) Fifth Amendment right to privacy; and (4) First Amendment retaliation for free speech and expression.  ("Complaint," Dkt. No. 1 ¶¶ 49–77.)  Plaintiffs seek declaratory relief.

Plaintiffs filed their MPI on October 2, 2017.  (Dkt. No. 15.)  Defendants filed their MTD and Opposition to Plaintiffs' MPI on October 23, 2017.  (Dkt. No. 36.)  Plaintiffs filed a Reply for their Motion to Preliminary Injunction and an Opposition to Defendants' Motion to Dismiss on November 6, 2017.  ("MPI Reply," Dkt. No. 47.)  Defendants filed their MTD reply on November 13, 2017.  ("MTD Reply," Dkt. No. 61.)

## B.  Factual History

The parties do not dispute the basic facts in this case.  In June 2016, after multiple years of data review, the Department of Defense ("DOD") announced it would implement a new policy allowing transgender people to serve openly in the United States military ("June 2016 Policy").  (See generally Dkt. No. 28, Exh. C.)  In reliance on this policy change, many transgender individuals came out to their chain of command without incident.  On July 26, 2017, President Trump changed course, tweeting:

> After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military.  Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail.  Thank you.

("President Trump's Twitter Proclamation," Dkt. No. 28, Exh. F.)

On August 25, 2017, President Trump issued a memorandum ("Presidential Memorandum") formalizing the policy he announced via Twitter.  (Dkt. No. 28, Exh. G.)  The Presidential Memorandum contains several operative prongs: (1) it indefinitely extends the prohibition preventing transgender individuals from entering the military (the "Accession Directive"); (2) it requires the military to authorize the discharge of transgender service members (the "Retention Directive"); and (3) it largely halts the use of DOD or Department of Homeland Security ("DHS") resources to fund sex reassignment surgical procedures for current military members ("Sex Reassignment Surgery Directive") (collectively, "Directives").  (Id. at 47.)  The DOD must submit a plan implementing the Presidential Memorandum by February 2018.  (Id.)

On September 14, 2017, Defendant Secretary of Defense James Mattis ("Defendant Mattis") issued an "Interim Guidance"[1] which established the temporary DOD policy regarding transgender persons.  (MTD at 7.)  While the Interim Guidance is in effect, no current transgender service member will be discharged or denied reenlistment solely based on their transgender status.  Id.  Defendant Mattis must present a plan to implement the Presidential Memorandum to President Trump by February 21, 2018.  (Id.)

### 1.  Military Transgender Policy before July 2017

In August 2014, the DOD removed references to mandatory exclusion based on gender and identity disorders from its physical disability policy.  ("Declaration of Eric K. Fanning," Dkt. No. 22 ¶¶ 12–13.)  Additionally, the DOD directed each branch of the armed forces to assess whether there remained any justification to prohibit service by openly transgender individuals.  (Id. at 13.)

In July 2015, then-Secretary of Defense Ashton B. Carter created a group to begin comprehensively analyzing whether any justification remained validating the ban on open service by transgender individuals.  ("Declaration of Brad Carson," Dkt. No. 26 ¶¶ 8–9.)  The working group created by Secretary Carter included the Armed Services, the Joint Chiefs of Staff, the service secretaries, and other specialists from throughout the DOD (the "Working Group").  (Id. ¶ 9.)  The review process included analyzing evidence from a variety of sources, such as scholarly materials and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders of units with transgender service members.  (Id. ¶ 10.)

Additionally, the Working Group commissioned the RAND Corporation, a nonprofit research institution that provides analysis to the military, to complete a comprehensive study on the impact of permitting transgender individuals to serve openly.  (Id. ¶ 11.)  The 113-page study, "Assessing the Implications of Allowing Transgender Personnel to Serve Openly" (the "RAND Report," Dkt. No. 26, Exh. B), examined factors such as the health care costs and readiness implications of allowing open service by transgender persons.  The RAND Report also analyzed the other 18 foreign militaries which permit military service by transgender individuals, focusing on Australia, Canada, Israel, and the United Kingdom—the four countries "with the most well-developed and publicly available policies on transgender military personnel."  (RAND Report at 23.)  This comparative analysis found no evidence that allowing open service by transgender persons would negatively affect operational effectiveness, readiness, or unit cohesion.  (Id. at 24.)  Moreover, the RAND Report concluded healthcare costs for transgender service members would "have little impact on and represents an exceedingly small proportion of [the DOD's] overall health care expenditures."  (Id. at 22–23.)  Specifically, the RAND Report found health care costs would increase "by between $2.4 million and $8.4 million annually."  (Id. at 22.)  By

---

[1] Neither party has included a copy of the Interim Guidance as an exhibit, but a copy may be found at https://defense.gov/Portals/1/Documents/PDFs/Military-Service-By-Transgender-Individuals-Interim-Guidance.pdf (last visited December 8, 2017).

contrast, the overall healthcare cost of those serving in the active component of the military is approximately $6 billion annually, while the overall healthcare cost for the DOD is $49.3 billion annually. (Id. at 22–23.) Furthermore, the RAND Report noted discharging transgender service members, "[a]s was the case in enforcing the policy on homosexual conduct, [] can involve costly administrative processes and result in the discharge of personnel with valuable skills who are otherwise qualified." (Id. at 77.) At the conclusion of its analysis, the Working Group "did not identify any basis for a blanket prohibition on open military service of transgender people. Likewise, no one suggested . . . that a bar on military service by transgender persons was necessary for any reason, including readiness or unit cohesion." (Declaration of Eric K. Fanning ¶ 27.)

Based on the results of this review process, on June 30, 2016, Secretary Carter issued a Directive-type Memorandum announcing transgender Americans may serve openly and without fear of being discharged based solely on that status. ("DTM 16-005," Dkt. No. 22, Exh. C.) Secretary Carter stated:

> These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability and retention, is consistent with military readiness and with strength through diversity.

(Id. at 135.)

This assessment was shared by some of the highest ranking military officials in the country. (See generally Declaration of Eric K. Fanning; "Declaration of Michael Mullen," Dkt. No. 21; "Declaration of Raymond E. Mabus," Dkt. No. 23; "Declaration of Deborah L. James," Dkt. No. 24.) According to the directive, transgender individuals would be permitted to enlist in the military and serve openly beginning on July 1, 2017. (DTM 16-005, at 137.) This date was later postponed until January 1, 2018. (See Dkt. No. 28, Exh. E.) The DOD also issued handbooks, regulations, and memorandums which provided instruction to military commanders in how to implement the new policies, set forth guidance related to medical treatment provisions, and expressly prohibited discrimination on the basis of gender identity. (See "Transgender Service in the U.S. Military," Dkt. No. 22, Exh. 6.)

