1  CHAD A. READLER
2  Principal Deputy Assistant Attorney General
   Civil Division
3
4  BRETT A. SHUMATE
   Deputy Assistant Attorney General
5
6  BRINTON LUCAS
   Counsel to the Assistant Attorney General
7
8  JOHN R. GRIFFITHS
   Branch Director
9
10 ANTHONY J. COPPOLINO
   Deputy Director
11
12 RYAN B. PARKER
   ANDREW E. CARMICHAEL
13 United States Department of Justice
   Civil Division, Federal Programs Branch
14 Telephone: (202) 514-4336
   Email: ryan.parker@usdoj.gov
15
16
17 *Counsel for Defendants*

18         **UNITED STATES DISTRICT COURT**
           **CENTRAL DISTRICT OF CALIFORNIA**
19

| 20  AIDEN STOCKMAN; NICOLAS TALBOTT; TAMASYN REEVES; JAQUICE TATE; JOHN DOES 1-2; JANE DOE; and EQUALITY CALIFORNIA, | CASE NO. 5:17-CV-01799-JGB-KK |
|---|---|
| 21 22 | **DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION** |
| 23          Plaintiffs, | |
| 24     v. | Date:       April 23, 2017 |
| 25 | Time:       9:00 a.m. |
| 26  DONALD J. TRUMP, et al. | Courtroom:  1 |
| | Judge:      Hon. Jesus G. Bernal |
| 27 | |
| 28          Defendants. | |

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

1

2    STATE OF CALIFORNIA,

3                  Plaintiff-Intervenor,

4

5       v.

6

7    DONALD J. TRUMP, et al.

8

9                  Defendants.

10

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

ARGUMENT ....................................................................................................... 7

    I.    Plaintiffs Cannot Show A Likelihood of Success On The Merits .......... 7

        A.  The Current Challenge to the 2017 Memorandum Is Moot ............. 7

        B.  The New Policy Withstands Constitutional Scrutiny ....................... 9

            1. The new policy is subject to highly deferential review .......... 10

            2. The new policy survives highly deferential scrutiny .............. 14

                a. Military Readiness ............................................... 15

                b. Order, Discipline, Leadership, and Unit Cohesion ..... 18

                c. Disproportionate Costs ................................................. 22

            3. The new policy is consistent with the Court's prior

               reasoning ............................................................................ 24

    II.    Plaintiffs Have Not Satisfied The Equitable Factors ............................. 24

CONCLUSION .................................................................................................. 25

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - i
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

# **INTRODUCTION**

Last December, this Court entered a preliminary injunction forbidding the enforcement of several directives in a Presidential Memorandum from August 2017 concerning military service by transgender individuals (2017 Memorandum).  Dkt. 79 (Op.).  The Court understood these directives to institute a policy "'categorically excluding transgender individuals'" based on reasons that "'were not supported and were in fact contradicted by the only military judgment available at the time.'"  Op. 18–19.  On that understanding, the Court issued a preliminary injunction precluding Defendants from implementing those specific directives in the Memorandum.  Op. 21.

The bases for that preliminary injunction no longer exist.  Last month, the Secretary of Defense, with the agreement of the Secretary of Homeland Security, sent the President a memorandum recommending that the President revoke his 2017 Memorandum so that the military can implement a new policy.  Mattis Memorandum, Ex. 1.  After an extensive review of the issue, the Department of Defense concluded that maintaining the policy on transgender service put in place by Secretary Carter in 2016 would pose substantial risks to military readiness and therefore proposed to adopt a new policy.  *Id.* at 1–3.  Far from a categorical ban based on transgender status, this new policy, like the Carter policy before it, would turn on the medical condition of gender dysphoria and contain a nuanced set of exceptions allowing some transgender individuals, including many Plaintiffs here, to serve.  *Id.* at 2–3.  Along with this memorandum, Secretary Mattis sent the President a 44-page report providing a detailed explanation for why, in the professional, independent judgment of the Department, this new policy is necessary to further military interests.  Report, Ex. 2.  The President then issued a new memorandum on March 23, 2018, revoking his 2017 Memorandum, thus allowing the military to implement its preferred policy.  2018 Memorandum, Ex. 3.

Given these changed circumstances, the preliminary injunction should be dissolved.  Plaintiffs can no longer meet any of the four criteria for this extraordinary

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 1
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

relief.  On the merits, their challenge to the revoked 2017 Memorandum no longer presents a live controversy and, in any event, the military's new policy is constitutional. Plaintiffs cannot establish that they would suffer any cognizable injury from the new policy, much less an irreparable one.  And given the Department's judgment that retaining the Carter policy would pose risks to military readiness, the balance of the equities and public interest strongly cut against prolonging this state of affairs.

To be clear, Defendants respectfully maintain that the Court's preliminary injunction, which addressed only certain directives in the President's 2017 Memorandum, does not extend to the Defense Department's new policy.  But in an abundance of caution, Defendants urge this Court to dissolve the preliminary injunction in order to permit the military to implement the policy it believes will best ensure our Nation's defense.  To the extent that Plaintiffs may seek to challenge that new policy, that independent controversy should not be litigated under the shadow of a preliminary injunction of a Presidential Memorandum that is no longer in effect.

## BACKGROUND

**1.** For decades, military standards presumptively barred the accession and retention of certain transgender individuals.  In July 2015, however, then-Secretary Carter ordered the creation of a working group to study the possibility of "welcoming transgender persons to serve openly," and instructed it to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness."  *Id.* at 13.  As part of this review, the Department commissioned RAND to study the issue, which concluded that allowing transgender service members to serve in their preferred gender would limit deployability, impede readiness, and impose costs on the military, but dismissed these burdens as "negligible," "marginal," or "minimal."  Dkt. 26-2, at xii, 46–47, 69–70; *accord* Report 14.

