UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | EDCV 17-01799 JGB (KKx) | Date | September 18, 2018 |
| Title | *Aiden Stockman, et al. v. Donald J. Trump, et al.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   Order DENYING Defendants' Motion to Dissolve the Preliminary Injunction (Dkt. No. 82) (IN CHAMBERS)

On March 23, 2018, Defendants Donald J. Trump ("President Trump"), in his official capacity as President of the United States; James N. Mattis, in his official capacity as Secretary of Defense; Joseph F. Dunford, Jr., in his official capacity as Chairman of the Joint Chiefs of Staff; Richard V. Spencer, in his official capacity as Secretary of the Navy; Ryan D. McCarthy, in his official capacity as Acting Secretary of the Army; Heather A. Wilson, in her official capacity as Secretary of the Air Force; and Elaine C. Duke, in her official capacity as Acting Secretary of Homeland Security (collectively, "Defendants") filed a Motion to Dissolve the Preliminary Injunction. ("Motion," Dkt. No. 82.) Plaintiffs Aiden Stockman, Nicolas Talbott, Tamasyn Reeves, Jaquice Tate, John Doe 1, John Doe 2, Jane Doe, and Equality California (collectively, "Plaintiffs") filed an opposition on April 25, 2018. ("Opposition," Dkt. No. 98.) Defendants filed a reply on May 7, 2018. ("Reply," Dkt. No. 105). The Court held a hearing on this matter on July 30, 2018. Upon consideration of the papers filed in support of and in opposition to this Motion, as well as the oral arguments presented by the parties, the Court DENIES Defendants' Motion.

## I.   BACKGROUND

### A.  Procedural History

On September 5, 2017, Plaintiffs filed a complaint against Defendants, asserting four causes of action: (1) Fifth Amendment equal protection; (2) Fifth Amendment due process;

(3) Fifth Amendment right to privacy; and (4) First Amendment retaliation for free speech and expression. ("Complaint," Dkt. No. 1 ¶¶ 49–77.) Plaintiffs seek declaratory relief. (Id.) Plaintiffs filed a Motion for Preliminary Injunction on October 2, 2017. ("MPI," Dkt. No. 15.) The Court granted Plaintiffs' MPI on December 22, 2017. ("December Order," Dkt. No. 79.)

**B. Factual History**

The parties do not dispute the basic facts in this case. In June 2016, after multiple years of data review, the Department of Defense ("DOD") announced it would implement a new policy which allowed transgender people to serve openly in the United States military ("June 2016 Policy"). (See generally Dkt. No. 28, Exh. C.) On July 26, 2017, President Trump changed course, and tweeted:

> After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail. Thank you.

("President Trump's Twitter Proclamation," Dkt. No. 28, Exh. F.)

On August 25, 2017, President Trump issued a memorandum ("2017 Presidential Memorandum") formalizing the policy he announced via Twitter. (Dkt. No. 28, Exh. G.) The 2017 Presidential Memorandum contained several operative prongs: (1) it indefinitely extended the prohibition preventing transgender individuals from entering the military (the "Accession Directive"); (2) it required the military to authorize the discharge of transgender service members (the "Retention Directive"); and (3) it largely halted the use of DOD or Department of Homeland Security ("DHS") resources to fund sex reassignment surgical procedures for current military members ("Sex Reassignment Surgery Directive") (collectively, "Directives"). (Id. at 47.) The DOD was to submit a plan implementing the 2017 Presidential Memorandum by February 2018. (Id.)

On September 14, 2017, Defendant Mattis, the current Secretary of Defense, issued an "Interim Guidance" which established the temporary DOD policy regarding transgender persons. DoD Interim Guidance on Military Service by Transgender Individuals (September 2017), available at https://defense.gov/Portals/1/Documents/PDFs/Military-Service-By-Transgender-Individuals-Interim-Guidance.pdf (last visited September 13, 2018). While the Interim Guidance was in effect, no current transgender service member could be discharged or denied reenlistment solely based on their transgender status. Id.