The former military leaders among the Working Group, such as, former Secretary of the Army Eric K. Fanning, former Chairman of the Joint Chiefs of Staff Admiral Michael Mullen, former Secretary of the Navy Raymond E. Maubus, and former Secretary of the Air Force Deborah L. James, have all explicitly drawn parallels connecting the allowance of open service by transgender persons to the allowance of open service by gay and lesbian persons. (See Declaration of Eric K. Fanning ¶¶ 10–16; Declaration of Michael Mullen ¶¶ 9–15; Declaration of Raymond E. Mabus ¶¶ 19, 24; Declaration of Deborah L. James ¶ 44.) These leaders contend many of the same worries accompanying allowing open transgender service were vocalized, and eventually allayed, in the context of ending "Don't Ask Don't Tell." (See Declaration of Eric K.

Fanning ¶¶ 10–16; Declaration of Admiral Michael Mullen ¶¶ 9–15; Declaration of Raymond E. Mabus ¶¶ 19, 24; Declaration of Deborah L. James ¶ 44.)

**2.  Military Transgender Policy after July 2017**

On July 26, 2017, President Trump changed course, announcing via Twitter that transgender individuals would not be permitted to serve in the military.  (President Trump's Twitter Proclamation.)  One month later, his Presidential Memorandum promulgated the Accession Directive, Retention Directive, and Sex Reassignment Surgery Directive.  (Presidential Memorandum.)  President Trump stated the Obama Administration had "dismantled the [DOD and DHS's] established framework by permitting transgender individuals to serve openly in the military."  (Id.)  Additionally, he stated the Obama Administration failed to identify a sufficient basis to conclude ending the longstanding policy against open transgender service "would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources."  (Id.)  The Accession Directive extends the policy prohibiting open accession into the military beyond January 1, 2018.  The Retention and Sex Assignment Directives take effect on March 23, 2018.  (Id.)

On September 14, 2017, Defendant Mattis issued the Interim Guidance, which stated the accession prohibition "remain[s] in effect because current or history of gender dysphoria or gender transition does not meet medical standards."  (Interim Guidance.)  The Interim Guidance notes this general prohibition is still "subject to the normal waiver process."  (Id.)  By February 21, 2018, Defendant Mattis must submit to President Trump "a plan to implement the policy and directives in the Presidential Memorandum."  (Id.)

Regarding the Sex Assignment Directive, the Interim Guidance provides "[s]ervice members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition."  (Id.)  However, "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex."  (Id.)  This language essentially mirrors that of the Presidential Memorandum.  (Presidential Memorandum.)

The reception to President Trump's policy change by the military has been somewhat critical.  Current Chairman of the Joint Chiefs of Staff Joseph Dunford disagrees with the decision to reinstate the transgender ban, stating he "believe[s] that any individual who meets the physical and mental standards . . . should be afforded the opportunity to continue to serve."  (Dkt. No. 28, Exh. I.)  He has also previously told lawmakers transgender troops have served the military honorably and he would continue to abide by this sentiment for as long as he holds his position.  (Id.)  Additionally, it is not clear the nation's top military leaders were consulted about this policy change prior to President Trump's Twitter Proclamation.  (See Dkt. No. 28, Exh. M.)  Moreover, after the promulgation of President Trump's tweets, 56 retired generals and admirals signed a declaration stating a ban on open service by transgender persons would degrade military readiness.  (Dkt. No. 28, Exh. O.)

### C.  The Plaintiffs

#### 1.  Aiden Stockman

Plaintiff Aiden Stockman is a transgender man from California who intended to join the Air Force.  ("Stockman Declaration," Dkt. No. 16 ¶ 1.)  Plaintiff Stockman has conducted online research to prepare for the enlistment process, including talking to friends and neighbors stationed at an Air Force base near his home.  (Id. ¶ 9.)  He came out to his family as transgender during his sophomore year of high school.  (Id. ¶ 4.)  During his junior year, he took the Armed Services Vocational Aptitude Battery ("ASVAB") test in hopes he could join the military upon graduation.  (Id. ¶ 10.)  Plaintiff Stockman intends to undergo chest surgery, also called "top surgery" as soon as possible, likely in the spring of 2018.  (Id. ¶ 11.)  He states that if the ban were lifted, he would go talk with a recruiter about enlisting as soon as his chest surgery is completed. (Id. ¶ 15.)

#### 2.  Nicolas Talbott

Plaintiff Nicolas Talbott is a transgender man from Ohio who intended to join the Air Force National Guard.  ("Talbott Declaration," Dkt. No. 17 ¶ 1.)  Plaintiff Talbott came out as transgender to his mother at the age of 16 and, in 2012, started taking hormones according to his transition plan.  (Id. ¶¶ 5–6.)  He states he tried to enlist but the military recruiters would not allow him because of his transgender status.  (Id. ¶ 7.)  After he learned the accession ban was lifted in June 2016, Plaintiff Talbott spoke with an Air Force National Guard recruiter who advised him to enlist.  (Id. ¶ 11.)  Plaintiff Talbott was told to get letters certifying that being transgender had no adverse effects on his ability to serve and that older, unrelated injuries would also have no adverse effects.  (Id.)  He then began studying for the ASVAB in anticipation of being allowed to join the military, but President Trump's Twitter Proclamation discouraged him. (Id. ¶ 14.)  Plaintiff Talbott maintains he would seek immediate enlistment were the ban lifted today.  (Id. ¶ 16.)

#### 3.  Tamasyn Reeves

Plaintiff Tamasyn Reeves is a transgender woman from California who wants to serve in the Navy.  ("Reeves Declaration," Dkt. No. 18 ¶ 1.)  Plaintiff Reeves had tried to enlist in the military in 2010, but was rejected because she, at the time, identified as gay.  (Id. ¶ 5.)  In 2011, she learned about what it means to be transgender and started coming out to her colleagues and friends.  (Id. ¶ 6.)  A year later, she started taking hormones to begin her medical transition.  (Id. ¶ 7.)  The policy change June 2016 excited Plaintiff Reeves, and she intended to enlist as soon as she finished her college degree.  (Id. ¶ 9.)  The revived ban, however, sunk her hopes.  (Id. ¶ 10.) She states she would immediately talk to a recruiter about enlisting upon receiving her degree in the spring of 2018 if the ban was lifted.  (Id. ¶ 12.)