After this review, then-Secretary Carter ordered the Defense Department on June 30, 2016, to adopt a new policy.  First, the military had until July 1, 2017, to revise its

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 2
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

accession standards.  Report 14.  Under this revision, a history of "gender dysphoria," "medical treatment associated with gender transition," or "sex reassignment or genital reconstruction surgery" would be disqualifying unless an applicant provided a certificate from a licensed medical provider that the applicant had been stable or free from associated complications for 18 months.  *Id.* at 15.  Second, and effective immediately, service members could not be discharged based solely on their "gender identity" or "expressed intent to transition genders," Dkt. 22-3, at 4, but, if diagnosed with gender dysphoria, could transition genders, Report 14.  Transgender individuals who lacked a diagnosis of gender dysphoria had to continue serving in their biological sex.  *Id.* at 15.

**2.** Before the Carter accession standards took effect on July 1, 2017, the Deputy Secretary of Defense "directed the Services to assess their readiness to begin accessions" and received their input in May 2017.  Dkt. 28-5.  "Building upon that work and after consulting with the Service Chiefs and Secretaries," Secretary Mattis "determined that it [was] necessary to defer the start of [these] accessions" so that the military could "evaluate more carefully the impact of such accessions on readiness and lethality."  *Id.*  Based on the recommendation of the services and in the exercise of his independent discretion and judgment, he therefore delayed the implementation of the new accession standards on June 30, 2017, until January 1, 2018.  *Id.*; *see* Report 4.  He also ordered the Under Secretary of Defense for Personnel and Readiness to lead a review, which would "include all relevant considerations" and last for five months.  Dkt. 28-5.  Secretary Mattis explained that this study would give him "the benefit of the views of the military leadership and of the senior civilian officials who are now arriving in the Department," and that he "in no way presupposes the outcome of the review."  *Id.*; *see* Report 17.

While that review was ongoing, the President stated on Twitter on July 26, 2017, that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military."  Dkt. 28-6.  The President later issued a Memorandum on August 25, 2017, calling for, *inter alia*, "further study" into the risks of

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 3
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

maintaining the Carter policy. Report 17.[1]  In response, Secretary Mattis established a Panel of Experts on September 14, 2017, to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members." Report 17.  The Panel consisted of the members of senior military leadership who had "the statutory responsibility to organize, train, and equip military forces" and were "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force." *Id.* at 18.

In 13 meetings over the span of 90 days, the Panel met with commanders of transgender service members, military and civilian medical professionals, and transgender service members themselves. *Id.*  It reviewed information on gender dysphoria, its treatment, and its effects on military effectiveness, unit cohesion, and military resources. *Id.*  It received briefing from three separate groups dedicated to issues involving personnel, medical treatment, and military lethality. *Id.*  It drew on the military's experience with the Carter policy thus far, and considered evidence supporting and cutting against its recommendations. *Id.*  And, unlike those responsible for the Carter policy, it did not "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness," but made "no assumptions." *Id.* at 19.  Exercising its professional military judgment, the Panel provided Secretary Mattis with recommendations. *Id.*

After considering these recommendations along with additional information, Secretary Mattis, with the agreement of the Secretary of Homeland Security, sent the President a memorandum in February 2018 proposing a new policy consistent with the Panel's conclusions. *Id.*; *see* Mattis Memorandum.  The memorandum was accompanied by a 44-page report setting forth in detail the bases for the Department's recommended new policy.  Mattis Memorandum 3; *see* Report.

**3.** In his memorandum, Secretary Mattis explained why a departure from the

---

[1] This filing does not describe the ensuing litigation given the Court's familiarity.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 4
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

Carter policy was necessary. "Based on the work of the Panel and the Department's best military judgment," the military had concluded "that there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria and require, or have already undertaken, a course of treatment to change their gender." Mattis Memorandum 2. In addition, it had found "that exempting such persons from well-established mental health, physical health, and sex-based standards … could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." *Id.* And although Secretary Carter had concluded otherwise on the basis of the RAND report, that study "contained significant shortcomings." *Id.* It relied on "limited and heavily caveated data" and "glossed over the impacts of healthcare costs, readiness, and unit cohesion, and erroneously relied on the selective experiences of foreign militaries with different operational requirements than our own." *Id.*

Therefore, "in light of the Panel's professional military judgment and [his] own professional judgment," Secretary Mattis proposed a policy that continued some parts of the Carter policy and departed from others. *Id.*; *see id.* at 2–3; Report 4–6, 32–43. Like the Carter policy, the new policy does not draw lines on the basis of transgender status, but presumptively disqualifies individuals with a certain medical condition, gender dysphoria, from service. *Compare* Report 4–6, 19, *with* Dkt. 22-3. The key difference between the two is the exceptions to that presumptive disqualification.

Under the new policy, as under the Carter policy, individuals who "identify as a gender other than their biological sex" but who do not suffer clinically significant "distress or impairment of functioning in meeting the standards associated with their biological sex"—and therefore have no history or diagnosis of gender dysphoria—may serve if "they, like all other persons, satisfy all standards and are capable of adhering to the standards associated with their biological sex." Report 4.

Individuals who both are "diagnosed with gender dysphoria, either before or after

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 5
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

entry into service," and "require transition-related treatment, or have already transitioned to their preferred gender," are presumptively "ineligible for service." *Id.* at 5. This presumptive bar is subject to both individualized "waivers or exceptions" that generally apply to all Department and Service-specific standards and policies as well as a categorical reliance exception for service members who relied on the Carter policy. *Id.* Specifically, service members "who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy," including those who entered the military "after January 1, 2018," "may continue to receive all medically necessary care, to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commences." *Id.* at 5–6.