///
///
///

1. **Military Transgender Policy before July 2017**

In August 2014, the DOD removed references to mandatory exclusion based on gender and identity disorders from its physical disability policy. ("Declaration of Eric K. Fanning," Dkt. No. 22 ¶¶ 12–13.) Additionally, the DOD directed each branch of the armed forces to assess whether there remained any justification to prohibit service by openly transgender individuals. (Id. at 13.)

In July 2015, then-Secretary of Defense Ashton B. Carter created a group to begin comprehensively analyzing whether any justification remained which validated the ban on open service by transgender individuals. ("Declaration of Brad Carson," Dkt. No. 26 ¶¶ 8–9.) The working group created by Secretary Carter included the Armed Services, the Joint Chiefs of Staff, the service secretaries, and other specialists from throughout the DOD (the "Working Group"). (Id. ¶ 9.) As part of the review process, the Working Group analyzed evidence from a variety of sources, including scholarly materials and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders of units with transgender service members. (Id. ¶ 10.)

In addition, the Working Group commissioned the RAND Corporation, a nonprofit research institution that provides analysis to the military, to complete a comprehensive study on the impact of permitting transgender individuals to serve openly. (Id. ¶ 11.) The 113-page study, "Assessing the Implications of Allowing Transgender Personnel to Serve Openly" (the "RAND Report," Dkt. No. 26, Exh. B), examined factors such as the health care costs and readiness implications of allowing open service by transgender persons. The RAND Report also analyzed the other 18 foreign militaries which permit military service by transgender individuals, focusing on Australia, Canada, Israel, and the United Kingdom—the four countries "with the most well-developed and publicly available policies on transgender military personnel." (RAND Report at 23.) This comparative analysis found no evidence that allowing open service by transgender persons would negatively affect operational effectiveness, readiness, or unit cohesion. (Id. at 24.) Moreover, the RAND Report concluded healthcare costs for transgender service members would "have little impact on and represents an exceedingly small proportion of [the DOD's] overall health care expenditures." (Id. at 22–23.) Specifically, the RAND Report found health care costs would increase "by between $2.4 million and $8.4 million annually." (Id. at 22.) By contrast, the overall healthcare cost of those serving in the active component of the military is approximately $6 billion annually, while the overall healthcare cost for the DOD is $49.3 billion annually. (Id. at 22–23.) Furthermore, the RAND Report noted discharging transgender service members, "[a]s was the case in enforcing the policy on homosexual conduct, [] can involve costly administrative processes and result in the discharge of personnel with valuable skills who are otherwise qualified." (Id. at 77.) At the conclusion of its analysis, the Working Group "did not identify any basis for a blanket prohibition on open military service of transgender people. Likewise, no one suggested . . . that a bar on military service by transgender persons was necessary for any reason, including readiness or unit cohesion." (Declaration of Eric K. Fanning ¶ 27.)

Based on the results of this review process, on June 30, 2016, Secretary Carter issued a Directive-type Memorandum announcing transgender Americans may serve openly and without fear of being discharged based solely on that status. ("DTM 16-005," Dkt. No. 22, Exh. C.) Secretary Carter stated:

> These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability and retention, is consistent with military readiness and with strength through diversity.

(Id. at 135.)

Some of the highest ranking military officials in the country concurred with this assessment. (See generally Declaration of Eric K. Fanning; "Declaration of Michael Mullen," Dkt. No. 21; "Declaration of Raymond E. Mabus," Dkt. No. 23; "Declaration of Deborah L. James," Dkt. No. 24.) According to the directive, transgender individuals would be permitted to enlist in the military and serve openly beginning on July 1, 2017. (DTM 16-005, at 137.) This date was later postponed to January 1, 2018. (See Dkt. No. 28, Exh. E.) The DOD also issued handbooks, regulations, and memoranda which instructed military commanders how to implement the new policies, set forth guidance related to medical treatment provisions, and expressly prohibited discrimination on the basis of gender identity. (See "Transgender Service in the U.S. Military," Dkt. No. 22, Exh. 6.)