### 4. Jaquice Tate

Plaintiff Jaquice Tate is a transgender man currently serving as a Sergeant in the Army. ("Tate Declaration," Dkt. No. 19 ¶ 1.) He enlisted in 2008 and has served domestically, in Germany, and on deployment in Iraq. (Id. ¶ 4.) For his service in Iraq, he was awarded an Army Commendation Medal. (Id. ¶ 6.) He has also received multiple Army Achievement Medals, Certificates of Appreciation, and two Colonel Coins of Excellence. (Id. ¶ 11.) Plaintiff Tate, in reliance on the June 2016 Policy, came out to his chain of command. (Id. ¶ 19.) In Fall of 2016, Plaintiff Tate, in conjunction with his chain of command and his doctor, created his medical transition plan. (Id. ¶ 21.) Consequently, he started taking hormones in February 2017 and received approval for chest surgery. (Id.) Plaintiff Tate expects to receive chest surgery in late 2017 or early 2018. (Id.) Plaintiff Tate feels as though the ban demeans his years of military service. (Id. ¶ 23.)

### 5. John Doe 1

Plaintiff John Doe 1 is a transgender man who currently serves as a Non-Commissioned Officer in the Air Force. ("John Doe 1 Declaration," Dkt. No. 29, Exh. 2.) Plaintiff John Doe 1 grew up in a military family and intends to make a career out of his military service. (Id. ¶¶ 2–3.) He has received numerous commendations and endorsements from his chain of command. (Id. ¶¶ 7–8.) In April 2017, in reliance on the June 2016 Policy, he came out to his chain of command and received a medical transition plan. (Id. ¶ 17.) Plaintiff John Doe 1 fears he will be discharged under the express terms of the ban. (Id. ¶ 19.) He understands the Sex Reassignment Surgery Directive denies him transition-related medical care. (Id. ¶ 21.) Consequently, he intends to pay out-of-pocket for chest surgery. (Id.) Plaintiff John Doe 1 is bewildered at how he went from first in his class at Airmen Leadership School to being deemed unfit to serve. (Id. ¶ 25.)

### 6. John Doe 2

Plaintiff John Doe 2 is a transgender man who currently serves in the Army. ("John Doe 2 Declaration," Dkt. No. 29, Exh. 3.) Plaintiff John Doe 2 enlisted in 2015 at the age of 17, and earned two Colonel Coins of Excellence by August 2017. (Id. ¶ 6.) He possess technical expertise pertaining to the operations, diagnostics, and maintenance of multichannel communications systems necessary for the Army to make real-time tactical decisions. (Id. ¶ 5.) His position requires Secret-level security clearance. (Id.) He expects to serve in the Army until he is eligible to receive retirement benefits. (Id. ¶ 11.) While Plaintiff John Doe 2 realized he was transgender in his junior year of high school, he did not come out to anyone until he joined the Army. (Id. ¶¶ 15, 18.) In reliance on the June 2016 policy change, he came out to his chain of command and began researching the new policies and guidance. (Id. ¶¶ 20–21.) He worked with an Army doctor to develop a medical transition plan and treatment. (Id. ¶ 21.) After meeting with his commander and doctors, Plaintiff John Doe 2 was approved for chest surgery, and expects to have it completed in March 2018. (Id. ¶ 22.) He anticipates completing his medical transition by 2020. (Id.) However, after the promulgation of the Presidential Memorandum, he fears being subject to an imminent involuntary discharge. (Id. ¶¶ 28–29.)

### 7. Jane Doe 2

Plaintiff Jane Doe is a transgender woman currently serving in the Air Force.  ("Jane Doe Declaration," Dkt. No. 29, Exh. 4.)  Plaintiff Jane Doe entered the military in 2010, having already completed her college degree.  (Id. ¶¶ 2–3.)  As a consequence, she entered the military as an Airman First Class.  (Id. ¶ 3.)  After basic training, she was stationed domestically then selected for deployment in the Middle East.  (Id.)  She has received an Air Force Commendation Medal for distinctly exemplary service.  (Id. ¶ 5.)  Plaintiff Jane Doe intends on serving in the military until she is eligible for a pension and retirement benefits.  (Id. ¶ 9.)  While she identified as transgender at age 14, she waited until college to come out to those closest to her.  (Id. ¶ 11.)  In reliance on the June 2016 policy change, she came out to the rest of her family and to the public, updating her social media to her correct gender.  (Id. ¶ 13.)  With her chain of command and doctor, she created a medical transition plan which had received all the necessary approvals.  (Id. ¶ 14.)  She fears the Presidential Memorandum will strip her of her career, salary, and housing.  (Id. ¶¶ 15–18.)

### 8. Equality California

Plaintiff Equality California ("EQCA") is an organization dedicated to LGBTQ civil rights.  ("Declaration of Rick Zbur," Dkt. No. 20 ¶ 2.)  Its membership includes transgender individuals in active service, transgender military veterans, and transgender individuals who intend to pursue long-term military careers.  (Id. ¶ 4.)

## D.  Pending Cases

On October 30, 2017, the Honorable Colleen Kollar-Kotelly of the D.C. District Court issued a nationwide injunction concerning the Accession and Retention Directives.  See Doe 1 v. Trump, --- F. Supp. 3d ----, CV 17-01597 (CKK), 2017 WL 4873042, at *2 (D.D.C. Oct. 30, 2017).  That court, however, dismissed the Sex Reassignment Surgery Directive claim, holding the plaintiffs lacked standing to challenge that directive.  Id. at *23–24.  The court noted one plaintiff, who had her transition-related procedure canceled by the Defense Health Agency, later received a waiver and is currently having her request processed.  Id. at *24.  A second plaintiff's prospective harm was deemed too speculative, as her transition treatment plan would not begin until after she returned from active duty in Iraq.  Id.  Finally, a third plaintiff is set to begin transition surgery before the ban would go into effect, also excluding him from harm.  Id.  The court concluded "no Plaintiffs have demonstrated that they are substantially likely to be impacted by the Sex Reassignment Surgery Directive, and none have standing to challenge that directive."  Id.