Individuals who "are diagnosed with, or have a history of, gender dysphoria" but who neither require nor have undergone gender transition are likewise "generally disqualified from accession or retention." *Id.* This presumptive disqualification is subject to the same exceptions discussed above as well as two new categorical ones. *Id.* With respect to accession, individuals with a history of gender dysphoria may enter the military if they (1) can demonstrate "36 consecutive months of stability (i.e., absence of gender dysphoria) immediately preceding their application"; (2) "have not transitioned to the opposite gender"; and (3) "are willing and able to adhere to all standards associated with their biological sex." *Id.* With respect to retention, those diagnosed with gender dysphoria after entering the military may remain so long as they (1) can comply with Department and Service-specific "non-deployab[ility]" rules; (2) do "not require gender transition"; and (3) "are willing and able to adhere to all standards associated with their biological sex." *Id.*

On March 23, 2018, the President issued a new memorandum concerning transgender military service. 2018 Memorandum. The 2018 Memorandum revoked the 2017 Memorandum "and any other directive [the President] may have made with respect

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 6
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

to military service by transgender individuals," thereby allowing the Secretaries of Defense and Homeland Security to "exercise their authority to implement any appropriate policies concerning military service by transgender persons." *Id.*

## ARGUMENT

"Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong." *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (plurality op.) (internal quotation marks, ellipsis, and citation omitted). Courts therefore regularly dissolve preliminary injunctions when changed circumstances undermine the basis for the interlocutory relief. *See, e.g.*, *CTIA-The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1111 (9th Cir. 2017). Ordinarily, "dissolution should depend on the same considerations that guide a judge in deciding whether to grant or deny a preliminary injunction in the first place"— *i.e.*, "[t]he familiar quartet" of "likelihood of success, the threat of irreparable injury to the party seeking interim relief, the equities and the public interest." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1225 (1st Cir. 1994). The changed circumstances here preclude Plaintiffs from satisfying any of these criteria.

## I. PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS

### A. The Current Challenge to the 2017 Memorandum Is Moot

To start, Plaintiffs are no longer likely to succeed because their challenge is moot. A case is moot "'when it is impossible for a court to grant any effectual relief to the prevailing party,'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013), and that is true here. The only relief Plaintiffs seek is a declaration that the "August 25 Directive" is unconstitutional and an injunction of its enforcement. Dkt. 1, at 19. But because that Memorandum has been revoked, a declaration from this Court as to the Constitutionality of that Memorandum would amount to an advisory opinion. If Plaintiffs fear *future* injury from the proposed new policy, which they have not

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 7
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

challenged, those harms would stem from the independent action of the Secretaries of Defense and Homeland Security in implementing that policy, not the 2017 or 2018 Memoranda.  If Plaintiffs decide to challenge the new policy upon implementation, courts can review it at that time.[2]

Nor can Plaintiffs find refuge in the doctrine that "a defendant's voluntary cessation of a challenged practice" does not necessarily moot the case.  *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982).  When the government repeals and replaces one of its policies, the question is "whether the new [policy] is sufficiently similar to the repealed [one] that it is permissible to say that the challenged conduct continues," or, put differently, whether the policy "has been 'sufficiently altered so as to present a substantially different controversy from the one … originally decided.'"  *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993).

Any dispute over the new policy "'present[s] a substantially different controversy'" than Plaintiffs' challenge to the President's 2017 Memorandum.  *Id.*  The target of Plaintiffs' complaint was a "categorical ban" in the face of what they described as "exhaustive multi-year review" by military leadership.  Dkt. 1, at 1.  Likewise, this Court's preliminary injunction rested on its view that the President had ordered a ban "'categorically excluding transgender individuals'" for reasons that "'were not supported and were in fact contradicted by the only military judgment available at the time.'"  Op. 18–19.  The new policy, by contrast, contains several exceptions allowing some transgender individuals, including many Plaintiffs here, to serve, and it is the product of independent military judgment following an extensive study.  *See infra* Parts I.B.3, II.

At a minimum, the replacement of an alleged categorical exclusion with a more nuanced regime presents a substantially different controversy.  In *Department of Treasury v. Galioto*, 477 U.S. 556 (1986) (per curiam), for instance, a lower court held that a federal

---

[2] Any review in that scenario would be governed by the Administrative Procedure Act and thus limited to the administrative record.  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 8
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

statute barring all former mental patients who had been involuntarily committed from buying firearms was unconstitutional because it created an "'irrebuttable presumption'" that anyone involuntarily committed was permanently a threat "no matter the circumstances." *Id.* at 559.  During the appeal, Congress amended the law to allow anyone prohibited from purchasing firearms to seek individualized relief from the Treasury Department.  *Id.*  Concluding that "no 'irrebuttable presumption' now exists since a hearing is afforded to anyone subject to firearms disabilities," the Supreme Court held the issue moot.[3]  *Id.*  This case is no different.  Because Plaintiffs sought an injunction precluding enforcement of the 2017 Memorandum—and thereby effectively maintain the Carter policy, which, like the new policy, treats gender dysphoria as presumptively disqualifying, Op. 10—the heart of their challenge was necessarily limited to the (allegedly) categorical nature of that Memorandum.  Confirming this fact, the preliminary injunction barred Defendants from "categorically excluding individuals" based on their transgender status.  Op. 21.  With that issue no longer live, the appropriate course is to dissolve that injunction.[4]

### B.    The New Policy Withstands Constitutional Scrutiny

In all events, Plaintiffs are not entitled to a preliminary injunction barring implementation of the new policy, as they cannot prove that this new policy likely

---

[3] The district court addressing Washington's challenge to the executive orders barring entry of certain foreign nationals took a similar tack.  *Washington v. Trump*, No. 17-0141, 2017 WL 1045950 (W.D. Wash. Mar. 16, 2017) (Robart, J.).  It held that its preliminary injunction against the first order did not extend to the second because of a new exception for lawful permanent residents and certain foreign nationals and a clarification that individuals could seek asylum.  *Id.* at *3, *4.

[4] If the Court finds that the challenge to the Memorandum remains live and that at least some Plaintiffs would have standing to challenge the new policy, *but see infra* Part II, enjoining that Memorandum would not redress any of their purported injuries.  If the new policy would disqualify any of those Plaintiffs from military service, an injunction against the (non-existent) Memorandum would not cure that harm.

---

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 9
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

violates equal protection principles.  *See* Op. 19.