The former military leaders among the Working Group, such as former Secretary of the Army Eric K. Fanning, former Chairman of the Joint Chiefs of Staff Admiral Michael Mullen, former Secretary of the Navy Raymond E. Maubus, and former Secretary of the Air Force Deborah L. James, have all explicitly drawn parallels between allowing open service by transgender persons and permitting open service by gay and lesbian persons. (See Declaration of Eric K. Fanning ¶¶ 10–16; Declaration of Michael Mullen ¶¶ 9–15; Declaration of Raymond E. Mabus ¶¶ 19, 24; Declaration of Deborah L. James ¶ 44.) These leaders contend that many of the same concerns relating to open transgender service were vocalized, and eventually allayed, in the context of ending "Don't Ask Don't Tell." (See Declaration of Eric K. Fanning ¶¶ 10–16; Declaration of Admiral Michael Mullen ¶¶ 9–15; Declaration of Raymond E. Mabus ¶¶ 19, 24; Declaration of Deborah L. James ¶ 44.)

2. **Military Transgender Policy after July 2017**

On July 26, 2017, President Trump changed course, announcing via Twitter that transgender individuals would not be permitted to serve in the military. (President Trump's Twitter Proclamation.) One month later, his 2017 Presidential Memorandum promulgated the Accession Directive, Retention Directive, and Sex Reassignment Surgery Directive. (2017 Presidential Memorandum.) President Trump claimed the Obama Administration had "dismantled the [DOD and DHS's] established framework by permitting transgender individuals

to serve openly in the military." (Id.) Additionally, he stated the Obama Administration failed to identify a sufficient basis to conclude ending the longstanding policy against open transgender service "would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." (Id.)

The military reception to President Trump's policy change was somewhat critical. Current Chairman of the Joint Chiefs of Staff Joseph Dunford disagreed with the decision to reinstate the transgender ban, stating he "believe[s] that any individual who meets the physical and mental standards . . . should be afforded the opportunity to continue to serve." (Dkt. No. 28, Exh. I.) He also previously told lawmakers transgender troops have served the military honorably, and he would continue to abide by this sentiment for as long as he holds his position. (Id.) Additionally, it is not clear whether the nation's top military leaders were consulted about this policy change prior to President Trump's Twitter Proclamation. (See Dkt. No. 28, Exh. M.) Moreover, after the promulgation of President Trump's tweets, 56 retired generals and admirals signed a declaration stating a ban on open service by transgender persons would degrade military readiness. (Dkt. No. 28, Exh. O.)

The Accession Directive would have extended the policy prohibiting open accession into the military beyond January 1, 2018. The Retention and Sex Assignment Surgery Directives were to take effect on March 23, 2018. (Id.) However, a series of judicial orders, including the Court's December Order, preliminarily enjoined the government from enacting these policies. See Doe 1 v. Trump, 275 F. Supp. 3d 167 (D.D.C. 2017); Stone v. Trump, 280 F. Supp. 3d 753 (D. Md. 2017); Karnoski v. Trump, No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017). To date, these injunctions remain in place.

### 3. The Mattis Memorandum

On February 22, 2018, Defendant Mattis promulgated a memorandum which recommended that President Trump revoke his prior 2017 Presidential Memorandum in order for the military to implement a new policy. ("Mattis Memorandum," Dkt. No. 83-1.) Defendant Mattis states he "created a Panel of Experts [("the Panel")] comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders and directed them to consider [the issue of transgender military service] and develop policy proposals based on data, as well as their professional military judgment . . . ." (Id. at 1.) The Panel "met with . . . transgender Service members" and "reviewed available information on gender dysphoria . . . and the effects of gender dysphoria on military effectiveness, unit cohesion, and resources." (Id. at 1–2.) Based on the work of the Panel, the DOD concluded there are "substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria, and require, or have already undertaken, a course of treatment to change their gender." (Id. at 2.) Additionally, exempting those individuals could "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." (Id.) The Mattis Memorandum also criticized the RAND Report, noting it "contained significant shortcomings," "referred to limited and heavily caveated data to support its conclusions, glossed over the impacts of healthcare costs, readiness, and unit cohesion, and

erroneously relied on the selective experiences of foreign militaries . . . ." (Id.) Defendant Mattis concluded the DOD should adopt the following policies:

> Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) Service members diagnosed with gender dysphoria after entering into service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and received medically necessary treatment for gender dysphoria.
>
> Transgender persons who require or have undergone gender transition are disqualified from military service.
>
> Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex.