The court in Doe 1 conducted a lengthy analysis regarding the import of the Presidential Memorandum.  As here, Defendants in Doe 1 essentially argued "the Presidential Memorandum merely commissioned an additional policy review; that review is underway; nothing is set in stone, and what policy may come about is unknown; and regardless, Plaintiffs are protected by

the Interim Guidance." Id. at *17. Finding the defendants' arguments to be a "red herring," the court stated:

> The President controls the United States military. The directives of the Presidential Memorandum, to the extent they are definitive, are the operative policy toward military service by transgender service members. The Court must and shall assume that the directives of the Presidential Memorandum will be faithfully executed. See Nat'l Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1408 (D.C. Cir. 1998) (assessing "faithful" application of agency rule). Consequently, the Interim Guidance must be read as implementing the directives of the Presidential Memorandum, and any protections afforded by the Interim Guidance are necessarily limited to the extent they conflict with the express directives of the memorandum.
>
> . . .
>
> Nothing in the August 2017 Statement by Secretary Mattis, or the Interim Guidance, can or does alter these realities. The Statement provides that Secretary Mattis will establish a panel of experts "to provide advice and recommendations on the implementation of the president's direction." After the "panel reports its recommendations and following ... consultation with the secretary of Homeland Security," Secretary Mattis will "provide [his] advice to the president concerning implementation of his policy direction." Put differently, the military is studying how to implement the directives of the Presidential Memorandum. Such a policy review and implementation plan are likely necessitated by the fact that—as borne out by the RAND Report and the declarations submitted by the Pseudonym Plaintiffs—transgender service members occupy a variety of crucial positions throughout the military, including active duty postings in war zones. Presumably, the removal and replacement of such individuals during a time of war cannot occur overnight. Accordingly, Defendants are correct that policy decisions are still being made. But the decisions that must be made are how to best implement a policy under which transgender accession is *prohibited*, and discharge of transgender service members is *authorized*. Unless the directives of the Presidential Memorandum are altered—and there is no evidence that they will be—military policy toward transgender individuals must fit within these confines.
>
> . . .
>
> Finally, although Defendants make much of the protections afforded by the Interim Guidance to transgender individuals, that protection is necessarily qualified by the Presidential Memorandum. The Interim Guidance provides that: "*As directed by the [Presidential] Memorandum*, no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status." (Emphasis added). The protections

afforded by the Presidential Memorandum lapse by February 21, 2018, and discharge must be authorized by March 23, 2018. The Interim Guidance can do nothing to obviate these facts. Nor is standing vitiated by the mere possibility that the President may alter the directives of the Presidential Memorandum. See Appalachian Power Co. v. EPA, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("[A]ll laws are subject to change. Even that most enduring of documents, the Constitution of the United States, may be amended from time to time. The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment."). Nor is there evidence that such a change may occur, given the President's unequivocal pronouncement that "the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military."

Id. at *17–18 (emphasis in original). The Court considers Doe to be persuasive authority, and finds its analysis sound and useful.

On November 21, 2017, the Honorable Marvin J. Garbis of the District of Maryland issued a nationwide injunction concerning the Accession Directive, the Retention Directive, and the Sex Reassignment Surgery Directive. Stone v. Trump, --- F. Supp. 3d ---- No. CV MJG-17-2459, 2017 WL 5589122, at *16 (D. Md. Nov. 21, 2017). Distinguishing the plaintiffs before it from the plaintiffs in Doe 1, the Stone court noted plaintiffs Stone and Cole were "highly unlikely to complete their medically-necessary surgeries before the effective date of the Directive." Id. at *13. Additionally, while the Doe 1 court found a disqualifying lack of certainty impeded the plaintiffs' standing, the Stone court stated there is "no lack of certainty regarding when transition treatment will begin for [plaintiffs] Stone and Cole since treatment has already begun, and [their] surgeries are endangered by the Directive's deadline." Id. That court approvingly cited the standing and constitutional analysis in Doe 1. Id. at *10, 15.

## II.   MOTION TO DISMISS

Defendants present a two-pronged challenged to Plaintiffs' Complaint. First, they assert Plaintiffs lack standing and do not face an imminent threat of future injury. Alternatively, they assert Plaintiffs' claims are unripe and not yet fit for judicial determination. (MTD at 11.)   For the reasons stated below, the Court concludes it has jurisdiction to determine the constitutionality of the Accession Directive, Retention Directive, and Sex Reassignment Surgery Directive.

### A.  Legal Standard

Under Rule 12(b)(1), a party may bring a motion to dismiss for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A challenge to the court's jurisdiction may be facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000)). In a facial attack, the moving party asserts the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. Safe Air, 373

F.3d at 1039.  By contrast, in a factual attack, the moving party disputes the truth of allegations that, by themselves, would otherwise invoke federal jurisdiction.  Id.

When considering a factual attack, a court applies a standard similar to that used in deciding summary judgment motions.  Evidence outside the pleadings may be considered, but all factual disputes must be resolved in favor of the nonmoving party.  See Dreier v. United States, 106 F.3d 844, 847 (9th Cir. 1996).  If the moving party presents admissible evidence in support of its motion, "the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."  Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

In a facial challenge, "a court examines the complaint as a whole to determine whether the plaintiff has alleged a proper basis of jurisdiction."  Watson v. Chessman, 362 F. Supp. 2d 1190, 1194 (S.D. Cal. 2005).  Again, a plaintiff's complaint is treated similarly to a summary judgment motion: the allegations are treated as true and all inferences are drawn in favor of the plaintiff.  Id.  "The court will not, however, infer allegations supporting federal jurisdiction; federal subject matter must always be affirmatively alleged."  Id. (quoting Century Sw. Cable Television, Inc. v. CIIF Assocs., 33 F.3d 1068 (9th Cir. 1994)).  When a plaintiff relies on the general federal question statute, 28 U.S.C. § 1331, "a claim not arising under the United States Constitution, or any federal statute . . . . will not generally survive a Rule 12(b)(1) facial attack."  Id. (internal citations and quotation marks omitted).

## B.  Standing

"Constitutional standing concerns whether the plaintiff's personal stake in the lawsuit is sufficient to make out a concrete 'case' or 'controversy' to which the federal judicial power may extend under Article III, § 2."  Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co., 219 F.3d 895 (9th Cir. 2000).  "[T]he irreducible constitutional minimum of standing" is comprised of three elements: (1) an injury-in-fact; (2) a causal connection between the injury and challenged conduct such that the injury is "fairly traceable" to the challenged action; and (3) it must be "likely," not merely "speculative" that the injury can be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).  The injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  Id. at 560.  "The party invoking federal jurisdiction bears the burden of establishing these elements."  Id. at 561.

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).  Thus, the "standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of Government was unconstitutional."  Id. (quoting Raines v. Byrd, 521 U.S. 811, 819 (1997)).  Importantly, when there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650–51 (2017).

Defendants argue Plaintiffs have not demonstrated injury-in-fact.  (MTD at 17.)  For the foregoing reasons, the Court finds Plaintiffs met their burden and have standing to challenge the Accession, Retention, and Sex Reassignment Surgery Directives.