### 1.   The new policy is subject to highly deferential review

On its face, the new policy triggers rational basis review.  That policy, like the Carter policy before it, draws lines on the basis of a medical condition (gender dysphoria) and an associated treatment (gender transition), not transgender status. *Compare* Report 3–5, *with* Dkt. 22-3, at 1–2.  Such classifications receive rational basis review, which is why no one ever challenged the Carter policy on grounds it was subject to heightened scrutiny.  *See, e.g.*, *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365–68 (2001); *Geduldig v. Aiello*, 417 U.S. 484, 494–97 & n.20 (1974).[5]

But even assuming *arguendo* that the new policy would trigger intermediate scrutiny outside of the military context, that context, unquestionably present here, requires a far less searching form of review.  While the government is not "free to disregard the Constitution" when acting "in the area of military affairs," it is equally true that "the tests and limitations to be applied may differ because of the military context." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981).  "[R]eview of military regulations challenged on First Amendment grounds," for example, "is far more deferential than constitutional review of similar laws or regulations destined for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986).  And the same is true for the constitutional "rights of servicemembers" more generally, including those within the Due Process Clause.  *Weiss v. United States*, 510 U.S. 163, 177 (1994); *see also Solorio v. United States*, 483 U.S. 435, 448 (1987) (listing "variety of contexts" where deferential review applied).  In short, "constitutional rights must be viewed in light of the special circumstances and needs of the armed forces," and "[r]egulations which might infringe constitutional rights in other

---

[5] Even if the new policy could be cast as turning on transgender status, such classifications warrant rational basis review, not intermediate scrutiny.  *See, e.g.*, *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227–28 (10th Cir. 2007).  Even if *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000), may "suggest[]" otherwise, Op. 19, it is distinguishable and, in all events, Defendants respectfully reiterate this position to preserve the issue. Defendants agree with the Court, however, that strict scrutiny is inappropriate.  *Id.*

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 10
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

contexts may survive scrutiny because of military necessities." *Beller v. Middendorf*, 632 F.2d 788, 810–11 (9th Cir. 1980) (Kennedy, J.).

This different standard of review is necessary not only because the Constitution itself commits military decisions to "the political branches directly responsible—as the Judicial Branch is not—to the electoral process," but also because "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see Rostker*, 453 U.S. at 65–66. That is particularly true with respect to the "'complex, subtle, and professional decisions as to the composition … of a military force,' which are 'essentially professional military judgments.'" *Winter v. NRDC*, 555 U.S. 7, 24 (2008).

Although the Supreme Court has expressly refused to attach a "label[]" to the standard of review applicable to military policies alleged to trigger heightened scrutiny, *Rostker*, 453 U.S. at 70, several features of its decisions in this area demonstrate that rational basis review most closely describes its approach in practice. First, while the Court has generally refused "to hypothesize or invent governmental purposes for gender classifications *post hoc* in response to litigation," *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1697 (2017) (internal quotation marks, brackets, and citation omitted), it has done so when military deference is required. In *Schlesinger v. Ballard*, 419 U.S. 498 (1975), it upheld a statutory scheme under which male naval officers were subject to mandatory discharge for failing twice to be promoted within roughly 10 years of service, while female officers were afforded 13 years to obtain equivalent promotions. *Id.* at 499–505, 510. The Court explained that "Congress may … quite rationally have believed" that female officers "had less opportunity for promotion than did their male counterparts" and that this framework would correct the imbalance. *Id.* at 577. The main dissent criticized that choice "to conjure up a legislative purpose." *Id.* at 511 (Brennan, J.); *cf. Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975) ("recitation of a benign, compensatory purpose is not an automatic shield … against any inquiry into the actual purposes" of

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 11
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

civilian sex-based classifications).[6]

Second, whereas the Court has rejected certain evidentiary defenses of sex-based classifications in the civilian context, *see, e.g.*, *Craig v. Boren*, 429 U.S. 190, 199–204 (1976), it has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including evidence from former military officials. In *Goldman*, it rejected a free-exercise challenge to the Air Force's prohibition of a Jewish officer from wearing a yarmulke while working as a clinical psychologist in an Air Force base hospital, even though that claim would have triggered strict scrutiny at the time had it been raised in the civilian context. 475 U.S. at 510; *see id.* at 506. The Court did so even in the face of "expert testimony" from a former Chief Clinical Psychologist to the Air Force that religious exceptions to a military dress code would "increase morale," and even though the "Air Force's assertion to the contrary [was] mere *ipse dixit*, with no support from actual experience or a scientific study in the record." *Id.* at 509; *see* Br. for Pet'r at 21, *Goldman*, 475 U.S. 503 (No. 84-1097); 1985 WL 669072, at *21. In the Court's view, the beliefs of such "expert witnesses" were "quite beside the point," as current "military officials … are under no constitutional obligation to abandon their considered professional judgment." 475 U.S. at 509.[7]

---

[6] Similarly, the Court in *Rostker* rejected an equal protection challenge to a statute exempting women from the requirement to register for the draft. 453 U.S. at 83. Even though the suit had been filed in 1971, the Court relied on Congress's analysis of the issue nine years later, when it declined to amend the statute to permit the conscription of women at President Carter's urging. *See id.* at 60–63. In doing so, it rejected the argument that it "must consider the constitutionality of the [relevant statute] solely on the basis of the views expressed by Congress in 1948, when the [law] was first enacted in its modern form." *Id.* at 74. Instead, because Congress in 1980 had "reconsider[ed] the question of exempting women from [the draft], and its basis for doing so," its views from that time were "highly relevant." *Id.* at 75.

[7] In *Rostker*, the Court again declined to overrule the considered judgment of the political branches in the military context, even in the face of disagreement within those branches. President Carter had recommended that Congress require women to register for the draft, 453 U.S. at 60, and had provided "testimony of members of the Executive and

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 12
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

Third, whereas concerns about "administrative convenience" ordinarily cannot be used to survive intermediate scrutiny, *e.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 205 (1977), they may play a key role in challenges to policies concerning the military. In *Rostker*, Congress "did not consider it worth the added burdens of including women in draft and registration plans" in light of the "administrative problems such as housing and different treatment with regard to dependency, hardship and physical standards.'" 453 U.S. at 81. The Court reasoned that it was not its place "to dismiss such problems as insignificant in the context of military preparedness." *Id.* Again, the dissents criticized the Court for jettisoning parts of intermediate scrutiny. *See id.* at 94 (Brennan, J.) ("[A]dministrative convenience … is not an adequate constitutional justification under the *Craig v. Boren* test."); *id.* at 85 (White, J.) (same).