(Id. at 2–3.) Defendant Mattis also sent President Trump a report which detailed why, in the opinion of the DOD, this new policy would be necessary to further the interests of the military. ("DOD Report," Dkt. No. 83-2.) President Trump issued a new memorandum on March 23, 2018, which revoked the 2017 Presidential Memorandum and allowed the DOD to implement its preferred policy. ("2018 Presidential Memorandum," Dkt. No. 83-3.) Given these developments, Defendants ask the Court to dissolve the preliminary injunction issued in the Court's December Order. (Motion at 2.)

   4. **Karnoski v. Trump**

On April 13, 2018, the Honorable Marsha J. Pechman issued an order which partially granted plaintiffs' motion for summary judgment in a similar case. Karnoski v. Trump, No. C17-1297-MJP, 2018 WL 1784464 (W.D. Wash. Apr. 13, 2018). In Karnoski, the defendants made several of the same arguments advanced here, such as mootness, standing, and level of deference to the DOD Report. Id. Judge Pechman held that discrimination against transgender persons should be subject to strict scrutiny. Id. at *10–11. However, the court declined to determine the level of deference due to the DOD Report. Id. at 11–13. Additionally, the court held that the preliminary injunction already issued should remain in effect, and struck the defendants' motion to dissolve the preliminary injunction. Id. at *14. The defendants appealed this decision, and that appeal is currently pending before the Ninth Circuit. The Ninth Circuit recently ruled that the preliminary injunction should remain in place during the pendency of the appeal in order to preserve the status quo. (Karnoski, et al. v. Trump, et al., No. 18-35347, Dkt. No. 90.) Thus, under the current legal landscape, the Ninth Circuit has begun the process of reviewing the Karnoski decision, including the order upholding the preliminary injunction and striking

defendants' motion to dissolve, and has maintained the preliminary injunction while Karnoski is under review.

## II.  LEGAL STANDARD

The basic function of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits.  Univ. of Texas v. Camenisch, 451 U.S. 390, 392 (1981).  To obtain a preliminary injunction, a party must either show (1) a combination of probable success and the possibility of irreparable harm, or (2) the balance of hardship tips in its favor and the party has raised serious questions.  Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (holding that, to obtain a preliminary injunction, a movant must show: (1) likelihood of success on the merits; (2) irreparable harm; (3) balance of equities tips in his favor; and (4) an injunction is in the public interest).   A district court has discretion to dissolve or to modify a preliminary injunction if factual or legal circumstances have changed since the issuance of the injunction.  See Mariscal-Sandoval v. Ashcroft, 370 F.3d 851, 859 (9th Cir. 2004).  "A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction."  Sharp v. Weston, 233 F.3d 1166, 1170 (9th Cir. 2000).

## III.  DISCUSSION

**A. Mootness**

Defendants contend Plaintiffs' challenge is now moot because any dispute over the new policy "presents a substantially different controversy" than Plaintiffs' challenge to the 2017 Presidential Memorandum.  (Motion at 8.)  Defendants state the appropriate question is whether the "challenged conduct continues" or whether the policy "has been sufficiently altered as to present a substantially different controversy from the one [previously] decided."  (Id. (quoting Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla., 508 U.S. 656, 662 n.3 (1993)).)  Defendants argue Plaintiffs' original challenge was premised on the assumption that President Trump had ordered a categorical ban excluding transgender individuals for reasons not supported by prevalent military judgment. (Motion at 8.)  The new policy, Defendants argue, contains several exceptions which would allow "some" transgender individuals to serve and is the product of "independent military judgment following extensive study."  (Id.)  Defendants maintain this new policy turns "on the basis of a medical condition and its associated treatment," and does not implement the 2017 Presidential Memorandum.  (Reply at 2.)  These arguments fail.