### 1.  Accession Directive

The Accession Directive indefinitely extends the prohibition preventing transgender individuals from entering the military.  The prohibition would have expired on December 31, 2017.  Defendants argue no Plaintiff "has been denied accession into the military, which could be denied for numerous reasons wholly unrelated to an applicant's transgender status."  (Id. at 18.)  Additionally, "allegations of speculative future harms are insufficient to establish standing." (Id.)  Defendants have made this argument twice before, to no avail.  See Stone, 2017 WL 5589122, at *11; Doe 1, 2017 WL 4873042, at *20–22.  Citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 205, (1995), Gratz v. Bollinger, 539 U.S. 244, 251 (2003), and Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 709–10 (2007), the Doe 1 court noted the appropriate inquiry is two-pronged:  (1) whether the plaintiff is "very likely" to apply for accession "in the relatively near future"; and (2) whether the plaintiff is "substantially likely to hit a barrier when he applies for accession."  Doe 1, 2017 WL 4873042, at *21.  The court found it was likely one of the plaintiffs will graduate from the Naval Academy and attempt to accede, and "[a]nything else is the product of mere speculation."  Id.  Likewise, based on a plaintiff's declarations and testimony showing he had already met with a recruiting officer and had plans to accede which "are not speculative," the Stone court also found a plaintiff faced a "substantial risk" that his "attempt to accede . . . will be prohibited solely on the basis of his transgender status."  Stone, 2017 WL 5589122, at *11.  Defendants' argument leaves this Court similarly unpersuaded.

Here, Plaintiffs Stockman, Talbott, and Reeves have separately demonstrated an affirmative intent to join the military, going as far as to take the ASVAB, speaking with military recruiters, and attempting to join even before Secretary Carter promulgated DTM 16-005.  (See Declaration of Aiden Stockman ¶¶ 9–11; Declaration of Nicolas Talbott ¶¶ 7–16; Declaration of Tamasyn Reeves ¶¶ 7–12.)  These Plaintiffs all declare that, were the ban lifted today, they would seek enlistment.  See Declaration of Aiden Stockman ¶ 15; Declaration of Nicolas Talbott ¶ 16; Declaration of Tamasyn Reeves ¶ 12.)  While Defendants argue Plaintiffs may be eligible for individualized waivers (MTD at 18), Plaintiffs contend, and the Doe 1 court agreed, transgender people have never been eligible for medical waivers.  See Doe 1, 2017 WL 4873042, at *21 (finding "no evidence that waivers are actually made available to transgender individuals, or that they will be"); Supplemental Declaration of Eric K. Fanning, Dkt. No. 47-1 ¶ 11; Supplemental Declaration of Raymond Edwin Maybus Jr., Dkt. No. 47-2 ¶ 10.)  Additionally, even if Plaintiffs could successfully apply for a waiver, the need to apply for one when no other group must do so is likely also a violation of equal protection rights.  See Hawaii v. Trump, 859 F.3d 741, 767–68 (9th Cir. 2017) (holding a plaintiff need not wait for a denial of discretionary waiver from the travel ban in order to challenge the ban), vacated as moot on other grounds, 2017 WL 4782860, at *1 (U.S. Oct. 24, 2017); Doe 1, 2017 WL 4873042, at *21 (stating "even if a bona fide waiver

process were made available . . . [this] would not vitiate the barrier that [the plaintiff] claims is violative of equal protection.")

Based on the submitted declarations, the Court is convinced Plaintiffs Stockman, Talbott, and Reeves are highly likely to apply for accession in the relatively near future and are substantially likely to hit a barrier upon that application.  This injury is concrete, particularized, imminent, and not at all hypothetical.  Consequently, Plaintiffs have standing to challenge the Accession Directive.

## 2.  Retention Directive

Beginning on March 23, 2018, the Retention Directive authorizes the discharge of military members solely on the basis of their transgender status.  (<u>See</u> Presidential Memorandum; President Trump's Twitter Proclamation.)  Defendants argue Plaintiffs merely "*may* be discharged from the military in the future" and note, as of yet, no transgender service member has been discharged.  (MTD at 17 (emphasis added).)  Consequently, "Plaintiffs' speculation that they may be discharged in the future is insufficiently concrete and imminent to establish standing."  <u>Id.</u>  However, by characterizing Plaintiffs' fear as "speculation," Defendants ignore the surrounding political and legal realities.  The Commander-in-Chief of the military, President Trump, announced:

> After consultation with my Generals and military experts, please be advised that the United States Government *will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military*.  Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail.  Thank you.

(President Trump's Twitter Proclamation, (emphasis added).)

This proclamation has been expanded into a full Presidential Memorandum, which proclaims the Retention Directive is set to begin on March 23, 2018.  (Presidential Memorandum.)  Nonetheless, Defendants untenably argue that Plaintiffs' fear of being discharged is speculative because no one has yet been discharged.  (MTD at 17.)  This logic falls apart under scrutiny, however, as the Presidential Memorandum does not even take effect until 2018.  The Presidential Memorandum is clear in its intent, force, and impending effect.

Plaintiffs argue courts routinely decide questions of constitutionality before the promulgation of implementing regulations.  (MPI Reply at 10, citing <u>Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n</u>, 346 F.3d 851, 872 n.22 (9th Cir. 2003) (holding statutory challenge justiciable despite absence of implementing regulations "because it is clear that any standard required" would violate the constitution although no standard had yet issued); <u>Nance v. EPA</u>, 645 F.2d 701, 713, 717 (9th Cir. 1981) (holding statutory challenge justiciable although the "EPA has not yet promulgated regulations under the amended act).)  The Court agrees with Plaintiffs' position.  Plaintiffs Tate, John Doe 1, and John Doe 2, all current military service members,

plausibly fear discharge once the Retention Directive becomes operative.  (See Tate Declaration ¶ 25; John Doe 1 Declaration ¶ 19; John Doe 2 Declaration ¶¶ 28–29.)  This fear is appropriately born out of President Defendant Trump's Twitter Proclamation, the Presidential Memorandum, and the Interim Guidance.  Consequently, the Court finds Plaintiffs Tate, John Doe 1, and John Doe 2 face concrete, particularized, and imminent injury.  Accordingly, they have standing to challenge the constitutionality of the Retention Directive.