Fourth, the political branches enjoy significant latitude to choose "among alternatives" in furthering military interests. *Id.* at 72 (majority). In *Rostker*, President Carter and military leadership urged a sex-neutral alternative that they believed "would materially increase [military] flexibility,'" but Congress rejected that proposal in favor of retaining its sex-based approach. 453 U.S. at 63; *see id.* at 70. Invoking the "deference due" Congress in this area, the Court refused "to declare unconstitutional [that] studied choice of one alternative in preference to another." *Id.* at 71–72. Again, the main dissent attacked that approach as "significantly different from" the analysis in typical sex-discrimination cases, as the government had not shown that "a gender-neutral statute would be a less effective means" of furthering objectives. *Id.* at 94 (Brennan, J.).

Finally, arguable inconsistencies resulting from line-drawing have not been

the military in support of that decision," *id.* at 79. The lower court relied on this testimony to hold that Congress's refusal to require women to register was unconstitutional because "'military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility.'" *Id.* at 63. But the Supreme Court reversed, noting that the lower court had "palpably exceeded its authority" in "relying on this testimony," as Congress had "rejected it." *Id.* at 81–82.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 13
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

enough to render military decisions invalid.  In *Goldman*, the Court acknowledged that the Air Force had an "exception … for headgear worn during indoor religious ceremonies" and gave commanders "discretion" to allow "visible religious headgear … in designated living quarters."  475 U.S. at 509.  Additionally, service members could "wear up to three rings and one identification bracelet," even if those items "associate[d] the wearer with a denominational school or a religious or secular fraternal organization" and thereby served as "emblems of religious, social, and ethnic identity."  *Id.* at 518 (Brennan, J., dissenting).  Yet the court deferred to the Air Force's judgment that creating an exception for a psychologist who wanted to wear religious headgear in a hospital on base "would detract from the uniformity sought by [its] dress regulations."  *Id.* at 510 (majority op.).  Had this case occurred in the civilian context and strict scrutiny been applied, it is doubtful that the regulation would have been sustained.

Given the Court's substantial departure from core aspects of intermediate and even strict scrutiny in cases involving military deference, Defendants believe the most appropriate description of the applicable standard is rational basis review.  But at a minimum, even if the Court prefers to label the standard a peculiar form of "intermediate scrutiny," Op. 19, its substantive analysis of the new policy should track the Supreme Court's highly deferential approach in this area.  *See Rostker*, 453 U.S. at 69–70 (disavowing the utility of traditional scrutiny labels in military deference cases).  Said differently, regardless of the standard of review the Court ultimately employs, the basic elements of traditional intermediate scrutiny should not apply in the instant case.

## 2.    The new policy survives highly deferential scrutiny

The new policy survives the applicable level of scrutiny.  As a threshold matter, certain aspects of the policy should not be at issue.  To start, its treatment of transgender individuals without gender dysphoria—who are eligible to serve in their biological sex— is consistent with the Carter policy and hence this Court's preliminary injunction.  *See* Dkt. 22-3, at 2.  Nor can those with gender dysphoria dispute being held to the same

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 14
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

retention standards, including deployability requirements, as all other service members. And the 36-month period of stability for accession—as opposed to the Carter policy's 18 months—is not constitutionally significant, especially since it "is the same standard the Department currently applies to persons with a history of depressive disorder," whereas the 18-month period "has no analog with respect to any other mental condition listed in [the accession standards]." Report 42.

The only change in the policy that is even arguably legally significant is its presumptive disqualification of individuals with gender dysphoria who require or have undergone gender transition, along with the corollary requirement that service members generally serve in their biological sex, and that change easily survives the deferential review applicable here. In the Department's considered judgment, accommodating gender transition would create unacceptable risks to military readiness; undermine good order, discipline, and unit cohesion; and create disproportionate costs. Mattis Memorandum 2. There should be no dispute that avoiding those harms are at least important interests. Courts must "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest,'" *Winter*, 555 U.S. at 24, and here, the Department has found that minimizing these risks is "absolutely essential," Mattis Memorandum 2. The only issue is whether the Court should defer to the military's judgment that the new policy is necessary to effectuating that critical interest. *See, e.g.*, Report 32. That should not be a close question.

### a.    Military Readiness

In the Department's professional military judgment, service by those who require or have undergone gender transition poses at least two significant risks to military readiness. First, in light of "evidence that rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment" (including sex reassignment surgery) compared to others, as well as "considerable scientific uncertainty" over whether these "treatments fully remedy … the mental health

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 15
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

problems associated with gender dysphoria," the Department found that "the persistence of these problems is a risk for readiness." Report 32. This risk-based assessment—grounded in an extensive review of evidence, including materials unavailable at the time the Carter policy was adopted—is a classic military judgment entitled to deference. *See id.* at 19–27.

The need to "proceed cautiously" in this area is particularly compelling given the uniquely stressful nature of the military. *Id.* at 27. Although none of the available studies "account for the added stress of military life, deployments, and combat," *id.* at 24, preliminary data show that service members with gender dysphoria are "eight times more likely to attempt suicide" and "nine times more likely to have mental health encounters" than service members as a whole, *id.* at 21–22. Thus, in Secretary Mattis's judgment, the Department should not risk "compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations." Mattis Memorandum 2.

In short, the Department concluded that the military risks stemming from the uncertain efficacy of a particular medical treatment for a particular medical condition outweighed the possible benefits of allowing individuals with that condition to serve as a general matter. That is precisely the sort of analysis the military must perform with respect to any medical accession or retention standard, and the cautious approach it took here is hardly out of the norm. *See* Report 3. Indeed, even the Carter policy implicitly acknowledged that gender dysphoria or gender transition could impede military readiness by requiring applicants to demonstrate that they had been stable or had avoided complications for an 18-month period. *See* Dkt. 22-3. Given that even administrative convenience concerns cannot be dismissed in this context, *see Rostker*, 453 U.S. at 81, the military's assessment of the tolerable level of risk from a medical condition and its treatment should not be second-guessed.