The enactment of a new policy does not moot a challenge to a previous one where, as here, the new one differs little from the first.  In City of Jacksonville, the city enacted an ordinance which required it to set aside a certain percentage of its money each year for "Minority Business Enterprises" ("MBE's").  508 U.S. at 658.  The plaintiff challenged this policy, and a district court entered a preliminary injunction against the city.  Id. at 659.  The city later repealed

its MBE ordinance and replaced it with a new ordinance which had three principal differences: (1) it now applied just to women and black people, not to women and other minority groups; (2) the percentage of money set aside for these businesses became a percentage range rather than a set percentage figure; and (3) there were now five alternative methods for achieving the city's participation goals. Id. at 661. In its discussion on mootness, the Supreme Court noted:

> There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so. *Nor does it matter that the new ordinance differs in certain respects from the old one.* City of Mesquite [,455 U.S. 283 (1982),] does not stand for the proposition that it is only the possibility that the selfsame statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect. The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to black- and female-owned contractors—and, in particular, insofar as its "Sheltered Market Plan" is a "set aside" by another name—*it disadvantages them in the same fundamental way*.

Id. at 669 (emphasis added). Here, President Trump stated the essence of the first policy in his Twitter proclamation: transgender people will no longer be able to serve in the U.S. military. (President Trump's Twitter Proclamation.) In keeping with that proclamation, the first policy banned the accession and retention of transgender individuals. (2017 Presidential Memorandum). The policies described in the 2017 Presidential Memorandum and the 2018 Presidential Memorandum are fundamentally the same. Indeed, President Trump specifically announced this review process along with the first policy. (2017 Presidential Memorandum). This new policy specifically bans transgender individuals from serving in the military in a manner consistent with their gender identity. (Mattis Memorandum.) It excludes anyone who requires or has undergone gender transition, and requires proof that a person has been stable in their birth sex for the last thirty-six months. (Id.) In sum, it disadvantages transgender service members "in the same fundamental way." City of Johnsonville, 508 U.S. at 669.

Defendants contend this policy has exceptions which will allow some transgender individuals to serve in the military (Motion at 5–6), yet these very exceptions expose the policy as being substantially the same as the first. To start, all transgender individuals "who require or have undergone gender transition are disqualified from military service." (Mattis Memorandum at 2–3.) Yet, transgender individuals "without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex." (Mattis Memorandum at 2–3.) Additionally, people *with* gender dysphoria who do not require or have not undergone gender transition are exempted from the policy as long as they are "willing and able to adhere to all standards associated with their biological sex." (Id.) Taken together, it is clear that a diagnosis of gender dysphoria is neither necessary nor sufficient to be excluded from the military under this new policy. What is both necessary and sufficient to be excluded, irrespective of a diagnosis of gender dysphoria, is a person serving consistent with their

transgender identity. In short, the policy aims to eliminate a person's *trans*ness, and nothing else. See Karnoski, 2018 WL 1784464, at *12 ("Requiring transgender people to serve in their biological sex does not constitute open service in any meaningful way, and cannot reasonably be considered an exception to the Ban. Rather, it would force transgender service members to suppress the very characteristics that defines them as transgender in the first place.") (internal quotation marks omitted); see also Christian Legal Soc'y v. Martinez, 561 U.S. 661, 689 (2010) (rejecting purported distinction between targeting same-sex intimate conduct and discriminating against gay people).

For the purpose of mootness, the controversy presented by the new policy is substantively the same as the controversy presented by the old policy. Transgender individuals will be disadvantaged "in the same fundamental way." City of Jacksonville, 508 U.S. at 669. Defendants have appropriately informed the Court that it must decide whether the challenged conduct continues. (Motion at 8.) It clearly does.

**B. Constitutional Review**

    **1. Military Deference and Rational Basis Review**

Defendants argue this new policy triggers rational basis review because it "draws lines on the basis of a medical condition (gender dysphoria) and an associated treatment (gender transition), not on transgender status." (Motion at 10.) This characterization, however, does not match reality. As noted above, a diagnosis of gender dysphoria is neither necessary nor sufficient for a person to be excluded from the military under this new policy. Yet the discussion does not end here, as Defendants also argue they are entitled to deference becasue the new policy is a military decision. (Id. (citing, e.g., Rostker v. Goldberg, 453 U.S. 57, 67 (1981) ("Congress is [not] free to disregard the Constitution when it acts in the area of military affairs . . . but the tests and limitations to be applied may differ because of the military context"); Goldman v. Weinberger, 475 U.S. 503, 507 (1986) ("Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society.")).) This deferential review is most appropriate when the military acts with measure, and not "unthinkingly or reflexively." Rostker, 453 U.S. at 72.