### 3. Sex Reassignment Surgery Directive

The Court believes it useful to juxtapose Plaintiffs against the plaintiffs in Doe 1.  The Doe 1 plaintiffs failed this first prong of the standing inquiry, as the court found "the risk of being impacted by the Sex Reassignment Surgery Directive is not sufficiently great to confer standing." 2017 WK 4873042 at * 23.  As previously discussed, that court noted Jane Doe 1's transition related procedure had been canceled, but defendants had submitted a declaration stating Jane Doe 1 had received a "health care waiver necessary to receive a transition-related surgery [and] is currently being processed."  Id. at 24.  This finding rendered Jane Doe 1 ineligible to challenge the Sex Reassignment Surgery Directive.  Additionally, Jane Doe 3 would not have begun her transition plan until after she returns from active deployment in Iraq.  Id.  The court found "[g]iven the possibility of discharge, the uncertainties attended by the fact that she has yet to begin any transition treatment, and the lack of certainty on when such treatment will begin, the prospective harm . . . is too speculative to constitute an injury in fact."  Id.  Finally, one of the named plaintiffs had stated that he would transition prior to applying for accession; therefore, he also failed to show injury-in-fact.  Id.

Here, Plaintiff John Doe 1 received a medical transition plan in April 2017.  (John Doe 1 Declaration ¶ 17.)  He has also received a diagnosis of gender dysphoria.  ("John Doe 1 Supplemental Declaration," Dkt. No. 47-6 ¶ 2.)  As a part of his plan, he is to begin taking Hormone Replacement Therapy ("HRT") "later this year," "once [he receives] final approvals from the Medical Multidisciplinary Team and [his] commander."  (Id. ¶ 3.)  He is scheduled to receive chest surgery in mid-2018 and sex organ surgery in 2020.  (Id. ¶¶ 4–5.)  Plaintiff John Doe 2 received a formal diagnosis of gender dysphoria in October 2016.  ("John Doe 2 Supplemental Declaration," Dkt. No. 47-7 ¶ 2.)  He began HRT in March 2017.  (Id. ¶ 3.)  His transition plan includes a projected chest surgery date in April 2018 and sex organ surgery by the end of 2021.  (Id. ¶¶ 4–5.)

According to the Presidential Memorandum, "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex."  (Presidential Memorandum.)  In deciding whether Plaintiffs have standing to challenge the Sex Reassignment Surgery Directive, the Court ordered the parties to submit supplemental briefing discussing the definition of the terms "necessary to protect the health" and "begun a course of treatment to reassign his or her sex."  (Dkt. No. 66.)  Additionally, the Court asked the parties to discuss whether and how these terms apply to Plaintiffs John Doe 1 and John Doe 2.  (Id.)  In response to the Court's order, Defendants argue

the Sex Reassignment Surgery Directive is currently under review and the final definitions of these terms are not yet ascertainable. (Dkt. No. 70, at 3.) Thus, Defendants contend Plaintiffs have not demonstrated injury-in-fact because no one yet knows what the future policy will be. (Id.) Despite this hand waiving, Defendants suggest the definitionally hollow term "necessary to protect the health" may equate to the legally hefty term "medically necessary." (Id. at 5–6.) However:

> As of now, Defendants therefore cannot state what the full scope and impact of [the] future policy will be with respect to sex reassignment surgery until the pending review is completed, including whether or not [the] current understanding of the terms 'necessary to protect the health' or 'begun a course of treatment to reassign his or her sex' will be altered in the future.

(Id. at 6.)

By contrast, Plaintiffs contend reading the Sex Reassignment Surgery Directive in context of the overall directive shows that it is intended to deny coverage of the surgery except in cases where the surgery is "necessary to protect the health of a transgender service member *for a reason unrelated to gender transition*." (Dkt. No. 72 (emphasis in original).) Plaintiffs note the Sex Reassignment Surgery Directive is not an isolated order but is part of a larger policy directive excluding transgender people from military service. (Id.) They argue the purpose of the Directive is to "hasten the departure of transgender individuals from the military, both by sending a clear message that they are unwelcome and by causing some current service members to leave military service because they cannot obtain needed medical care." (Id. at 4.) Moreover, Plaintiffs believe Defendants chose the ambiguous phrase "necessary to protect the health" as a way of intentionally avoiding the common legal term "medically necessary." (Id. at 5.) The interpretation must be different because then the surgeries would continue whenever they were proscribed as part of a gender transition plan, a reading which would "essentially nullify the Directive and contravene President Trump's premise about the cost of surgical care." Stone, 2017 WL 558122 at *13. Notably, Defendants made the same argument before the Stone court, which stated:

> [I]f the exception were to be interpreted under the broad terms proposed by Defendants, the 'exception' would essentially nullify the Directive and Contravene President Trump's premise about the cost of surgical care . . . Defendants may not evade judicial review by advancing (or, in this case, weakly suggesting) an interpretation of the challenged action that is both implausible and would fatally undercut the President's announced policy.

Id. at *13 (citation omitted).

This Court is equally unpersuaded by Defendants' construction of the Sex Reassignment Surgery exception. If the Sex Reassignment Surgery Directive means anything, it means a transgender service member cannot receive the surgery simply because it is "medically

necessary."  President Trump stated the policy change is occurring because the military would be "burdened with the tremendous medical costs."  (President Trump's Twitter Proclamation.) Allowing sex reassignment surgeries whenever they became medically necessary would result in the exception swallowing the rule and would do nothing to address President Trump's concerns. Perhaps anticipating this outcome, Defendants equivocate in their briefing, only suggesting that "necessary to protect the health" might equate to "medical necessity" instead of firmly proffering a definition.  Defendants hesitated when deciding whether the exception applies to Plaintiffs (MTD Reply at 7, (stating that Plaintiffs "potentially fall within the exception to the funding directive")), and now attempt to forge that hesitation into an axe sharp enough to chop down Plaintiffs' standing argument.  As Defendants are not able to outright state Plaintiffs fit into the exception and are entitled to the surgery, Plaintiffs' fears that the surgery will be denied are plausible given the plain words of President Trump.  Consequently, Plaintiffs John Doe 1 and John Doe 2 have demonstrated injury-in-fact as it pertains to the Sex Reassignment Surgery Directive.

As an aside, despite the Court's order for supplemental briefing, neither party addressed the meaning of "begun a course of treatment to reassign his or her sex."  This definition could be impactful as it is not at all clear Plaintiff John Doe 1 stands on the same jurisdictional footing as Plaintiff John Doe 2.  Without supplemental briefing the Court cannot be certain, but it appears Plaintiff John Doe 1 may not have yet started HRT, while Plaintiff John Doe 2 began it earlier this spring.  (Compare John Doe 1 Supplemental Declaration ¶ 3 with John Doe 2 Supplemental Declaration ¶ 3.)  Consequently, Plaintiff John Doe 1 may not have sufficiently "begun a course of treatment to reassign his or her sex," and thus would be ineligible for the exception regardless if the surgery was "necessary to protect" his health.