Second, even if it were guaranteed that the risks associated with gender dysphoria

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 16
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

could be fully addressed by transition, "most persons requiring transition-related treatment could be non-deployable for a potentially significant amount of time." Report 35. In the military's view, that limitation itself posed a separate "readiness risk." *Id.* at 33. After documenting the restrictions associated with transition-related treatments—including reports by some commanders that some transitioning service members would be non-deployable for two to two-and-half-years—the Department made an assessment that these burdens on military readiness were unacceptable. *Id.* at 33–35.[8]

This analysis should not be controversial. Even Secretary Carter acknowledged that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness needs." Dkt. 22-3, at 5. So did RAND, which concluded that the relevant limitations on deployability would "have a negative impact on readiness," Report 34–35. Although RAND dismissed this harm as "minimal" due to its estimation of the "exceedingly small number of transgender Service members who would seek transition-related treatment," *id.*, in the Department's judgment, that was the wrong question: "The issue is not whether the military can absorb periods of non-deployability in a small population," but "whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible." *Id.* at 35. After all, "by RAND's standard, the readiness impact of many medical conditions that the Department has determined to be disqualifying—from bipolar disorder to schizophrenia—would be minimal because they, too, exist only in relatively small numbers." *Id.* RAND "failed to analyze the impact" on "unit

---

[8] These limitations would also more broadly harm the service members' units. After all, any "increase in the number of non-deployable military personnel places undue risk and personal burden" on those service members who are "qualified and eligible to deploy." Report 35. In addition to these personal costs, service members who are deployed "more often to backfill or compensate for non-deployable" ones may face risks to family resiliency as well. *Id.* All of this poses a "significant challenge for unit readiness." *Id.*

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 17
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

readiness" at "the micro level" by taking a "macro" view of the entire military.  *Id.* at 14.  Given that even Congress may disagree with testimony by some military officers based on legislative concerns about deployability, *see Rostker*, 453 U.S. at 82, then military leadership between administrations should likewise be able to differ over what limitations on deployability are acceptable.

### b.  Order, Discipline, Leadership, and Unit Cohesion

The Department similarly disagreed with the RAND report's analysis of "the intangible ingredients of military effectiveness"—namely, "leadership, training, good order and discipline, and unit cohesion." Report 3.  While RAND recognized that "unit cohesion" was "a critical input for unit readiness," it concluded that accommodating gender transition would likely have "no significant effect" based on the experiences of four foreign militaries that had "fairly low numbers of openly serving transgender personnel." Dkt. 26-2, at 44–45.  By adopting this approach, however, RAND, in the Department's judgment, failed to "examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy"—"all of which are critical to unit cohesion"—"at the unit and sub-unit levels." Report 14.  Aside from potential harms to unit cohesion from limits on deployability, *see supra* Part I.B.2.a, accommodating gender transition would undermine the "good order and discipline, steady leadership, [and] unit cohesion" served by the military's sex-based standards in several respects, Report 28.

First, the Department reasonably concluded that any accommodation policy that does not require full sex-reassignment surgery could "erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline." *Id.* at 37.  As it explained, "[g]iven the unique nature of military service," service members often must "live in extremely close proximity to one another." *Id.*  To protect their reasonable expectations of privacy, the Department "has long maintained separate berthing, bathroom, and showering facilities for men and women." *Id.*  Far

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 18
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

from a suspect practice, the Supreme Court has acknowledged that it is "necessary to afford members of each sex privacy from the other sex in living arrangements," *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996), and "[i]n the context of recruit training, this separation is even mandated by Congress," Report 37 (collecting statutes).

Accommodating gender transition, the Department reasoned, at least with respect to those individuals who have not undergone a complete sex reassignment, would "undermine" these efforts to honor service members' "reasonable expectations of privacy." *Id.* at 36. Allowing transgender service members "who have developed, even if only partially, the anatomy of their identified gender" to use the facilities of either their identified gender or biological sex "would invade the expectations of privacy" of the non-transgender service members who share those quarters. *Id.* at 37. Absent the creation of separate facilities for transgender service members, which may well be a "logistically impracticable" and unacceptable accommodation, the military would face irreconcilable privacy demands. *Id.* For example, the Panel of Experts received a report from a commander who faced dueling equal opportunity complaints under the Carter policy over allowing a transgender service member who identified as a female but had male genitalia to use the female shower facilities—one from the female service members in the unit and one from the transgender service member. *Id.* These concerns are consistent with reports from commanding officers in the Canadian military that "they would be called on to balance competing requirements" by "meeting [a] trans individual's expectations … while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness." *Id.* at 40.

In the Department's judgment, such collisions of privacy demands "are a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions." *Id.* at 37. Accommodating transition would mean the "routine execution of daily activities" could be a recurring source of "discord in the unit," requiring commanders "to devote time and resources to resolve issues not present

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 19
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

outside of military service." *Id.* at 38. And any delayed or flawed solution by commanders "can degrade an otherwise highly functioning team," as any "appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline." *Id.*

In addition, accommodating gender transition, at least in the context of basic recruiting, puts the Department at risk of violating federal law. As it observed, Congress has "required by statute that the sleeping and latrine areas provided for 'male' recruits be physically separated from the sleeping and latrine areas provided for 'female' recruits during basic training and that access by drill sergeants and training personnel 'after the end of the training day' be limited to persons of the 'same sex as the recruits' to ensure 'after-hours privacy for recruits during basic training.'" *Id.* at 29. Accommodating the gender transition of recruits, drill sergeants, or training personnel in the context of basic recruiting places the Department in jeopardy of contravening those statutory mandates. The new policy advances the Department's obvious interest in avoiding that legal risk.[9]