In the Court's December Order, it noted "the only serious study and evaluation concerning the effect of transgender people in the armed forces led the military leaders to resoundingly conclude there was no justification for the ban." (December Order at 18.) Following the promulgation of this Order, Defendants conducted their own study and have submitted their own report. (DOD Report; Mattis Memorandum.) The DOD has concluded that "accommodating gender transition would create unacceptable risks to military readiness; undermine good order, discipline, and unit cohesion; and create disproportionate costs." (Motion at 15 (citing Mattis Memorandum at 2).) However, there are several reasons why the DOD Report and the new policy are not entitled to military deference.

First, the new policy and DOD Report represent after-the-fact justifications for the military ban on transgender service members. The relevant timeline is as follows: On July 26, 2017, President Trump announced that "*After consultation with my Generals and military experts*, please be advised that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military." (President Trump's Twitter Proclamation (emphasis added).) With this statement, President Trump made two things clear: (1) he had already consulted the relevant military experts who presumably provided information on how to proceed; and (2) the decision had been made to ban transgender individuals from serving in the military. The Interim Guidance and 2017 Presidential Memorandum formalized the policy announced in the initial proclamation. Following a series of defeats in the courts, including specific rebukes for not having an adequate military record to justify the ban, the DOD now, in 2018, has conducted a study which attempts to rationalize a decision made on July 26, 2017—a decision which, purportedly, already followed such a consultation with military experts.

As noted above, the new policy is essentially the same as the first policy, which distinguishes this case from Trump v. Hawaii, 138 S. Ct. 2392 (June 26, 2018). There, the Supreme Court upheld President Trump's authority to restrict entry of nationals from seven countries "whose systems for managing and sharing information about their nationals the President deemed inadequate." Id. at 2404. The immigration policy at issue underwent two substantive revisions before being squarely presented to the Supreme Court. Id. at 2403–04. In that case, there were serious allegations of religious animus levied at President Trump due to pronouncements, on multiple occasions, that he sought to implement a "Muslim ban." Id. at 2435–38 (Sotomayor, J. dissenting) (noting that President Trump, as a candidate, was "calling for a total and complete shutdown of Muslims entering the United States," which progressed to a characterization of his policy as "a suspension of immigration from countries where there's a proven history of terrorism") (internal quotation marks omitted). Notably, the final immigration policy before the Supreme Court did not concern a total Muslim ban as originally called for by then-Candidate Trump. Instead, the policy before the Supreme Court concerned seven specific countries, only five of which contained Muslim-majority populations. Id. at 2421. This, then, would cover only 8% of the world's Muslim population. Id. Additionally, three Muslim-majority countries were specifically removed from an earlier iteration of this immigration policy. Id. at 2422.

This case is distinguishable from Hawaii. Here, Trump specifically announced that he was banning transgender people from the military. This second iteration of the policy continues to do exactly that. The evolving limiting principles present in the Hawaii immigration policy revisions are absent here. Additionally, then-Candidate Trump specifically called for a Muslim ban at some point in the future. Here, President Trump announced the United States Government will not accept or allow transgender individuals, a decision which had followed military consultation. This language directly implies the necessary study has already concluded. For these reasons, Hawaii is inapposite to the present discussion.

Perhaps conceding the DOD Report represents an after-the-fact justification for the original transgender ban, Defendants argue Schlesinger v. Ballard, 419 U.S. 498 (1975), offers an