## C.  Ripeness

Alternatively, Defendants argue this case should be dismissed because it is not ripe to be adjudicated.  A dispute is ripe when it presents concrete legal issues in actual cases.  Colwell v. HHS, 558 F.3d 1112, 1123 (9th Cir. 2009).  "Ripeness and standing are closely related because they originate from the same Article III limitation."  Montana Envtl. Info. Ctr. v. Stone-Manning, 766 F.3d 1184, 1188 (9th Cir. 2014) (citing Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 n.5 (2014)).  In fact, "in many cases, ripeness coincides squarely with standing's injury in fact prong."  Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing. . . . Indeed, because the focus of our ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline.")

Plaintiffs have satisfied the injury-in-fact requirements and have standing to challenge the Accession, Retention, and Sex Reassignment Surgery Directives.  Thus, Plaintiffs also have established constitutional ripeness.  Bishop Paiute Tribe v. Inyo Cty., 863 F.3d 1144, 1153 (9th Cir. 2017).  Defendants' ripeness argument is not based in constitutional ripeness, but prudential ripeness.  Whether a dispute is ripe depends on "the fitness of the issues for judicial decision" and "the hardship to the parties" of withholding review.  Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977).

This case is fit for judicial decision.  President Trump has unambiguously stated his policy intentions, then formalized those intentions into an operative Presidential Memorandum.  "The only uncertainties are how, not if, the policy will be implemented and whether, in some future context, the President might be persuaded to change his mind and terminate the policies he is now putting into effect."  Stone, 2017 WL 5589122, at *14.  The constitutionality of the Directives within the Presidential Memorandum are fit for constitutional review; indeed, the Accession Directive goes into effect within a few short weeks.  (Presidential Memorandum.)  The Court need not wait for the Presidential Memorandum to be fully implemented before determining its constitutionality.  Union Pac. R.R. Co., 346 F.3d at 872 n.22.  Additionally, Plaintiffs would bear the brunt of the harm were judicial review withheld.  Plaintiffs have demonstrated "they are already suffering harmful consequences such as the cancellation and postponements of surgeries, the stigma of being set apart as inherently unfit, facing the prospect of discharge, . . . the inability to move forward with long-term medical plans, and the threat to their prospects of obtaining long-term assignments.  Waiting until after the Directives have been implemented to challenge their alleged violation of constitutional rights only subjects them to substantial risk of even greater harms."  Stone, 2017 WL 5589122, at *14; Doe 1, 2017 WL 4873042, at *24–25 ("The directives are known, and so are the circumstances under which they were issued.  They cannot be more concrete, and future policy by the military—absent action from the president—cannot change what the directives require. . . . Furthermore, the nature of the equal protection analysis in this case, which asses the facial validity of the Presidential Memorandum, means that the Court would not benefit from delay—the salient facts regarding the issuance of the Presidential Memorandum are not subject to change.")

Accordingly, having found Plaintiffs have standing to challenge the Directives, and that this case is ripe for judicial adjudication, the Court DENIES Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## III.  MOTION FOR PRELIMINARY INJUNCTION

### A.  Legal Standard

A plaintiff seeking a preliminary injunction must establish that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "A preliminary injunction is an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (describing the "substantial proof" requirement to grant a preliminary injunction as much higher than the burden of proof for a summary judgment).

The Ninth Circuit has adopted a "sliding scale" test for preliminary injunctions.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.  Id.  For example, "serious questions" as to the

merits of a case, combined with a showing that the hardships tip sharply in the plaintiff's favor, can support the issuance of an injunction, assuming the other two elements of the <u>Winter</u> test are also met. <u>Winter</u>, 555 U.S. at 24 ("Courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, and should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") <u>Id.</u>

A preliminary injunction can take two forms: either a prohibitory injunction or a mandatory injunction. <u>Chalk v. U.S. Dist. Court Cent. Dist. of California</u>, 840 F.2d 701, 704 (9th Cir. 1988). A prohibitory injunction prevents a party from taking action pending a resolution on the merits, <u>Heckler v. Lopez</u>, 463 U.S. 1328, 1333 (1983) (stating that a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"), while a mandatory injunction "orders a responsible party to take action." <u>Meghrig v. KFC W., Inc.</u>, 516 U.S. 479, 484 (1996). Since the "basic function" of a preliminary injunction is to preserve the status quo pending resolution on the merits, mandatory injunctions are "particularly disfavored." <u>Id.</u> Indeed, mandatory injunctions will not be issued unless failure to do so will result in "extreme or very serious damage." <u>Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.</u>, 571 F.3d 873, 879 (9th Cir. 2009).

## B.  Likelihood of Success on the Merits

Defendants argue "[t]he President and Secretary Mattis' decision that the complex issues presented by the policy on military service by transgender individuals warrant additional study before changes are made to longstanding policies passes muster under any standard." (MTD at 25.) However, this is not what happened in this case. In July of 2017, President Trump announced transgender people are barred from military service, and nothing in the Presidential Memorandum or Interim Guidance alters the fact that the decision has already been made. Defendants, in their briefing and at oral argument, attempt to focus on the constitutionality of the Interim Guidance and not the policy that takes place once it expires.[2] Even the title of the current operative policy, the "*Interim* Guidance," (emphasis added) attests to its temporary nature.

Defendants additionally contend military personnel decisions should be accorded a highly deferential level of review. However, this deferential review is most appropriate when the military acts with measure, and not "unthinkingly or reflexively." <u>Rostker v. Goldberg</u>, 453 U.S. 57, 72 (1981). Here, the only serious study and evaluation concerning the effect of transgender people in the armed forces led the military leaders to resoundingly conclude there was no justification for the ban. (<u>Supra</u>, "Military Transgender Policy Before July 2017," at 3–5.) The Court agrees with the <u>Doe 1</u> court, which noted "the record at this stage of the case shows that the reasons offered for categorically excluding transgender individuals were not supported and

---

[2] The <u>Doe 1</u> court's analysis of the interaction between the Presidential Memorandum and the Interim Guidance is sound and adopted by the Court. 2017 WL 4873042, at *17–18. Portions of that analysis have been reproduced in this Opinion. (<u>See</u> <u>supra</u> 9–10.)

were in fact contradicted by the only military judgment available at the time." 2017 WL 4873042, at *31. "[T]he Court's analysis in this Opinion has not been based on an independent evaluation of evidence or faulting the President for choosing between two alternatives based on competing evidence." Id.