Second, accommodating gender transition creates safety risks for, and perceptions of unfairness among, service members by applying "different biologically-based standards to persons of the same biological sex based on gender identity, which

---

[9] The Department cannot assume that courts will construe these statutes to accommodate gender transition. Instead, because these laws do not provide any specialized definition for "sex," "male," or "female," courts may conclude that the terms retain their ordinary meaning, *e.g.*, *Johnson v. United States*, 559 U.S. 133, 138 (2010), which turns on biology rather than gender identity, *see, e.g.*, *Oxford American English Dictionary* 622 (1980) (defining "sex" as "either of the two main groups (*male* and *female*) into which living things are placed according to their reproductive functions, the fact of belonging to these"); *id.* at 401 (defining "male" as "of the sex that can beget offspring by fertilizing egg cells produced by the female"); *id.* at 237 (defining "female" as "of the sex that can bear offspring or produce eggs"); *Webster's Third New International Dictionary* 836, 1366, 2081 (1993) (similar). That is likely given that Congress has confirmed this understanding by prohibiting discrimination on the basis of "gender identity" in addition to, rather than within, discrimination on the basis of "sex" or "gender." *See, e.g.*, 18 U.S.C. § 249(a)(2); 42 U.S.C. § 13925(b)(13)(A).

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 20
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

is irrelevant to standards grounded in physical biology." *Id.* at 36. For example, "pitting biological females against biological males who identify as female, and vice versa," in "physically violent training and competition" could pose "a serious safety risk." *Id.* In addition, service members who are not transgender would likely be frustrated by a "biological male who identifies as female" but "remain[s] a biological male in every respect" and yet is "governed by female standards" in "training and athletic competition," which tend to be less exacting than male standards in this area. *Id.*

Again, these are legitimate concerns, as both Congress and the Supreme Court have recognized that it is "necessary" to "adjust aspects of the physical training programs" for service members to address biological differences between the sexes. *Virginia*, 518 U.S. at 550 n.19 (citing statute requiring standards for women admitted to service academies to "be the same as those … for male individuals, except for those minimum essential adjustments in such standards required because of physiological differences between [the sexes]"). Especially given that "physical competition[] is central to the military life and indispensable to the training … of warriors," Report 36, the Department's concerns about risks here should not be ignored.

Third, the Department was concerned that exempting transgender service members from uniform and grooming standards associated with their biological sex would create friction in the ranks. As it explained, "allowing a biological male to adhere to female uniform and grooming standards" would "create[] unfairness for other males who would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity." *Id.* at 31. This is likely to be particularly true in cases where the standards prohibit non-transgender service members from expressing core aspects of their identity.

Given these concerns, the Department found that accommodating gender transition "risks unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline." Report

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 21
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

40. Due to "the vital interests at stake—the survivability of Service members, including transgender persons, in combat and the military effectiveness and lethality of our forces"—it therefore decided to take a cautious approach. *Id.*[10]

That careful military judgment merits significant deference. "Not only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman*, 475 U.S. at 507–08. Indeed, the Supreme Court has repeatedly deferred to similar judgments in this military context in the past. *See id.* at 509–10 ("uniformity sought by the dress regulations"); *Rostker*, 453 U.S. at 57 ( "'administrative problems such as housing and different treatment with regard to … physical standards'"). And it did so even though in each case current or former military officials disagreed.

### c.    Disproportionate Costs

Finally, the Department explained that in its experience with the Carter policy, accommodating gender transition was "proving to be disproportionately costly on a per capita basis." Report 41. Since the Carter policy's implementation, the medical costs for service members with gender dysphoria have "increased nearly three times" compared to others. *Id.* And that is "despite the low number of costly sex reassignment surgeries that have been performed so far"—"only 34 non-genital sex reassignment surgeries and one genital surgery"—which is likely to increase as more service members with gender dysphoria avail themselves of these procedures. *Id.* Notably, "77% of the

---

[10] The Department also considered, but rejected, allowing those who had undergone "a full sex reassignment surgery" to serve. Report 31. That measure, however, would be "at odds with current medical practice, which allows for a wide range of individualized treatment" for gender dysphoria. *Id.* It also would have little practical effect, as the "rates for genital surgery are exceedingly low." *Id.* And in any event, it would not address concerns about "the inconclusive scientific evidence that transition-related treatment restores persons with gender dysphoria to full mental health." *Id.* at 41.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 22
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

424 Service member treatment plans available for review"—*i.e.*, approximately 327 plans—"include requests for transition-related surgery." *Id.*

In light of the military's general interest in maximizing efficiency through minimizing costs, the Department decided that its disproportionate expenditures on accommodating gender transition could be better devoted elsewhere. *See id.* at 3, 41. Such a conclusion is not to be second-guessed. Even when alleged constitutional rights are involved, judgments by the political branches as to whether a benefit "consumes the resources of the military to a degree … beyond what is warranted" are entitled to significant deference. *Middendorf v. Henry*, 425 U.S. 25, 45 (1976).

\*      \*      \*

Based on these concerns, the Department made a "military judgment" that no longer providing a general accommodation for gender transition was "a necessary departure from the Carter policy." Report 32. While it was "well aware that military leadership from the prior administration, along with RAND, reached a different judgment," the Department's latest review had revealed that "the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed." *Id.* at 44. In fact, even RAND "concluded that allowing gender transition would impede readiness, limit deployability, and burden the military with additional costs," but dismissed "such harms [as] negligible in light of the small size of the transgender population." *Id.* But the Department was "not convinced that these risks could be responsibly dismissed or that even negligible harms" (at the macro level) "should be incurred given [its] grave responsibility." *Id.* It therefore "weighed the risks associated with maintaining the Carter policy against the costs of adopting a new policy that was less risk-favoring," and concluded that the "balances struck" by the new policy "provide the best solution currently available." *Id.* That careful cost-benefit analysis by the military survives deferential review.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 23
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

### 3.    The new policy is consistent with the Court's prior reasoning

The new policy also addresses all of the concerns underlying the Court's preliminary injunction.  To start, this Court declined to apply a deferential form of review at that stage due to its belief that the President's directives were "'contradicted by the only military judgment available at the time.'"  Op. 19.  That is obviously not true with respect to the new policy.  To be sure, the former officials responsible for the Carter policy may object to the Department's current approach, but, as *Goldman* and *Rostker* illustrate, such disagreement does not alter the deferential analysis required.  Indeed, this Court noted that it would not fault Defendants "'for choosing between two alternatives based on competing evidence,'" Op. 19, which is what occurred here.