example of when the Supreme Court accepted such a justification. (Motion at 11.) There, the Court upheld a statutory scheme under which male naval officers who failed to be promoted were subject to a shorter mandatory discharge schedule than female officers under the same circumstances. Schlesinger, 419 U.S. at 499–505. In discussing the rationale behind this difference in treatment, the Supreme Court noted that "Congress may thus quite rationally have believed that women line officers had less opportunity for promotion than did their male counterparts . . . ." Id. at 577. Defendants note that the dissent criticized the majority for "conjur[ing] up a legislative purpose." Id. at 500 (Brennan, J. dissenting). Plaintiffs contend the Supreme Court looked to whether a sufficient justification for the law existed at the time of its enactment. (Opposition at 12.) Upon review of this case, it is unclear whether the language Defendants quote represents an acceptance of an after-the-fact justification. However, language in other Supreme Court cases is not so ambiguous. See United States v. Virginia, 518 U.S. 515, 531 (1996) (noting that the government must proffer a justification which is "exceedingly persuasive," "genuine," "not hypothesized," not "invented *post hoc* in response to litigation," and "must not rely on overbroad generalizations"); Sessions v. Morales-Santana, 137 S. Ct. 1678, 1696 (2017) ("It will not do to hypothesize or invent governmental purposes for gender classifications *post hoc* in response to litigation.") (internal quotations omitted).

For these reasons, the Court finds Defendants are not entitled to rational-basis review pursuant to the doctrine of military deference. Although Karnoski explicitly found that transgender discrimination should be subject to strict scrutiny, this Court has already found that intermediate scrutiny is appropriate. (December Order at 19 (citing Schwenk v. Hartford, 204 F.3d 1187, 1201–02 (9th Cir. 2000) ("both [the Gender Motivated Violence Act and Title VII] prohibit discrimination based on gender as well as sex. Indeed, for the purposes of these two acts, the terms 'sex' and 'gender' have become interchangeable." Additionally, sex-based discrimination can include discrimination based on someone failing "to conform to socially-constructed gender expectations."); Norsworthy v. Beard, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); Olive v. Harrington, No. 115CV01276BAMPC, 2016 WL 4899177, at *5 (E.D. Cal. Sept. 14, 2016)).)

2. **Intermediate Scrutiny**

"A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." Sharp v. Weston, 233 F.3d 1166, 1170 (9th Cir. 2000). Under intermediate scrutiny, Defendants must proffer a justification for this new policy which is substantially related to an exceedingly persuasive justification. Virginia, 518 U.S. at 533. Defendants state the transgender ban advances three separate interests: (1) promoting military readiness based on deployability; (2) promoting unit cohesion based on concerns about maintaining sex-based standards; and (3) lowering costs. (Motion at 14–23.) The Court previously considered and rejected Defendants' third argument. (December Order at 19 ("[Defendants'] reliance on cost is unavailing, as precedent shows the ease of cost and administration cannot not survive intermediate scrutiny even if it is significant. Frontiero v. Richardson, 411 U.S. 677, 688–91 (1973)").) Accordingly, the Court will focus on Defendants' first two arguments.

### i. Military Readiness

Notably, Defendants continue to assert the operative question is whether a person suffers from gender dysphoria. (Motion at 15.) However, as discussed above, this focus misses the mark, as a diagnosis of gender dysphoria is neither necessary nor sufficient to be excluded from the military under this policy. Consequently, the Court is not persuaded by Defendants' fears of increased mental instability for those who suffer from gender dysphoria. (Id. at 14–16.) People with gender dysphoria are explicitly exempted from this new policy as long as they do not present as transgender. (Mattis Memorandum at 2–3.) Likewise, Defendants' concern that those who undergo gender transition surgery could negatively affect deployability is not substantially related to the actual effect of this policy. Defendants state the majority of current transgender service member treatment plans include a request for gender transition surgery. (Motion at 22–23.) However, the Mattis Memorandum bans all individuals who present as transgender from the military, not only those who have undergone gender transition surgery. (Mattis Memorandum at 2–3.) The decision to ban the accession of people who have undergone gender transition surgery is thus one part of the whole policy, and the purported rationalization for this decision, though contested by Plaintiffs, cannot be used to justify the whole policy even if assumed to be valid. In sum, the concerns voiced by Defendants are not substantially related to the effect of the policy, nor are these concerns exceedingly persuasive.