The Ninth Circuit has strongly suggested that discrimination on the basis of one's transgender status is equivalent to sex-based discrimination. See Schwenk v. Hartford, 204 F.3d 1187, 1201–02 (9th Cir. 2000) ("both [the Gender Motivated Violence Act and Title VII] prohibit discrimination based on gender as well as sex. Indeed, for the purposes of these two acts, the terms 'sex' and 'gender' have become interchangeable." Additionally, sex-based discrimination can include discrimination based on someone failing "to conform to socially-constructed gender expectations.") Several district courts in this circuit have plainly held discrimination on the basis of one's transgender status is subject to intermediate scrutiny. See Norsworthy v. Beard, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); Olive v. Harrington, No. 115CV01276BAMPC, 2016 WL 4899177, at *5 (E.D. Cal. Sept. 14, 2016). Moreover, the courts which have examined the constitutionality of the transgender ban have also applied intermediate scrutiny. See Stone, 2017 WL 5589122, at *15; Doe 1, 2017 WL 4873042, at *27–29. The Court is persuaded by the analysis contained in these opinions.

Plaintiffs are "protected by the Fifth Amendment's Due Process Clause[, which] contains within it the prohibition against denying to any person the equal protection of the laws." U.S. v. Windsor, 133 S. Ct. 2675, 2695, 186 L. Ed. 2d 808 (2013). Consequently, the government must proffer a justification which is "exceedingly persuasive," "genuine," "not hypothesized," not "invented post hoc in response to litigation," and "must not rely on overbroad generalizations." United States v. Virginia, 518 U.S. 515, 531 (1996). Defendants' justifications do not pass muster. Their reliance on cost is unavailing, as precedent shows the ease of cost and administration not survive intermediate scrutiny even if it is significant. Frontiero v. Richardson, 411 U.S. 677, 688–91 (1973). Moreover, all the evidence in the record suggests the ban's cost savings to the government is miniscule. (RAND Report at 22–23.) Furthermore, Defendants' unsupported allegation that allowing transgender individuals to be in the military would adversely affect unit cohesion is similarly unsupported by the proffered evidence. (Compare MTD at 30–31 with RAND Report at 24.) These justifications fall far short of exceedingly persuasive. Accordingly, the Court finds Plaintiffs have demonstrated their Equal Protection claim will likely succeed on the merits and further analysis of their other claims is unnecessary at this stage of the proceedings.

## C. Irreparable Harm

Defendants first argue, "for much the same reasons they lack standing, Plaintiffs cannot show that they are likely to be injured if the Court does not enter an injunction." (MTD at 24.) Considering the Court has already found Plaintiffs have standing, this argument is easily dismissed. Second, Defendants contend Plaintiffs' injuries would not be beyond remediation. (Id.) For example, they argue separation from the military would not constitute irreparable harm

because it is within the Court's equitable powers to remedy the injury.  (Id.)  However, these arguments fail to address the negative stigma the ban forces upon Plaintiffs.

Plaintiffs allege, and the Court agrees, the ban sends a damaging public message that transgender people are not fit to serve in the military.  (MPI Reply at 19.)  There is nothing any court can do to remedy a government-sent message that some citizens are not worthy of the military uniform simply because of their gender.  A few strokes of the legal quill may easily alter the law, but the stigma of being seen as less-than is not so easily erased.  See Obergefell v. Hodges, 135 S. Ct. 2584, 2602 (2015) ("laws excluding same-sex couples from the marriage right impose stigma and injury of the kind prohibited by our basic charter"); Lawrence v. Texas, 539 U.S. 558, 573 (2003) ("If protected conduct is made criminal and the law which does so remains unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons.")  Additionally, "the deprivation of constitutional rights unquestionably constitutes irreparable injury." Hernandez v. Sessions, 872 F.3d 976, 994 (9th Cir. 2017) (internal quotations omitted) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)).  This ban singles out transgender individuals for unequal treatment solely because of their transgender status.  Plaintiffs have appropriately demonstrated irreparable injury.  See Stone, 2017 WL 5589122, at *16; Doe 1, 2017 WL 4873042, at *32.

## D.  Balance of Equities and Public Interest

The Court finds Plaintiffs have shown the balance of equities and public interest weighs in favor of granting injunctive relief.  Plaintiffs already feel the stigma attached to the Directives.  (See Tate Declaration ¶ 23; John Doe 1 Declaration ¶¶ 23–25; John Doe 2 Declaration ¶¶ 30–33, 38–39.)  Defendants again attempt to make the preliminary injunction about the Interim Guidance and not the policies which will supersede the Interim Guidance.  (MTD at 40.)  As noted above, this argument is misplaced.  Additionally, as in Stone and Doe 1, Defendants make a perfunctory argument regarding the import of a strong national defense.  (MTD at 40.)  However:

> A bare invocation of "national defense" simply cannot defeat every motion for preliminary injunction that touches on the military. On the record before the Court, there is absolutely no support for the claim that the ongoing service of transgender people would have any negative effective on the military at all. In fact, there is considerable evidence that it is the discharge and banning of such individuals that would have such effects.... Moreover, the injunction that will be issued will in no way prevent the government from conducting studies or gathering advice or recommendations on transgender service.

Stone, 2017 WL 5589122, at *16 (quoting Doe 1, 2017 4873042, at *33.)  The record stands much the same here as it did in Stone and Doe 1, thus the Court has no reason to deviate from the above analysis.  In sum, considering all the Winter factors weigh in favor of granting a preliminary injunction, the Court preliminarily enjoins the Accession, Retention, and Sex Reassignment Surgery Directives pending the final resolution of this lawsuit.

## IV.  CONCLUSION

Finding the Plaintiffs have established injury-in-fact as it pertains to the Accession, Retention, and Sex Reassignment Surgery Directives, and finding this case ripe for adjudication, the Court DENIES Defendants' Motion to Dismiss.  Additionally, finding the <u>Winter</u> factors weigh in favor of granting a preliminary injunction, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction.  Therefore, until this litigation is resolved, the Court ORDERS:

1. Defendants, and their agents, employees, assigns, and all those acting in concert with them are enjoined from categorically excluding individuals, including Plaintiffs Aiden Stockman, Nicolas Talbot, Tamasyn Reeves, from military service on the basis that they are transgender; and

2. No current service member, including Plaintiffs Jaquice Tate, John Doe 1, John Doe 2, and Jane Doe, may be separated, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, or otherwise subjected to adverse treatment or differential terms of service on the basis that they are transgender.

**IT IS SO ORDERED.**