Likewise, the reason why this Court found the 2017 Memorandum would likely fail intermediate scrutiny—its belief that the reasons for the 2017 Memorandum were "unsupported by the proffered evidence"—is no longer present.  Op. 19.  The bases for the new policy are rooted in extensive studies, *see, e.g.*, Report 19–27; experience under the Carter policy, *see, e.g.*, *id.* at 8, 34, 37, 41; and the considered professional judgment of military officials, *see, e.g.*, *id.* at 4, 18, 32, 41, 44.  Thus, even if an ordinary form of intermediate scrutiny applied, the new policy would survive it.

## II. PLAINTIFFS HAVE NOT SATISFIED THE EQUITABLE FACTORS

Even if Plaintiffs could show a live controversy in which they were likely to prevail, the preliminary injunction would have to be dissolved given their failure to meet any of the equitable factors needed for an order barring adoption of the new policy.

To start, Plaintiffs have not shown that they would suffer any irreparable injury under the new policy.  Indeed, they have not even proven that they would have standing to press a challenge to this policy, and it is clear that many of them would not.  At the outset, the four individual Plaintiffs who are currently serving—Jaquice Tate, John Does 1 and 2, and Jane Doe—would qualify for the new policy's exception for service members who relied on the Carter policy and thus could continue serving in their

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 24
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

preferred gender.  *See* Op. 7–8; Report 43.  Accordingly, these Plaintiffs will not sustain any injury under the new policy, let alone an irreparable one.  As for the four remaining Plaintiffs—three individuals who wish to join the military and an organization to which they belong—Defendants respectfully maintain for preservation purposes that they cannot establish standing to challenge or irreparable injury from the new policy for the same reasons they failed to meet these requirements with respect to the 2017 Memorandum.

Nor have Plaintiffs established that the balance of the equities or the public interest favors an injunction against the new policy.  In contrast to the absence of any irreparable harm associated with dissolving the preliminary injunction, such an order will force the Defense Department to adhere to a policy that it has concluded poses "substantial risks" and threatens to "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality."  Mattis Memo 2; *see also, e.g.*, Report 32–35, 41, 44.  These "specific, predictive judgments" from "senior" military officials—including the Secretary of Defense himself—"about how the preliminary injunction would reduce the effectiveness" of the military merit significant deference.  *Winter*, 555 U.S. at 27.  After all, the military is not "required to wait until the injunction actually results in an inability" to effectively prepare "for the national defense before seeking its dissolution."  *Id.* at 31 (internal quotation marks, brackets, and ellipsis omitted).

## CONCLUSION

This Court should dissolve the preliminary injunction issued on December 22, 2017.  In light of the Department of Defense's judgment that maintaining the Carter policy poses substantial risks to military readiness, Defendants respectfully request a ruling on this motion as soon as possible and no later than May 23, 2018.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 25
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

1

2    Dated: March 23, 2018                    Respectfully submitted,

3
                                             CHAD A. READLER
4                                            Acting Assistant Attorney General
                                             Civil Division
5

6                                            BRETT A. SHUMATE
7                                            Deputy Assistant Attorney General

8                                            BRINTON LUCAS
9                                            Counsel to the Assistant
                                             Attorney General
10

11                                           JOHN R. GRIFFITHS
                                             Branch Director
12

13                                           ANTHONY J. COPPOLINO
                                             Deputy Director
14

15                                           */s/ Ryan Parker*
16                                           RYAN B. PARKER
                                             Senior Trial Counsel
17                                           ANDREW E. CARMICHAEL
                                             Trial Attorney
18                                           United States Department of Justice
19                                           Civil Division, Federal Programs Branch
                                             Telephone: (202) 514-4336
20                                           Email: ryan.parker@usdoj.gov

21
                                             *Counsel for Defendants*
22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 26
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

# **CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2018, I electronically filed the foregoing

Motion to Dissolve the Preliminary Injunction using the Court's CM/ECF system,

causing a notice of filing to be served upon all counsel of record.


Dated:        March 23, 2018                    */s/ Ryan Parker*

RYAN B. PARKER
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-4336
Email: ryan.parker@usdoj.gov

*Counsel for Defendants*

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 27
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

AIDEN STOCKMAN; NICOLAS
TALBOTT; TAMASYN REEVES;
JAQUICE TATE; JOHN DOES 1-2;
JANE DOE; and EQUALITY
CALIFORNIA,

                    Plaintiffs,

          v.


DONALD J. TRUMP, et al.


                    Defendants.

CASE NO. 5:17-CV-01799-JGB-KK

**[PROPOSED ORDER]
GRANTING DEFENDANTS'
MOTION TO DISSOLVE THE
PRELIMINARY INJUNCTION**

STATE OF CALIFORNIA,

                    Plaintiff-Intervenor,


          v.


DONALD J. TRUMP, et al.


                    Defendants.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 28
*Stockman, et al. v. Trump, et al.*, No. 5:17-cv-1799 (JGB)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

[PROPOSED] ORDER

Upon consideration of Defendants' Motion to Dissolve the Preliminary Injunction, the opposition, and reply thereto, it is hereby ORDERED that the Motion is GRANTED and that the Court's preliminary injunction entered on December 22, 2017 is hereby dissolved.


IT IS SO ORDERED

Dated:                                    _____

JESUS G. BERNAL
UNITED STATES DISTRICT JUDGE



Respectfully submitted by:

/s/ Ryan Parker
RYAN B. PARKER
Senior Trial Counsel
United States Department of Justice

*Counsel for Defendants*

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336