### ii. Unit Cohesion

Defendants first argue that any transgender service member accommodation policy which "does not require full sex-reassignment surgery could 'erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline.'" (Motion at 18 (quoting DOD Report at 37).) Defendants premise their argument by stating the only feasible way for transgender service members to serve in the military would involve requiring them to submit to sex reassignment surgery. (Id. at 18–19.) Defendants then state that allowing service members "who have developed . . . the anatomy of their identified gender to use the facilities of either their identified gender or biological sex would invade the expectations of privacy of the non-transgender service members who share those quarters." (Id. at 19 (citing DOD Report at 37) (internal quotations omitted).) Thus, Defendants argue the military faces two choices: create separate facilities for transgender service members, which is deemed "logistically impracticable," or be presented with "irreconcilable privacy demands." (Id. (citing DOD Report at 37).) Additionally, Defendants cite to a specific instance where a commanding officer faced dueling equal opportunity complaints—one from a transgender woman with male sex organs who wanted to use the female shower facilities, and one from the other female service members in the unit. (Id.)

In response, Plaintiffs cite to a litany of non-binding cases to support their contention that Courts across the country have held that allowing transgender individuals to live in accord with their identity does not threaten the privacy or safety interests of others. (Opposition at 7 (citing, e.g., Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034,

1046–47 (7th Cir. 2017); M.A.B. v. Bd. of Educ. of Talbot Cty., 286 F. Supp. 3d 704, 724–26 (D. Md. 2018)).) Defendants note that none of Plaintiffs' cited cases concern the military context. (Reply at 10.)

   The military has often used concerns regarding unit cohesion to contest permitting open service by individuals in minority groups. In Log Cabin Republicans v. U.S., the court ruled that that the military's "don't ask, don't tell" policy ("DADT"), which banned open service by gay persons, violated the First Amendment of the Constitution. 716 F. Supp. 2d 884 (C.D. Cal. 2010).[1] The court made this determination despite the government's argument that DADT "is necessary to protect unit cohesion and heterosexual service members' privacy." Id. at 920. In finding DADT "is not necessary to protect the privacy of service [] members," id. at 923, the court relied upon testimony given by various officers in the military who attested there was no nexus between DADT and a loss of unit cohesion. Id. at 921–22; see also Witt v. U.S. Dep't of Air Force, 739 F. Supp. 2d 1308, 1315 (W.D. Wash. 2010) (finding that open gay service would not affect unit cohesion, and noting that the "men and women of the United States military have over the years demonstrated the ability to accept diverse peoples into their ranks and to treat them with the respect necessary to accomplish the mission, whatever that mission might be. That ability has persistently allowed the armed forces of the United States to be the most professional, dedicated and effective military in the world."). Notably, these concerns were also present in "past efforts to stop the integration of blacks and women into the armed forces; efforts bolstered by arguments that history and common sense proved wrong." Witt v. U.S. Dep't of Air Force, 444 F. Supp. 2d 1138, 1143 (W.D. Wash. 2006), aff'd in part, rev'd in part sub nom. Witt v. Dep't of Air Force, 527 F.3d 806 (9th Cir. 2008); see also Dahl v. Sec'y U.S. Navy, 830 F. Supp. 1319 (E.D. Cal. 1993) (citing a DOD report as stating "Most of the issues raised regarding the effect that admitting declared homosexuals would have on unit cohesion . . . are also reminiscent of the arguments advanced against the 1948 order to desegregate military establishments, and later the arguments that sought to minimize the role of women Armed Forces. Those who resist changing the traditional policies support their position with statements of the negative effects on discipline, morale, and other abstract values of military life.").

   In the history of military service in this country, "the loss of unit cohesion" has been consistently weaponized against open service by a new minority group. Yet, at every turn, this assertion has been overcome by the military's steadfast ability to integrate these individuals into effective members of our armed forces. As with blacks, women, and gays, so now with transgender persons. The military has repeatedly proven its capacity to adapt and grow stronger specifically by the inclusion of these individuals. Therefore, the government cannot use "the loss of unit cohesion" as an excuse to prevent an otherwise qualified class of discrete and insular minorities from joining the armed forces. The Court finds this justification of the transgender ban is not exceedingly persuasive and cannot survive intermediate scrutiny.

---

[1] A subsequent opinion vacated this decision on the grounds that the original case had become moot due to Congress voluntarily enacting the Don't Ask, Don't Tell Repeal Act of 2010. Log Cabin Republicans v. U.S., 658 F.3d 1162 (9th Cir. 2011).

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion to Dissolve the Preliminary Injunction.

**IT IS SO ORDERED.**